FILED
2018 JUL 10  AM 10:
U.S. BANKRUPTCY COURT
DISTRICT OF MARYLAND
GREENBELT

FILED
2018 JUL 10  AM 10:
U.S. BANKRUPTCY COURT
DISTRICT OF MARYLAND
GREENBELT

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

IN RE:

BARBARA ANN KELLY

      Debtor

Case No. 18-13244-WIL
Chapter 13

_____/

## GREGORY B. MYERS' OPPOSITION TO CHAPTER 13 TRUSTEE'S MOTION TO DISMISS FOR FAILURE TO QUALIFY FOR RELIEF UNDER CHAPTER 13

Gregory B. Myers ("Myers" or "Movant"), *pro se*, as a party in interest herein, files *Gregory B. Myers' Opposition to Chapter 13 Trustee's Motion to Dismiss for Failure to Qualify for Relief Under Chapter 13* (the "Opposition"), and states as follows:

1. On March 13, 2018, Kelly filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland, Case No. 18-13244-WIL ("Kelly's Chapter 13 Case").

2. On April 18, 2018, Nancy L. Spencer Grigsby, Chapter 13 Trustee (the "Chapter 13 Trustee"), filed a *Motion to Dismiss for Failure to Qualify for Relief Under Chapter 13 and Notice of Opportunity for a Hearing* (the "Motion to Dismiss") (Doc. 31).

3. Pursuant to 11 U.S.C. § 109(e), only noncontingent, liquidated debts are considered in computing the total amount of debts for eligibility purposes.

4. As of the Petition Date, Kelly has noncontingent, liquidated *unsecured* debts totaling less than $394,725.00, the jurisdictional limit for unsecured creditors as set forth in 11 U.S.C. § 109(e).

5.      As of the Petition Date, Kelly has noncontingent, liquidated *secured* debts totaling

less than $1,184,200.00, the jurisdictional limit for secured creditors as set forth in 11 U.S.C. §

109(e).

6.      A bona fide dispute may render a debt unliquidated if it prevents the ready

determination of the amount of a claim. *In re Lambert*, 43 B.R. 913 (Bankr. D. Utah 1984) ("a

debt cannot be certain to the extent there is a bona fide dispute as to its amount or the underlying

liability of the debtor to pay the debt."). The Fourth Circuit in *Platinum Fin. Servs. v. Byrd (In re

Byrd)*, 357 F.3d 433 (4th Cir. 2004) xplained, "a bona fide dispute requires 'an objective basis for

either a factual or a legal dispute as to the validity of [the] debt.'" *Id.* at 437 (citations omitted).

7.      Each of the following claims filed in Kelly's Chapter 13 Case are currently pending

for resolution in various other courts of law, which official proceedings[1] objectively demonstrate

that there is either a factual or a legal dispute as to the validity of the debt.  Accordingly, said

claims are both *disputed* and *unliquidated* and cannot be included in the jurisdictional limits set

forth in 11 U.S.C. § 109(e).

### Claim 1-1

8.      "U.S. Bank National Association, as Trustee for Credit Suisse First Boston

Mortgage Acceptance Corp., CSFB Mortgage-Backed Pass-Through Certificates, Series 2005-11"

("US Bank") filed Claim 1-1. US Bank's Claim 1-1 is in the amount of $3,219,793.50 and is

---

[1] "[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), cert. denied, 565 U.S. 825 (2011); *Philips v. Pitt Cnty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Pursuant to Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Of import here, in *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n. 1 (4th Cir. 1990), the Court recognized that a district court may "properly take judicial notice of its own records."

*purportedly* secured against real property located at 700 Gulf Shore Blvd. North, Naples, Florida 34102 (the "Naples Property"). The following timeline of events reveals US Bank's Claim 1-1 is disputed and unliquidated:

- On June 30, 2005, Kelly obtained a loan from AmSouth Bank in the amount of $1,840,000.00 (the "Loan") in connection with the purchase of the Naples Property. The Loan comprised a "Fixed Rate Note" (the "Fixed Rate Note") and "Mortgage" (the "Mortgage") payable to AmSouth Bank.

- On April 9, 2015, Regions Bank (as successor by merger to AmSouth Bank), Kelly, and Myers entered into a "Settlement Agreement." The Settlement Agreement, *inter alia*, states:

    Limited Release. Except as otherwise set forth herein, this Agreement constitutes a **full and final mutual release** applying to all known and unknown, anticipated and unanticipated, suspected or unsuspected, claims, damages, losses, costs or fees as between Regions (as well as its affiliates, agents, **assigns**, and owners) and Myers and/or Kelly (as well as their affiliates, agents, and assigns) arising out of the involvement, dealings, settlements, and the beginning of time and up through the date of this **loans between Regions and Myers and/or Kelly from Agreement**.

    Full Authority. Each of the Parties to this Agreement represents and warrants that the said Party has the full rights, powers, capacity and authority to enter into and perform that Party's respective obligations hereunder, and that such obligation shall be binding upon such party without the requirement. approval. or consent of any other person or entity in connection herewith. **Each Party also represents and warrants that it has not pledged or assigned to any other parties the claims and rights being resolved herein**.

    Full and Complete Agreement. This Agreement memorializes the agreement made on this date and

> sets forth a complete and final agreement and
> understanding of the Parties, and there have been no
> verbal or written representations, promises or
> understandings between the Parties with respect to
> this Agreement except as expressly contained herein.
> No modification or waiver of any of the provisions
> shall be valid unless made in writing and signed by
> the Party against which such modification or waiver
> is sought to be enforced.

(Emphasis added). A copy of the Settlement Agreement is attached hereto as **Exhibit A**.

9.      On April 10, 2015, Regions Bank, Kelly, and Myers filed a *Joint Motion to Dismiss Appeal with Prejudice* (the "Joint Motion") in the United States Court of Appeals for the Eleventh Circuit, Case No. 14-12865-BB. The Joint Motion, *inter alia*, states, "On April 9, 2015, the Appellants and the Appellee entered into a settlement agreement (the 'Settlement Agreement') governing the disposition of the above-captioned appeal *and various other matters*. Pursuant to the Settlement Agreement, *and in accord with the provisions thereof* (the exclusion of which herein shall not be deemed as a waiver or abrogation of the same), Ms. Kelly and Mr. Myers are to dismiss this appeal. Further, in light of the Settlement Agreement, and its provisions governing the disposition of the disputes giving rise to this appeal, it is respectfully suggested that the instant matter is now moot, and accordingly meritorious of dismissal." A copy of the Joint Motion is attached hereto as **Exhibit B**.

10.      On April 10, 2015, the United States Court of Appeals for the Eleventh Circuit entered an Order granting the Joint Motion on the terms agreed to by the parties in the Settlement Agreement (the "Eleventh Circuit Order"). A copy of the Eleventh Circuit Order is attached hereto as **Exhibit C**.

11.      Critically here, US Bank is judicially estopped from relying on any "assignment" from Regions Bank (as successor by merger to AmSouth Bank) to perfect a security interest in the

Fixed Rate Note and/or Mortgage. Specifically, at a hearing on September 30, 2014, counsel for

US Bank made the following representations to the Court:

> THE COURT:· Let's make a notation that's going to go into the report and recommended order that plaintiff [US Bank] is not going to be relying on the second assignment of mortgage to prove its standing --
> MR. PERKINS:· Correct, Your Honor. \*\*\* It will not be brought into evidence as proof of standing.

A copy of the September 30, 2014 hearing transcript is attached hereto as **Exhibit D**.

      12.    On September 10, 2015 - <u>after</u> the Eleventh Circuit Order was entered - the Collier

County Circuit Court entered a *Final Judgment of Foreclosure* in Case No. 11-2009-CA-010813.

The *Final Judgment of Foreclosure* explains "the assignment has no legal effect other than to take

the mortgage out of the name of the original lender - AmSouth Bank n/k/a Regions Bank - in the

public Records," and critically, "[t]he Plaintiff did not rely on the Assignment of Mortgage to

establish its standing to prosecute this mortgage foreclosure action." Thus, US Bank is judicially

estopped from relying on any "assignment" from Regions Bank to perfect a security interest in the

Fixed Rate Note and/or Mortgage.

      13.    On October 4, 2016, Kelly timely filed a revisory motion pursuant to Rule 1.540

Florida Rule of Civil Procedure in Collier County Circuit Court, Case No. 11-2009-CA-010813,

which remains pending and unresolved ("On motion and upon such terms as are just, the court

may relieve a party or a party's legal representative from a final judgment…). A copy of Kelly's

Rule 1.540 motion (without all exhibits) is attached hereto as **Exhibit E**.[2]

      14.    11 U.S.C. § 544 provides in relevant part:

---

[2] On October 4, 2016, Myers timely filed a revisory motion pursuant to Rule 1.540 Florida Rule of Civil Procedure in Collier County Circuit Court, Case No. 11-2009-CA-010813, which remains pending and unresolved ("On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment…).

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

15.    A chapter 13 debtor may exercise the trustee's avoidance powers under 11 U.S.C. § 544 if doing so will benefit the bankruptcy estate. *In re Aiwohi,* 13-90038 (Bankr. Haw. Jan. 31, 2014). Thus, under § 544(a), Kelly has the power and status of a creditor, whether one exists or not, who (1) extends credit to the debtor at the time of commencement of the case and obtains a judicial lien on all the debtor's property; or (2) extends credit to the debtor at the time of commencement of the case and obtains an execution which is returned unsatisfied; or (3) becomes a bona fide purchaser of real property at the time of commencement of the case.

16.    *See also Houston v. Eiler (In re Cohen),* 305 B.R. 886 (B.A.P. 9th Cir. 2004), explaining that a chapter 13 debtor's standing to exercise avoidance power focusses on a "holistic" approach that best advances the underlying purposes of chapter 13 and that harmonize with the

overall picture of a chapter 13 debtor maintaining control, albeit under court supervision, over estate property. The Sixth Circuit BAP has likewise found that ambiguity in statutory language and chapter 13 practicalities favor a finding that debtors have derivative standing to exercise the trustee's strong arm power beyond what is conferred under section 522(h). *U.S. Bank Nat'l Ass'n v. Barbee*, No. 10-8074 (B.A.P. 6th Cir., Dec. 12, 2011) (following *Countrywide Home Loans v. Dickson (In re Dickson)*, 427 B.R. 399 (B.A.P. 6th Cir. 2010), *aff'd on other grounds*, 655 F.3d 585 (6th Cir. 2011)).

17. Kelly and Myers are considered an ideal hypothetical lien creditor armed with a judgment providing a superior security interest in the Fixed Rate Note and/or Mortgage from Regions Bank (as successor by merger to AmSouth Bank), such that they may contest the validity of US Bank's purported lien on the Naples Property pursuant to 11 U.S.C. § 544(a)(1), evidencing a bona fide dispute. Stated differently, Kelly and Myers as a hypothetical lien creditor can prevail over the unperfected lien claim of US Bank on the Naples Property (i.e., to cut-off any interest that US Bank may claim in the Naples Property).

18. Accordingly, US Bank's Claim 1-1 is in the amount of $3,219,793.50 is disputed and unliquidated and cannot, as a matter of law, be considered for purposes of determining Kelly's Chapter 13 eligibility.

### Claim 2-1

19. Seaside Community Development Corp. ("SCDC") filed Claim 2-1. Claim 2-1 is an *unsecured* claim in the amount of $611,543.30. SCDC's Claim 2-1 is a fraudulent proof of claim as is revealed by the following timeline of events:

■ **August 31, 2017:** The United States District Court for the Northern District of Florida, Pensacola Division (the "FL

District Court") enters a "Judgment" (the "August 31, 2017 Judgment") (Doc. 369) in Case 3:10-cv-00392-RV-EMT (the "FL Litigation"). Barbara Ann Kelly's name does **not** appear in the August 31, 2017 Judgment. A copy of the August 31, 2017 Judgment is attached hereto as **Exhibit F**.

- **September 26, 2017:** Kelly appeals the August 31, 2017 Judgment to the United States Court of Appeals for the Eleventh Circuit (the "Eleventh Circuit"), Appeal Number 17-14348-GG (the "Appeal of August 31, 2017 Judgment") [Case 3:10-cv-00392-RV-EMT; Doc. 370].

- **October 25, 2017:** The Eleventh Circuit issues a "Jurisdictional Question" in Appeal Number 17-14348-GG. A copy of the Eleventh Circuit's October 25, 2017 letter and "Jurisdictional Question" is attached hereto as **Exhibit G**.

- **December 4, 2017:** SCDC files an *Emergency Motion for Order Authorizing Registration of Judgment in the District Court of Maryland* (the "Emergency Motion") [Case 3:10-cv-00392-RV-EMT; Doc. 377] requesting an order authorizing registration of the August 31, 2017 Judgment (Doc. 369) in the District Court of Maryland.

- **December 5, 2017:** The FL District Court enters an Order granting the Emergency Motion (the "Order") [Case 3:10-cv-00392-RV-EMT; Doc. 378], authorizing registration of the August 31, 2017 Judgment (Doc. 369) in the District Court of Maryland. The Order, *inter alia*, states "Registration of the [August 31, 2017] Judgment in Maryland is authorized."

- **December 7, 2017:** According to Donna Bajzik ("Ms. Bajzik"), Deputy Clerk and Case Administrator for Case Number 3:10-cv-392-RV-EMT, on December 7, 2017, an "attorney" from the law firm of Emmanuel Sheppard & Condon (Attorneys of record for SCDC in the FL Litigation) called Ms. Bajzik and asked her to "add Barbara Ann Kelly's name to the [August 31, 2017] Judgment."

- **December 7, 2017:** Without jurisdiction, the FL District Court enters an "Amended Judgment" (the "December 7, 2017 Amended Judgment") [Case 3:10-cv-00392-RV-EMT; Doc.

379]. A Copy of the December 7, 2017 Amended Judgment is attached hereto as **Exhibit H**.

■ **January 5, 2018:** Kelly appeals the December 7, 2017 Amended Judgment to the Eleventh Circuit, Appeal Number 17-14348-GG (the "Appeal of December 7, 2017 Amended Judgment") [Case 3:10-cv-00392-RV-EMT; Doc. 370]. A Copy of the [Notice of] "Appeal of December 7, 2017 Amended Judgment" is attached hereto as **Exhibit I**.

20.    Rule 60 of the Federal Rules of Civil Procedure, *inter alia*, provides:

(a) CORRECTIONS BASED ON CLERICAL MISTAKES; OVERSIGHTS AND OMISSIONS. The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. **But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected <u>only with the appellate court's leave</u>**.

(Emphasis added).

21.    Because SCDC never obtained leave from the Eleventh Circuit before it fraudulently obtained the December 7, 2017 Amended Judgment - by unlawfully having the Case Administrator for Case Number 3:10-cv-392-RV-EMT "add Barbara Ann Kelly's name to the [August 31, 2017] Judgment" - the December 7, 2017 Amended Judgment is void as a matter of law. "It is well settled that a judgment is void if the court that considered it lacked jurisdiction of the subject matter." *Watts v. Pinckney,* 752 F.2d 406, 409 (9th Cir.1985) (internal quotes and emphasis deleted). A void judgment under federal law is one in which the rendering court lacked subject matter jurisdiction over a dispute, or jurisdiction over parties, or acted in a manner inconsistent with due process of law, or otherwise acted unconstitutionally in entering judgment. *See Klugh v. U.S.,* D.C.S.C., 610 F.Supp. 892, 901. A void judgment is one that from its inception is a complete nullity and has no legal force or effect, is incapable of confirmation or ratification,

is ineffectual to bind parties or to support a right, forms no defense to actions taken thereunder, *and its invalidity may be asserted by any person whose rights are affected at any time and at any place directly or collaterally*. No statute of limitations or repose runs on its holdings, the matters thought to be settled thereby are not res judicata, and "years later, when the memories may have grown dim and rights long been regarded as vested, any disgruntled litigant may reopen old wound and once more probe its depths. And it is then as though trial and adjudication had never been."[3] *Moses v Cashcall quoting Jaffe and Asher v. Van Brunt*, S.D.N.Y.1994, 158 F.R.D. 278. The U.S. Supreme Court stated that if a court is "without authority, its judgments and orders are regarded as nullities. They are not "voidable", but simply "void"; and form no bar to a recovery sought, even prior to a reversal in opposition to them. *They constitute no justification; and all persons concerned in executing such judgments or sentences, are considered, in law, as trespassers* [4]." *Elliot v. Piersol*, 1 Pet. 328, 340, 26 U.S. 328, 340 (1828).

22.    Further evidence that Claim 2-1 is disputed and unliquidated is the fact that Kelly filed a *Complaint and Jury Trial Demand* against defendant SCDC, Case No. 66-2018-CA-000144, which is currently pending in the Circuit Court of the First Judicial Circuit in and for Walton County, Florida (the "SCDC Jury Trial Complaint"). In the SCDC Jury Trial Complaint, Kelly is requesting entry of judgment for damages in an amount *not less than* Five Million Dollars ($5,000,000.00). A Copy of the *Complaint and Jury Trial Demand* (without exhibits) against defendant SCDC, Case No. 66-2018-CA-000144, is attached hereto as **Exhibit J.**

---

[3] It is well established that the passage of time cannot make valid that which has been void from the beginning.

[4] Black's Online Legal Dictionary 2nd Edition: Trespass. A form of action, at the common law, which lies for redress in the shape of money damages for any unlawful injury done to the plaintiff, in respect either to his person, property, or rights, by the immediate force and violence of the defendant.

23.     Accordingly, SCDC's Claim 2-1 in the amount of $611,543.30 is disputed and unliquidated and cannot, as a matter of law, be considered for purposes of determining Kelly's Chapter 13 eligibility.

### CLAIM 5

24.     Offit Kurman, P.A. ("Offit Kurman") filed Claim 5. Claim 5 is an unsecured claim in the amount of $330,965.28. Offit Kurman's Claim 5-1 is a fraudulent proof of claim.

25.     Certain of the amounts contained in Offit Kurman's Claim 5-1 were also included in the Trustee's Motion for Approval of Proposed Compromise and Settlement filed in Adversary Proceeding No. 16-00474, which is currently on appeal in the United States District Court for the District of Maryland, Appeal Nos. PX-17-cv-3846, PX-17-cv-3847, and PX-18-cv-0336.

26.     Further evidence that Claim 5-1 is disputed and unliquidated is the fact that Kelly filed a *Complaint and Demand for Jury Trial* against defendant Offit Kurman, Case No. 1:17-cv-03668-CCB, which is currently pending in the United States District Court for the District of Maryland (the "Offit Kurman Jury Trial Complaint"). In the Offit Kurman Jury Trial Complaint, Kelly is requesting entry of judgment for damages in an amount *not less than* Ten Million Dollars ($10,000,000.00). A Copy of the *Complaint and Demand for Jury Trial* (without exhibits) against defendant Offit Kurman, Case No. 1:17-cv-03668-CCB, is attached hereto as **Exhibit K**.

27.     Accordingly, Offit Kurman's Claim 5 in the amount of $330,965.28 is disputed and unliquidated and cannot, as a matter of law, be considered for purposes of determining Kelly's Chapter 13 eligibility.

### Claim 8-1

28.     "SunTrust Mortgage, Inc." filed Claim 8-1.[5] Claim 8-1 is *purportedly* a secured claim in the amount of $663,277.97. SunTrust Mortgage, Inc's Claim 8-1 is disputed and unliquidated as Kelly has filed a *Complaint and Jury Trial Demand* against defendant SunTrust Bank, Case No. 66-2018-CA-000091, which is currently pending in the Circuit Court of the First Judicial Circuit in and for Walton County, Florida (the "SunTrust Bank Jury Trial Complaint"). In the SunTrust Bank Jury Trial Complaint, Kelly is requesting entry of judgment for damages in an amount *not less than* Five Million Dollars ($5,000,000.00).  A Copy of the *Complaint and Jury Trial Demand* (without exhibits) against defendant SunTrust Bank, Case No. 66-2018-CA-000091, is attached hereto as **Exhibit L**.

29.     Accordingly, SunTrust Mortgage, Inc's Claim 8-1 in the amount of $663,277.97 is disputed and unliquidated and cannot, as a matter of law, be considered for purposes of determining Kelly's Chapter 13 eligibility.

### Claim 9-1

30.     "U.S. Bank NA, successor trustee to Bank of America, NA, successor in interest to LaSalle Bank NA, as trustee, on behalf of the holders of the WaMu Mortgage Pass-Through Certificates, Series 2007-OA4" ("US Bank") filed Claim 9-1. Claim 9-1 is *purportedly* a secured claim in the amount of $2,321,433.05. US Bank's Claim 9-1 is disputed and unliquidated as Kelly has filed an *Amended Complaint and Jury Trial Demand* against defendant US Bank, Case No. Case No. 8:17-ev-01812-PWG, which is currently pending in the United States District Court for the District of Maryland (the "US Bank Jury Trial Complaint"). In the US Bank Jury Trial Complaint, Kelly is requesting entry of judgment for damages in an amount *not less than* Ten

---

[5] It is unclear from Claim 8-1 as filed whether "SunTrust Mortgage, Inc." is the purported creditor, or "SunTrust Bank" is the purported creditor.

Million Dollars ($10,000,000.00). A Copy of the *Amended Complaint and Jury Trial Demand* (without exhibits) against defendant US Bank, Case No. Case No. 8:17-ev-01812-PWG, is attached hereto as **Exhibit M**. *See also* Letter to Judge Grimm filed April 4, 2018, requesting leave to file second amended complaint and motion for summary judgment, a copy of which is attached hereto as **Exhibit N.**

31.     Accordingly, US Bank's Claim 9-1 in the amount of $2,321,433.05 is disputed and unliquidated and cannot, as a matter of law, be considered for purposes of determining Kelly's Chapter 13 eligibility.

32.     Lastly, Myers advises the Court that the value listed for the Naples Property in the schedules filed in Kelly's Chapter 13 Case was obtained from the Collier County Tax Assessor's website and is the "assessed" value for tax purposes, which value is not equivalent to current fair market value of the Naples Property. The current fair market value of the Naples Property is estimated to be in excess of $5,000,000. Myers advises the Court that he will obtain an appraisal of the Naples Property if the Court deems it necessary.

WHEREFORE, for the reasons set forth above, Myers respectfully requests that the Court enter an order denying the Chapter 13 Trustee's Motion to Dismiss (Doc. 31), and grant such other and further relief as is just and proper.

RESPECTFULLY SUBMITTED on this 10th day of July, 2018.

_____
Gregory B, Myers, *pro se*
700 Gulf Shore Blvd. North
Naples, Florida 34102
(301) 325-2312
gregbmyers@verizon.net

## CERTIFICATE OF SERVICE

FILED

2018 JUL 10  AM 10: 18

U.S. BANKRUPTCY COURT
DISTRICT OF MARYLAND
GREENBELT

I HEREBY CERTIFY that on this 10th day of July, 2018, a copy of the foregoing was electronically served via email to the following:

Nancy Spencer Grigsby at ngrigsby@ch13md.com, grigsbyecf@ch13md.com
James G. Bell at james.bell@bww-law.com, bankruptcy@bww-law.com
Charles C. Lamari at cclamari@lerchearly.com, kdlevy@lerchearly.com
Kimberly B. Lane at klane@siwpc.com
Jeffrey M. Orenstein at jorenstein@wolawgroup.com
Douglas B. Riley at dbriley@tph-law.com
Gregory P. Johnson at gjohnson@offitkurman.com
Charles P. Hoskin at cph@esclaw.com

_____
Gregory B. Myers, *pro se*

# Exhibit A

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made and entered into this 8th day of April, 2015, by and between Regions Bank (as successor by merger to AmSouth Bank), an Alabama corporation ("Regions"), Barbara Ann Kelly ("Kelly"), an individual, and Gregory B. Myers ("Myers"), an individual. Regions, Kelly, and Myers are collectively referred to herein as the "Parties."

### RECITALS

Regions asserted a claim against Kelly and Myers in the Circuit Court for Montgomery County, Maryland, Civil Action No. 351949-V relating to Kelly's and Myers' $326,879.79 home equity line of credit balance under loan or account numbers 092-50200000000005005003768, 4327-1326-0008-4684 and 5299-0730-9219-1608 (the "HELOC"). Kelly and Myers removed that action to the United States District Court for the District of Maryland, where it was styled *Regions Bank v. Gregory B. Myers and Barbara A. Kelly*, Case No. 8:11cv3033-RWT (the "Maryland HELOC Action").

Kelly and Myers also asserted claims against Regions in the litigation styled *Barbara Ann Kelly and Gregory Brian Myers v. Regions Bank*, Case No. 3:11cv252-MCR/EMT in the United States District Court for the Northern District of Florida, Pensacola Division.

The parties consented to the transfer of the Maryland HELOC Action to the Northern District of Florida, and that action was initially assigned Case No. 3:12cv342-MCR/CJK. Both the federal actions were then consolidated when Regions filed its claim relating to the HELOC as a counterclaim in Case No. 3:11cv252-MCR/EMT (the "Northern District Action").

Regions prevailed on all issues in the Northern District Action. The court's September 30, 2013 order granted summary judgment in favor of Regions and determined that Regions was entitled to attorneys' fees and costs incurred in pursuing its counterclaim. On February 27, 2014 and June 20, 2014, the court entered Judgments in favor of Regions in the total amount of $582,731.72, of which $326,879.74 was for the principal owed on the HELOC (collectively, the "HELOC Judgments").

Myers and Kelly have filed an appeal of the District Court's rulings in the Northern District Action to the United States Court of Appeals for the Eleventh Circuit, Case No. 14-12865 (the "Eleventh Circuit Appeal").

The Northern District Action and Eleventh Circuit Appeal shall be collectively referred to herein as the "Federal Litigation."

Regions recorded the HELOC Judgments from the Federal Litigation in the public records of Montgomery County, Maryland. Kelly and Myers moved to strike the recording of the HELOC Judgments in Case No. 39323IV in the Circuit Court for Montgomery County, Maryland. The denial of that motion was appealed by Kelly and Myers in the appeal styled *Barbara Ann Kelly et al. v. Regions Bank*, in the Court of Special Appeals for Maryland, Case No. 01911 (the "Maryland Appeal").

Regions further asserted claims against Kelly and Myers in the litigation styled *Regions Bank, Successor by Merger to AmSouth Bank v. Gregory Brian Myers and Barbara Ann Kelly, et. al.*, Case No. 10-CA-1162, in the Circuit Court, First Judicial Circuit, Walton County, Florida (the "Foreclosure Litigation"). Kelly and Myers have raised certain defenses in the Foreclosure Litigation.

The Parties desire to enter into this Agreement in order to provide for complete resolution of the Federal Litigation, the Maryland Appeal and the Foreclosure Litigation currently existing between the Parties, as more fully set forth below.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which are acknowledged by all Parties, the Parties hereto agree as follows:

<u>COVENANTS AND RELEASE</u>

1.    <u>Recitals</u>. Each of the Parties acknowledges and represents that the recitals above are true and correct.

2.    <u>Payment and Satisfaction of the HELOC Judgments</u>. Kelly and Myers shall, jointly and severally, pay Regions $326,879.74, c/o Regions Bank, Attention: Anita Keely, 2050 Parkway Office Circle ALBH40402B, Hoover, AL 35244, pursuant to the following schedule:

      (a)    Beginning on June 1, 2015, and for thirty-six (36) months thereafter, Kelly and Myers shall pay Regions $1,000.00 per month towards satisfaction of the HELOC Judgments. These monthly payments shall be due on or before the 1st of each month (the "Monthly HELOC Payments").

      (b)    At the end of the thirty-six (36) month payment term, and on or before July 1, 2018, Kelly and Myers shall make a balloon payment (the "HELOC Balloon Payment") to Regions in the amount of $290,879.74.

Within thirty (30) days of receipt of all payments required in paragraphs (a) and (b) above, Regions shall record a Satisfaction of the HELOC Judgments. However, if Kelly and Myers default in the payment of any Monthly HELOC Payments or the HELOC Balloon Payment (which default expressly includes any failure to timely make any such payments), Regions shall be entitled to: (i) recover the full amount of the HELOC Judgments, plus all post-judgment interest, less payments made under this Agreement; and (ii) file the Consent Foreclosure Judgment in connection with the Foreclosure Litigation, as set forth in paragraph 4(b). Time is of the essence with respect to Kelly's and Myers' payment obligations.

Within the thirty-seven (37) month payment period contemplated herein (i.e., the 36 Monthly HELOC Payments plus the HELOC Balloon Payment), Regions, in its sole discretion, may agree to release the liens created by the HELOC Judgments so that Kelly and Myers may sell any property encumbered by the liens. However, Regions agrees that it will not refuse to release any such lien(s) created by the HELOC Judgments if Kelly and Myers can establish that the sale will result in sufficient proceeds to satisfy all remaining Monthly HELOC Payments plus the HELOC Balloon Payment obligations set forth herein. In connection with any sale of any encumbered property which satisfies Kelly's and Myers' remaining Monthly HELOC Payments plus the

HELOC Balloon Payment obligations hereunder, Kelly and Myers shall be credited for all HELOC Judgment payments made under this Paragraph 2. Any release of liens pursuant to this provision shall be conditional in nature and if any anticipated sale is not consummated, for any reason, Regions' liens shall remain in full force and effect.

Any of the amounts due and owing as described under this Paragraph 2 may be prepaid, in part or in whole, by Myers or and Kelly at any time without penalty.

3.    Modification of Seaside Lot 6 Note.  The Parties agree to modify the Seaside Lot 6 Note, and Myers and Kelly shall make the payments to Regions, jointly and severally, in the following manner:

   (a)   Beginning on June 1, 2015, and for thirty-six (36) months thereafter, Kelly and Myers shall make monthly interest-only payments, at 4% interest, based upon a principal obligation of $1,189,711.77. These monthly payments of $3,965.71 shall be due on or before the 1st of each month (the "Monthly Lot 6 Note Payments"), and sent to Regions Bank, Attention: Todd Mishkin, ALBH40402B, 2050 Parkway Office Circle, Hoover, AL 35244.

   (b)   At the end of the thirty-six (36) month payment term, and on or before July 1, 2018, Kelly and Myers shall make a balloon payment (the "Lot 6 Note Balloon Payment") to Regions in the amount of $1,189,711.77.

Within thirty (30) days of receipt of all payments required in paragraphs (a) and (b) above, Regions shall record a Satisfaction of the Lot 6 Mortgage. However, if Kelly and Myers default in the payment of any Monthly Lot 6 Note Payments or the Lot 6 Note Balloon Payment (which default expressly includes any failure to timely make any such payments) Regions shall be entitled to file the Consent Foreclosure Judgment in connection with the Foreclosure Litigation, as set forth in paragraph 4(b). Time is of the essence with respect to Kelly's and Myers' payment obligations.

Any of the amounts due and owing as described under this Paragraph 3 may be prepaid, in part or in whole, by Myers or and Kelly at any time without penalty.

4.    Waiver of Defenses and Consent to Foreclosure Upon Default.

   a.    Waiver.  Within ten (10) days of the date of this Agreement, Kelly and Myers shall dismiss, with prejudice, their affirmative defenses and withdraw all oppositions to summary judgment in the Foreclosure Litigation.[1]

   b.    Consent to Foreclosure.  Subject to Section 5 below, should Kelly and Myers fail to timely make any one of the payments specified in Paragraphs 2 and 3 of this Agreement, Regions shall be entitled to seek entry of the signed Consent Judgment of Foreclosure (a copy of which is attached as **Exhibit A**) in the Foreclosure Litigation as set forth therein. Regions'

---

[1] Pursuant to section 8 below, the Parties have executed a Tolling Agreement with regard to the Foreclosure Litigation in the event the Court does not grant the Stay of the Foreclosure Litigation.

counsel shall hold the signed Consent Judgment of Foreclosure in trust pending any payment default by Kelly and Myers under Paragraphs 2 and 3 of this Agreement. Upon full satisfaction of this Agreement, Regions shall direct its counsel to return to Kelly and Myers the signed Consent Judgment of Foreclosure.

    c.     Nothing herein shall be interpreted or applied to bar any consumer from bringing any claim in court pursuant to any provision of law for damages or other relief in connection with any alleged violation of any Federal law, where such claim has not arisen after the latest occurring dispute or claim mentioned herein.

    5.     <u>Notice and Cure</u>. If Regions contends that Kelly and Myers have defaulted or have otherwise failed to comply with the requirements under Paragraphs 2 or 3 of this Agreement, Regions shall provide written notice of such default by electronic mail to Myers' and Kelly's counsel at tlynch@offitkurman.com and to Myers at gregbmyers@verizon.net. Kelly and Myers shall have ten (10) days from the date of written notice of such default to cure any such default. Any failure by Regions to provide written notice of any default shall not constitute a waiver of any of Regions' rights under this Agreement; however, Regions shall not file the Consent Judgment of Foreclosure unless Myers' and Kelly have failed to cure any written notice of default as set forth herein. If, during the performance of this Agreement, Regions has put Kelly and Myers on notice of any default in six (6) separate instances, Regions shall no longer be required to comply with this paragraph, and may file the Consent Judgment of Foreclosure and otherwise enforce this Agreement, without notice of default, upon any subsequent payment default.

    6.     <u>Dismissal of Federal Litigation Appeal</u>. Within two (2) days of execution of this Agreement, Kelly and Myers shall dismiss with prejudice their Eleventh Circuit Appeal of the Federal Litigation, Case No. 14-12865.

    7.     <u>Dismissal of Maryland Appeal</u>. Within two (2) days of execution of this Agreement, Kelly and Myers shall dismiss with prejudice the Maryland Appeal, Case No. 01911, in the Court of Special Appeals for Maryland.

    8.     <u>Stay of Foreclosure Litigation</u>. Within fifteen (15) days of execution of this Agreement, Regions shall advise the Court in the Foreclosure Litigation of this Agreement, and the parties will file a joint motion and consent to an order staying the Foreclosure Litigation pending the satisfaction of the terms of this Agreement. Additionally, the parties shall enter into a Tolling Agreement (in the form attached to this Agreement as **Exhibit B**) providing that the statute of limitations, jurisdictional periods, and or other limitation periods shall be suspended pending the satisfaction or breach of this Agreement.

    9.     <u>Attorneys' Fees</u>. The Parties agree that they shall each separately be responsible for their own attorneys' fees and costs incurred solely in connection with this Agreement. However, in the event of any litigation in connection with the enforcement of this Agreement, any prevailing Party shall be entitled to recover from the other Party the payment of costs and expenses, including, but not limited to, reasonable attorneys' and paralegal fees incurred arising out of the enforcement of this Agreement.

10.    Limited Release. Except as otherwise set forth herein, this Agreement constitutes a full and final mutual release applying to all known and unknown, anticipated and unanticipated, suspected or unsuspected, claims, damages, losses, costs or fees as between Regions (as well as its affiliates, agents, assigns, and owners) and Myers and/or Kelly (as well as their affiliates, agents, and assigns) arising out of the involvement, dealings, settlements, and loans between Regions and Myers and/or Kelly from the beginning of time and up through the date of this Agreement.

However, this Release shall have no effect on any of the liens, obligations or remedies addressed by or created by this Agreement. This Release further has no application to Regions claims against Kelly and Myers in the Foreclosure Litigation.

11.    Full Authority. Each of the Parties to this Agreement represents and warrants that the said Party has the full rights, powers, capacity and authority to enter into and perform that Party's respective obligations hereunder, and that such obligation shall be binding upon such party without the requirement, approval, or consent of any other person or entity in connection herewith. Each Party also represents and warrants that it has not pledged or assigned to any other parties the claims and rights being resolved herein.

12.    Full and Complete Agreement. This Agreement memorializes the agreement made on this date and sets forth a complete and final agreement and understanding of the Parties, and there have been no verbal or written representations, promises or understandings between the Parties with respect to this Agreement except as expressly contained herein. No modification or waiver of any of the provisions shall be valid unless made in writing and signed by the Party against which such modification or waiver is sought to be enforced.

13.    Severability. Nothing contained herein shall be construed so as to require the commission of any act contrary to the law, and wherever there is any conflict found to exist between any of the provisions contained herein and any federal or state statute, law, ordinance or regulation, and the latter shall prevail, or if any court shall determine a provision of this Agreement void or voidable for any reason, any provision of this Agreement which is so effected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law, and the remainder of the Agreement, if practicable, will remain in full force and effect.

14.    Binding on Successors. All the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the Parties hereto and their respective heirs, and assigns.

15.    Anti-waiver. No waiver by any of the Parties of any default or breach of any provision of this Agreement shall constitute a waiver of any further or succeeding breach of the same or of any other provision hereof.

16.    Governing Law. This Agreement shall be deemed executed within the State of Florida, and shall be interpreted and governed by the internal laws of the State of Florida regardless of Florida choice of law provisions.

17.    Counterpart Provision. This Agreement may be executed in counterparts and each such counterpart shall be deemed an original.

18.     Effective Date. This Agreement shall become effective as of the date last signed by any Party.

19.     Comprehension of Document and Waiver of Right to Jury Trial. IN ENTERING INTO THIS AGREEMENT, THE PARTIES EACH REPRESENT THAT THEY HAVE RELIED OR HAVE HAD THE OPPORTUNITY TO RELY UPON THE LEGAL ADVICE OF THEIR ATTORNEYS, WHO ARE THE ATTORNEYS OF THEIR OWN CHOICE. THE PARTIES FURTHER REPRESENT THAT THE TERMS OF THIS AGREEMENT HAVE BEEN COMPLETELY READ AND EXPLAINED TO THEM BY THEIR ATTORNEYS, AND THAT THOSE TERMS ARE FULLY UNDERSTOOD AND VOLUNTARILY ACCEPTED BY EACH OF THEM. EACH PARTY FURTHER KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR LITIGATION THAT MAY ARISE OUT OF THIS AGREEMENT.

Regions Bank

By: _____

Date: _____

Barbara Ann Kelly

_____

Date: _____

Gregory B. Myers

_____

Date: _____

Page 6 of 6

# Exhibit B

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

BARBARA ANN KELLY, *et al.*,                )
                                            )
                     Appellants,            )
                                            )    Case No:  14-12865-BB
        v.                                  )
                                            )
REGIONS BANK                                )
                                            )
                     Appellee.              )
_____ )

## JOINT MOTION TO DISMISS APPEAL WITH PREJUDICE

Come now Barbara Ann Kelly ("Ms. Kelly"), Gregory Brian Myers ("Mr. Myers") (Ms. Kelly and Mr. Myers being collectively known as the "Appellants," and each sometimes being known as an "Appellant") and Regions Bank ("Regions Bank" or the "Appellee"), by and through respective undersigned counsel, and pursuant to Federal Rule of Appellate Procedure 42 and correlative Internal Operating Procedure 1, do hereby move to dismiss the above-captioned appeal, with prejudice, and in support thereof state as follows:

### I.       Certificate of Interested Persons and Corporate Disclosure Statement

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Local Rule 26.1-1, undersigned counsel for Regions Bank hereby states that Regions Bank is a wholly-owned subsidiary of its parent, Regions Financial Corporation, which is traded on the NYSE under the symbol "RF", and that no public company owns ten percent or more of the stock in Regions Financial Corporation.

Undersigned counsel for the Appellants and the Appellee further certify that the following persons and entities have an interest in the outcome of this case, amended to include one additional attorney:

Cox, Kevin Willoughby

**Kelly v. Regions Bank, Case No. 14-12865-BB (11th Cir. 2014)**

Crew & Crew P.A.

Crew, Jill W.

Crew, Michael H.

Daniel, Laurie Webb

Fogleman, Christopher Curtis

Gleason, Flynn, Emig & Fogleman, Chtd.

Hargitai, Peter P.

Holland & Knight LLP

Kelly, Barbara Ann

Lynch, Timothy Cronin

Morreale, Frank Edward

Myers, Gregory Brian

Offit Kurman, P.A.

Regensdorf, Paul R.

Regions Bank

Regions Financial Corporation ("RF")

Rodgers, M. Casey (Hon.)

Kelly v. Regions Bank, Case No. 14-12865-BB (11th Cir. 2014)

VerStandig, Maurice Belmont

## II.    Argument: This Appeal Should be Dismissed

On April 9, 2015, the Appellants and the Appellee entered into a settlement agreement (the "Settlement Agreement") governing the disposition of the above-captioned appeal and various other matters. Pursuant to the Settlement Agreement, and in accord with the provisions thereof (the exclusion of which herein shall not be deemed as a waiver or abrogation of the same), Ms. Kelly and Mr. Myers are to dismiss this appeal. Further, in light of the Settlement Agreement, and its provisions governing the disposition of the disputes giving rise to this appeal, it is respectfully suggested that the instant matter is now moot, and accordingly meritorious of dismissal. *See, e.g., Pac. Ins. Co. v. Gen. Dev. Corp.,* 28 F.3d 1093, 1096 (11th Cir. 1994) ("A case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. It is incumbent upon this court to consider issues of mootness *sua sponte* and, absent an applicable exception to the mootness doctrine, to dismiss any appeal that no longer presents a viable case or controversy.") (citing *Ethredge v. Hail,* 996 F.2d 1173, 1175 (11th Cir.1993); *Hogan v. Mississippi Univ. for Women,* 646 F.2d 1116, 1117 n. 1 (5th Cir. Unit A June 1981)).

## III.    Conclusion

WHEREFORE, the Appellants and the Appellee do hereby pray this Honorable Court dismiss the above-captioned appeal, with prejudice, and for such other and further relief as may be just and proper.

**[SIGNATURE BLOCKS ON FOLLOWING PAGE]**

Kelly v. Regions Bank, Case No. 14-12865-BB (11th Cir. 2014)

Respectfully Submitted,

OFFIT KURMAN, P.A.                        HOLLAND & KNIGHT, LLP

/s/ Maurice B. VerStandig                 /s/ Kevin W. Cox
Maurice B. VerStandig, Esquire            Kevin Willoughby Cox, Esquire
Offit Kurman, P.A.                        Holland & Knight, LLP
4800 Montgomery Lane, 9th Floor           315 South Calhoun Street, Suite 600
Bethesda, Maryland 20814-3465             Tallahassee, Florida 32301
Telephone: 240-507-1714                   Telephone: 850-425-5624
Facsimile: 240-507-1735                   Facsimile: 850-224-8832
mverstandig@offitkurman.com               kevin.cox@hklaw.com
*Attorney for Appellants*                 *Attorney for Appellee*


## CERTIFICATE OF SERVICE

Pursuant to, and in conformity with, Federal Rule of Appellate Procedure 25(c)(2) and Circuit Rule 25-3(a), I hereby certify that on this 10th day of April, 2015, the foregoing document was served on Kevin W. Cox, kevin.cox@hklaw.com, counsel for Regions Bank, via this Honorable Court's CM/ECF system.

OFFIT KURMAN, P.A.

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esquire
Offit Kurman, P.A.
4800 Montgomery Lane, 9th Floor
Bethesda, Maryland 20814-3465
Telephone: 240-507-1714
Facsimile: 240-507-1735
mverstandig@offitkurman.com
*Attorney for Appellants*

4817-2447-3379, v. 1

# Exhibit C

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

------------------------

No.  14-12865-V

------------------------

BARBARA ANN KELLY,
GREGORY BRIAN MYERS,

Plaintiffs -
Counter Defendants -
Appellants,

versus

REGIONS BANK,

Defendant -
Counter Claimant -
Appellee.

------------------------

Appeal from the United States District Court
for the Northern District of Florida

------------------------

Before: TJOFLAT, WILLIAM PRYOR and BARKSDALE,* Circuit Judges.

BY THE COURT:

Joint Motion to dismiss this appeal with prejudice is GRANTED.

------------------------

*Honorable Rhesa H. Barksdale, United States Circuit Judge for the Fifth Circuit, sitting by designation.

# Exhibit D

HEARING

September 30, 2014

Page 58

1    MR. LYNCH: So, Your Honor, they are co-counsel
2  in this case and they were listed as a witness in this
3  case, and when we noted their deposition, they said:
4  We won't be testifying and we're going to file a
5  motion for protective order if you try to depose one
6  of our lawyers.
7    So they're going to -- I mean, they've already
8  told us that they were going to assert the
9  attorney-client privilege on that issue. But if
10  you're telling me to note the deposition, I will, but
11  we've already explored that option, and we've been
12  told in no uncertain terms --
13    THE COURT: And even if you come back to court, I
14  can't make them testify. If they're claiming
15  attorney-client privilege, I can't make them testify
16  to anything.
17    MR. LYNCH: Which, Your Honor, is why we
18  didn't -- we didn't process the issue.
19    THE COURT: Okay. So then you're satisfied with
20  the documentation.
21    You know you're not going to get testimony from
22  the law firm who is co-counsel in this action?
23    MR. LYNCH: And I know that they're not going to
24  testify, because that was the stipulation.
25    THE COURT: Okay. So is there anyone else that

Page 59

1  you would like to suggest to me that you would like to
2  depose on this issue?
3    MR. LYNCH: No.
4    THE COURT: So we're done with Topic No. 3, the
5  second assignment of mortgage?
6    MR. LYNCH: I mean, based on the representation
7  from counsel that they aren't going to produce a
8  witness on this issue -- I mean, my position was I
9  would like to depose somebody from Wells Fargo who
10  could address all of our open issues.
11    MR. PERKINS: And, Your Honor, again, I think,
12  you know, Mr. Lynch can bring a certified copy and
13  make legal argument like he's done today on this issue
14  and assert that there's a standing issue, but --
15    THE COURT: Let's make a notation that's going to
16  go into the report and recommended order that
17  plaintiff is not going to be relying on the second
18  assignment of mortgage to prove its standing --
19    MR. PERKINS: Correct, Your Honor.
20    THE COURT: -- at trial.
21    MR. PERKINS: That's correct.
22    MR. LYNCH: Your Honor, and they're running away
23  from that as fast as they can, so I couldn't expect
24  them to try, but -- but we are certainly going to use
25  that at trial as evidence.

Page 60

1    THE COURT: And defendants will have the right to
2  use -- use it as rebuttal evidence or as a defense --
3    MR. LYNCH: That's right.
4    THE COURT: -- to standing, but I don't want to
5  get it to trial, Mr. Perkins, and then all of a sudden
6  the second assignment comes up as proof of standing.
7    MR. PERKINS: Correct, Your Honor.
8    THE COURT: Okay. So let's --
9    MR. PERKINS: It will not be brought into
10  evidence as proof of standing.
11    THE COURT: Yes. Let's put it in writing so
12  whichever judge does the trial will be able to see
13  when you point out there's an order to this effect,
14  Your Honor.
15    Okay. So plaintiff will not be able to rely on
16  the assignment for standing without waiving
17  defendants' right to challenge standing with the
18  second assignment. Okay.
19    And Ms. Stewart has come into the courtroom now,
20  so I'm going to break this case for a few minutes, and
21  I'm going to call out the 2:30 matter, and then we'll
22  come back and conclude this matter.
23    (A recess was held.)
24    THE COURT: All right. Gentlemen, be seated.
25  Thanks. I was just stretching. Sorry about that.

Page 61

1    MR. LYNCH: That's okay. So, Your Honor, if I
2  may?
3    THE COURT: Yes.
4    MR. LYNCH: We spoke outside for a minute --
5    THE COURT: Okay.
6    MR. LYNCH: -- and we thought it might be better
7  just to backtrack and work our way through the motion,
8  and we think we can cover most of the issues.
9    THE COURT: That's kind of where I was trying to
10  get us to go, was -- but I was working on it based on
11  the breakdown that Mr. Perkins had given with regard
12  to five deposition topics and ten requests for
13  production.
14    MR. LYNCH: Right. And so -- and I'll let
15  Mr. Perkins chime in on this, but he was breaking it
16  down to U.S. Bank versus Wells Fargo, because
17  technically we are moving to compel both.
18    THE COURT: Right.
19    MR. LYNCH: But Mr. Perkins has -- has told me
20  that it's going to be the same witness for both
21  designees.
22    THE COURT: Okay.
23    MR. LYNCH: So from my vantage point, while we
24  can have the order specific to topics, I think it
25  makes more sense just to walk through the motion

# Exhibit E

Filing # 47225009 E-Filed 10/04/2016 09:43:03 AM

**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
IN AND FOR COLLIER COUNTY, FLORIDA
CIVIL DIVISION**

| | | |
|---|---|---|
| US BANK NATIONAL ASSOCIATION, | * | |
| AS TRUSTEE FOR CREDIT SUISSE | * | |
| FIRST BOSTON CSFB 2005-11 | * | |
| | * | |
| Plaintiff, | * | Case No.:  11-2009-CA-010813 |
| | * | |
| v. | * | |
| | * | |
| BARBARA ANN KELLY, *et al.* | * | |
| | * | |
| Defendants. | * | |

---

**VERIFIED MOTION TO VACATE FINAL JUDGMENT OF FORECLOSURE**

Defendant BARBARA ANN KELLY ("Kelly"), *pro se*, pursuant to Florida Rule of Civil Procedure 1.540(b), moves this Court for entry of an Order vacating this Court's final judgment of foreclosure, and in support thereof states as follows:

**STANDARD**

Florida Rule of Civil Procedure 1.540(b), *inter alia*, provides, "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, decree, order, or proceeding for the following reasons:… (4) that the judgment or decree is void…"

A motion for relief from judgment should not be summarily dismissed without an evidentiary hearing unless it fails to allege a colorable entitlement to relief. The Second District has addressed this issue in <u>Henry v Henry</u> (Case No. 2D09-53, Fla. 2d DCA 2010) ("Because we conclude that the Husband alleged sufficient facts to show a colorable claim for relief under Florida Rule of Civil Procedure 1.540(b), we reverse and remand for an evidentiary hearing on the Husband's motion.").

## **BACKGROUND**

On September 10, 2015, this Court entered "FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT OF FORECLOSURE" (the "Initial Judgment"). See Exhibit "A" hereto.

On September 25, 2015, Defendant Gregory B. Myers ("Myers") timely filed "DEFENDANT GREGORY MYERS' MOTION FOR REHEARING" pursuant to and in conformity with Florida Rule of Civil Procedure 1.530 (the "Motion for Rehearing"). See Exhibit "B" hereto.

On September 30, 2015, Myers filed "DEFENDANT GREGORY MYERS' EMERGENCY MOTION FOR INJUNCTION" (the "Motion for Injunction"). See Exhibit "C" hereto.

On October 1, 2015, the Court held a hearing (the "October 1 Hearing") at which time the Court denied Myers' Motion for Injunction.[1] Immediately after the Court denied Myers' Motion for Injunction, Myers filed - in open court - "DEFENDANT GREGORY MYERS' NOTICE OF APPEAL OF NON-FINAL ORDER" (the "Appeal"). See Exhibit "D" hereto. The Appeal, *inter alia*, states:

> NOTICE IS GIVEN that Gregory Myers, Defendant/Appellant, appeals to the Florida Second District Court of Appeal, the order of this court rendered October 1, 2015. The nature of the order is a non-final order denying Defendant Gregory Myers' Emergency Motion for Injunction.

_____

[1] When the Court denied Myers' Motion for Injunction, Myers' timely and authorized Motion for Rehearing had *not* been scheduled for hearing, and was still pending and unresolved; thus, no final order had been entered in this case when Myers filed his appeal of a non-final order authorized pursuant to Florida Rule of Appellate Procedure 9.130(a)(3)(B).

2

The transcript of the October 1 Hearing, *inter alia*, provides:

> MR. MYERS: Your Honor, if I may, at this time I'd like to file a notice of appeal of your non-final order denying my emergency motion for injunction, and I have the notice of appeal here, if I may.
> MR. PERKINS: Your Honor, I just don't think that's appropriate. You can file at the clerk's office.
> MR. MYERS: (Handing Notice of Appeal to clerk.) And here are two copies, one for the court reporter and one for the judge.
> MR. PERKINS: And we're anticipating --
> MR. MYERS: If you can please note the date and time. Let the record show I filed that just now.
> THE COURT: All right. Let the record show that he filed it [Appeal]. Next motion.

See Exhibit "E" hereto.

On October 5, 2015, Judge Shenko rendered an "ORDER ON OCTOBER 1, 2015 HEARING AND JUDGMENT AWARDING ATTORNEYS' FEES AND COSTS" (the "Final Judgment"). See Exhibit "F" hereto.

On October 23, 2015, the Second District Court of Appeal issued an "ACKNOWLEDGEMENT OF NEW CASE" (the "2DCA Acknowledgement") directed at Myers' Appeal, case number 2D15-4521 (the "Appeal"). See Exhibit "G" hereto. The 2DCA Acknowledgement, *inter alia*, states:

> ## ACKNOWLEDGMENT OF NEW CASE
>
> DATE: October 23, 2015
>
> STYLE: GREGORY MYERS v. U. S. BANK NATIONAL ASOC.
>
> 2DCA#: **2D15-4521**
>
> The Second District Court of Appeal has received the Notice of Appeal reflecting a filing date of 10/1/15.
>
> The county of origin is Collier.

3

The lower tribunal case number provided is 2009-ca-010813.

The filing fee is Paid In Full - $300.

Case Type: Civil Other Non-Final

On October 30, 2015, the Second District Court of Appeal issued an Order on the Appeal

(the "2DCA Order"). <u>See</u> Exhibit "H" hereto. The 2DCA Order, *inter alia*, provides:

> Appellant's "notice of appeal of non-final order" states that appellant appeals "the order of this court rendered October 1, 2015. The nature of the order is a non-final order denying Defendant Gregory Myers' Emergency Motion for Injunction." However, this court notes that the Order on October 1, 2015, Hearing, in addition to denying appellant's emergency motion for injunction, denied without hearing appellant's timely motion for rehearing of the final judgment of foreclosure. This court also notes that rendition of the order denying appellant's emergency motion for injunction, along with rendition of the final judgment of foreclosure, did not occur until October 5, 2015, when the Order on October 1, 2015, Hearing was filed with the clerk of the circuit court. See Fla. R. App. P. 9.020(i)(1). Therefore, the notice of appeal filed on October 1, 2015, was premature in the absence of a signed written order filed with the clerk of the circuit court and thus was ineffective to invoke this court's jurisdiction to either review the denial of appellant's motion for injunction as a nonfinal appeal or review the final judgment of foreclosure. See Fla. R. App. P. 9.020(i)(3), 9.110(*l*). Furthermore, the circuit court retained jurisdiction and was not barred under rule 9.130(f) from rendering the final judgment of foreclosure when on October 5, 2015, it filed with the clerk of the circuit court the signed, written Order on October 1, 2015, Hearing.

> Accordingly, this court deems appellant's notice of appeal as a premature notice of appeal of the final judgment of foreclosure, and this case shall proceed as a final appeal. See Fla. R. App. P. 9.020(i)(3), 9.110(*l*).

> The portion of the Order on October 1, 2015, Hearing that denied appellant's motion for injunction shall be reviewed under the scope of this court's review of the final judgment of foreclosure. See Fla. R. App. P. 9.110(h). Challenges to this case classification may be made by motion within ten days of the date of this order.

4

Furthermore, appellant's October 28, 2015, emergency motion for review of order denying motion to stay pending appeal is granted only to the extent that we have reviewed the circuit court's order. We approve the order denying stay because the only argument presented in the motion to stay pertained to the circuit court's jurisdiction to deny the motion for rehearing, which as explained above is without merit. However, because this appeal is now proceeding as a final appeal of the final judgment of foreclosure rather than solely as a nonfinal appeal of the order denying appellant's emergency motion for injunction, this approval of the order denying stay is without prejudice for appellant to file in the circuit court a motion to stay pending appeal of the final judgment of foreclosure and, if denied, to file in this court a motion for review. See Fla. R. App. P. 9.310(a), (f).

## ARGUMENT

Myers' Appeal was an appeal of a non-final order authorized pursuant to Florida Rule of Appellate Procedure 9.130(a)(3)(B), specifically directed at Judge Shenko's denial of Myers' Motion for Injunction.

Florida Rule of Appellate Procedure 9.130(f) provides:

In the absence of a stay, during the pendency of a review of a non-final order, the lower tribunal may proceed with all matters, including trial or final hearing; provided that the lower tribunal may not render a final order disposing of the cause pending such review.

The Court's holding in *Carter v. Dorman,* 385 So. 2d 740 (Fla. 3d DCA 1980) is instructive here:

The order under review, denying a motion to set aside a final judgment under Fla.R.Civ.P. 1.540(b)(4), is reversed and the cause is remanded to the trial court with directions to set aside the said final judgment and to enter a new final judgment based on the jury verdict previously rendered herein upon a holding that (a) the original judgment was entered without jurisdiction while an appeal from a nonfinal trial court order was pending in this court, *De La Portilla v. De La Portilla,* 304 So. 2d 116 (Fla. 1974); *Crichlow v. Equitable Life Assurance Society,* 113 Fla. 668, 152 So. 849 (1933); Fla.R.App.P. 9.130(f); (b) this result is not changed by the fact that

5

the above-stated interlocutory appeal was subsequently dismissed for lack of jurisdiction, *Carter v. Dorman,* 381 So. 2d 778 (Fla. 3d DCA 1980), as this court still had jurisdiction to determine whether it had jurisdiction over the subject appeal which thereby deprived the trial court of jurisdiction to dispose finally of the cause during the pendency of said appeal, *Sun Insurance Co. v. Boyd,* 105 So. 2d 574, 575 (Fla. 1958); *State ex rel. B.F. Goodrich Co. v. Trammell,* 140 Fla. 500, 192 So. 175 (1939) (court syllabus no. 6); and (c) the trial court now has jurisdiction to enter a new final judgment based upon the jury verdict previously rendered in this cause. *Wagner v. Wagner,* 372 So. 2d 510, 512 (Fla. 3d DCA 1979).

The Court's holding in *Katz v. NME Hospitals, Inc.,* 791 So. 2d 1127 (Fla. 4th DCA 2000)

is instructive here:

On February 4, 2000, appellant appealed a January 31, 2000 order granting a motion for summary judgment. While that appeal was pending, the trial court entered two final judgments on March 2, 2000. Those orders were also appealed.

On May 12, 2000, this court dismissed the appeal from the January 31, 2000 order because it was a nonfinal, nonappealable order. Appellant argues that we must reverse the final judgments entered on March 2, 2000 because they were entered while the nonfinal appeal of the January 31, 2000 order was pending. Appellant relies on rule 9.130(f) which provides:

Stay of Proceedings. In the absence of a stay, during the pendency of a review of a nonfinal order, the lower tribunal may proceed with all matters, including trial or final hearing; provided that the lower tribunal *may not render a final order disposing of the cause pending such review.* (emphasis added.)

The Committee Notes to the rule state that the lower tribunal is "divested of jurisdiction" to enter a final order where a nonfinal appeal has been taken.

Appellees respond that the January 31, 2000 order was only an order granting a motion, clearly not appealable, as evidenced by our dismissal of that appeal in May. Accordingly, appellees argue, jurisdiction was not vested in this court. Appellant responds that the same factual situation was presented in *Carter v. Dorman,* 385 So.

6

2d 740 (Fla. 3d DCA 1980) in which the third district held that even though a nonfinal appeal was ultimately dismissed by the appellate court for lack of jurisdiction, the trial court was without jurisdiction to enter a final judgment while the nonfinal appeal was pending. The court reasoned, based on earlier cases, that it had **jurisdiction to determine jurisdiction**. We agree with *Carter* and therefore reverse the judgments. (emphasis added)

The Court's holding in *Garcia-Lawson v. Lawson*, 82 So. 3d 137, 137 (Fla. 4th DCA 2012) is instructive here:

Courts have interpreted this rule to mean that a trial court lacks the jurisdiction to render a final order while an appeal from a non-final order in the same case is pending and, if the trial court does so, the final order is a nullity. *E.g.*, *Dragomirecky v. Town of Ponce Inlet*, 891 So. 2d 633, 634 (Fla. 5th DCA 2005) ("[A]n order entered without jurisdiction is a nullity, and cannot be considered harmless error." (citations omitted)); *Connor Realty, Inc. v. Ocean Terrace N. Condo. Ass'n*, 572 So. 2d 4, 4 (Fla. 4th DCA 1990) ("[A] trial court may proceed in a cause pending a non-final appeal and dispose of any matter not in form or effect interfering with the power and authority of the appellate court to make its jurisdiction effective, but the trial court may do so *only short of final disposition.*" (emphasis in original) (citations omitted)).

The Court in *Chapman v. Universal Underwriters Insurance Company*, 549 So.2d 679 (Fla. 1st DCA 1989), explained:

One might argue that since we did not have jurisdiction to consider this appeal, as it was from an order merely granting a motion to dismiss, the trial court retained jurisdiction to enter the order. However, the Third District Court of Appeal in *Carter v. Dorman*, 385 So. 2d 740 (Fla. 3d DCA 1980), found that to be a distinction without a difference. Therein the court reversed an order denying a motion to set aside a final judgment under rule 1.540(b)(4), Florida Rules of Civil Procedure, on the basis that

... (a) the original judgment was entered without jurisdiction while an appeal from a non-final trial court order was pending in this Court [citation omitted]; (b) *this result is not changed by the fact that the above-stated interlocutory appeal was subsequently dismissed for lack of jurisdiction* [citation omitted], as this court still had

7

jurisdiction to determine whether it had jurisdiction over the subject appeal *which thereby deprived the trial court of jurisdiction to dispose finally of the cause* during the pendency of said appeal [citations omitted]; and (c) the trial court now has jurisdiction to enter a new final judgment based upon the jury verdict previously rendered in this cause. [Citation omitted.] 385 So.2d at 741 (emphasis added).

The Court in *Cooper v. Cooper*, 69 So. 3d 977 (Fla. 2d DCA 2011), explained:

Pursuant to Florida Rule of Appellate Procedure 9.130(f), a nonfinal appeal does not act as an automatic stay of proceedings in the trial court, but it divests the trial court of the power to "render a final order disposing of the cause pending such review."

Pursuant to Florida Rule of Appellate Procedure 9.130(f), Judge Shenko did not have the power to render the Final Judgment on October 5, 2015 while Myers' Appeal was pending in the Second District Court of Appeal.

WHEREFORE, Kelly respectfully prays this Honorable Court hold an evidentiary hearing on the instant motion, vacate the Final Judgment, and afford such other and further relief as may be just and proper.

## VERIFICATION

I HEREBY CERTIFY under penalty of perjury that I have read the foregoing and the facts stated herein are true and correct.

/s/ Barbara Ann Kelly
Barbara Ann Kelly

Dated:  October 4, 2016          Respectfully Submitted,

/s/ Barbara Ann Kelly
Barbara Ann Kelly, *pro se*
4505 Wetherill Road
Bethesda, MD  20816
(301) 325-3528
*bakellymyers@verizon.net*

8

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of October, 2016 the foregoing was electronically filed with the Clerk of Court using the Florida E-Filing Portal and a copy of same was electronically served via email to the following:

Jason Perkins, Esquire (by e-mail to JPerkins@cfjblaw.com)
CARLTON FIELDS JORDEN BURT
CNL Center at City Commons
450 S. Orange Avenue
Orlando, Florida 32801-3370
Counsel for plaintiff US Bank National Association,
as Trustee for Credit Suisse First Boston CSFB 2005-11
Counsel for Wells Fargo Bank, N.A.

Gregory B. Myers
700 Gulf Shore Blvd. N.
Naples, FL  34102
*gregbmyers@verizon.net*

/s/ Barbara Ann Kelly
Barbara Ann Kelly, *pro se*

# Exhibit A

INSTR 5171438   OR 5194   PG 847   RECORDED 9/15/2015 12:28 PM   PAGES 45
DWIGHT E. BROCK, CLERK OF THE CIRCUIT COURT, COLLIER COUNTY FLORIDA
REC $384.00   INDX $3.00



IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
IN AND FOR COLLIER COUNTY, FLORIDA
CIVIL ACTION

US BANK NATIONAL ASSOCIATION,
as Trustee for Credit Suisse
First Boston CSFB 2005-11,

    Plaintiff,

v.                         Case No.:  11-2009-CA-010813

BARBARA ANN KELLY, GREGORY
B. MYERS, SUNTRUST BANK, NAVY
FEDERAL CREDIT UNION; AND FIDELITY
& DEPOSIT COMPANY OF MARYLAND,

    Defendant.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT OF
FORECLOSURE**

    This action was tried before the Court for three days on February 19-20, 2015 and April

16, 2015 in Naples, Collier County, Florida.  The Court heard testimony presented by the

Plaintiff, US Bank National Association, as Trustee for Credit Suisse First Boston CSFB 2005-

11 (hereinafter, "Plaintiff") and Defendants, Barbara Ann Kelly and Gregory B. Myers

(hereinafter, "Defendants"); admitted numerous exhibits into evidence; and heard extensive legal

argument from counsel.

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

**I.**    <u>**THE PLAINTIFF'S PRIMA FACIE CASE**</u>

A.    <u>Background</u>

    This action involves a foreclosure on residential property situated at Lot 10, Block 7,

Naples Golf and Beach Club Tract, according to the plat in Plat Book 2, Page 78, of the Public

Records of Collier County, Florida also known as 700 Gulf Shore Boulevard North, Naples, Florida 34102 (hereinafter, "the Property").

The Plaintiff is a Trustee under a Pooling and Servicing Agreement, dated as of November 1, 2005, relating to CSFB Mortgage-Back Passed Through Certificates, Series 2005-11. See Plaintiff's Trial Exhibit #11.

The Defendants, Barbara Ann Kelly and Gregory B. Myers, are individuals who own the property, as husband and wife. See Plaintiff's Trial Exhibit #1. The Defendants, SunTrust and Navy Federal Credit Union, are junior lienholders. See Plaintiff's Trial Exhibit #45 and #47. The Defendant, Fidelity & Deposit Company of Maryland, is a judgment holder. See Plaintiff's Trial Exhibit #43.

Ms. Kelly currently resides in Bethesda, Maryland. See Trial[1] Transcript at pg. 73, lines 6-8. Mr. Myers currently resides in the Property and claims the Property as his homestead. See id. at pg. 71, line 21 through pg. 72, line 4.

Both Ms. Kelly and Mr. Myers have experience in the residential mortgage industry. In fact, Ms. Kelly was once the owner of Met-Fund, see id. at pg. 380, lines 2-3, a company in the business of originating residential mortgages for major lending institutions, see id. at pg. 75, line 24 through pg. 76, line 1, including, Wells Fargo, the servicer of the Defendants' loan, see id. at pg. 76, line 23 through pg. 77, line 8.

Met-Fund was in business from 2000 through the first few months of 2008. See id. at pg. 77, lines 9-11. In 2005, Ms. Kelly signed a loan application indicating that her monthly income as owner of Met-Fund equaled $90,000. See id. at pg. 380, lines 5-24.

---

[1] The testimony from the first two days of trial is contained in the "Trial Transcript." The testimony from the third day of trial is contained a separate transcript that the Court will refer to as the "Third Day of Trial Transcript."

B.    This Loan

Based on the evidence presented at trial, the Court finds that Defendant, Gregory B. Myers, was the attorney in fact for Defendant, Barbara Ann Kelly, pursuant to a Limited Power of Attorney executed on June 28, 2005 and recorded in the official records of Collier County, Florida on July 6, 2005. See Plaintiff's Trial Exhibit #2.

The Court further finds that Defendant, Gregory B. Myers, took out a loan in the amount of $1,840,000 on behalf of Defendant, Barbara Ann Kelly, in order to purchase the Property.

The loan is evidenced by a Promissory Note signed by Mr. Myers, as attorney in fact for Ms. Kelly, on June 30, 2005. See Plaintiff's Trial Exhibit #3. The loan is further evidenced by a Mortgage signed by Mr. Myers, as attorney in fact for Ms. Kelly, on June 30, 2005 and recorded July 6, 2005. See Plaintiff's Trial Exhibit #5.

AmSouth Bank n/k/a Regions Bank was the initial lender identified on the Promissory Note and Mortgage. See Plaintiff's Trial Exhibit #3. However, the Promissory Note contains an endorsement, in blank, providing "PAY TO THE ORDER OF _____ WITHOUT RECOURSE AMSOUTH BANK JONATHAN LOUKOTKA VICE PRESIDENT." Id. This is known as a blank endorsement or endorsement in blank.

The original Promissory Note and original Mortgage were both admitted into evidence in this case. See Trial Transcript at pg. 81, lines 6-8 and pg. 90, line 25 through pg. 91, line 1. The Court also took judicial notice of a certified copy of the Mortgage which is self-authenticating under the Florida Rules of Evidence. See Order on February 19, 2015 and February 20, 2015 Matters pg. 2, ¶ 4.

The Court finds that the Promissory Note obligates Ms. Kelly to make monthly payments in the amount of $9,583.33 on the first day of each month starting August 1, 2005. See

Plaintiff's Trial Exhibit #3 at pg. 1, ¶ 3. The Court further finds that the Promissory Note has a maturity date of July 1, 2020. See id. Thus, the Promissory Note has a term of 15 years or 180 months. See id. The Court additionally finds that the obligations set forth in the Promissory Note are secured by the Property.

C.     The Defendants' Default Under the Loan

The Court finds that Ms. Kelly defaulted under the terms and conditions of the Promissory Note and Mortgage (collectively, "the Loan Documents") by failing to make monthly payments due and owing under the loan documents.

At the trial of this matter, Plaintiff called Cindy Shanabrook to testify on its behalf. See Trial Transcript at pg. 101, lines 17-25. Ms. Shanabrook is an employee of Wells Fargo Bank, N.A. (hereinafter, "Wells Fargo"), which routinely does business under the name America's Servicing Company (hereinafter, "ASC"). See id. at pg. 102, lines 1-9.

Wells Fargo d/b/a ASC is the servicer for the Defendants' loan, see id. at pg. 102, lines 10-12, and has been since January 1, 2006, see id. at pg. 184, lines 16-19. In that capacity, Wells Fargo collects payments on the loan; corresponds with the borrower regarding the loan; and maintains the business records on the loan. See id. at pg. 104, lines 4-12. The Court finds that ASC at all times material to this litigation was the authorized agent of Wells Fargo.

Ms. Shanabrook testified that Defendants have not made a payment on the loan since August 7, 2009. See id. at pg. 208, lines 2-10. Ms. Shanabrook further testified that Defendants have missed sixty-six (66) monthly loan payments since that time. See id. at lines 11-13.

Ms. Shanabrook's testimony is corroborated by exhibits that were admitted into evidence. See Plaintiff's Trial Exhibit #40 (P-309 Screen Shots) & Plaintiff's Trial Exhibit #41 (Mortgage

Loan History).  Ms. Shanabrook's testimony is also corroborated by the Defendants' trial

testimony.  In that connection, Ms. Kelly testified:

> Q.    As you sit here today, are you aware that this loan is not
> current?
>
> A.    It's pretty evident.

Trial Transcript at pg. 384, lines 5-7.  Mr. Myers likewise testified:

> Q.    Okay. Did you make a payment in 2014?
>
> A.    I don't believe so, no.
>
> Q.    Did you make a payment in 2013?
>
> A.    I don't believe so.
>
> Q.    Did you make a payment in 2012?
>
> A.    I don't believe so.
>
> Q.    Did you make a payment in 2011?
>
> A.    I don't believe so.
>
> Q.    Did you make a payment in 2010?
>
> A.    I can't recall exactly, but I don't believe so.

Trial Transcript at pg. 93, line 25 through pg. 94, line 9.  The testimony was overwhelming that

there has not been any payment on the loan which is the subject matter of this litigation since

August 7th, 2009.

D.    The Default Notice

　　　Paragraph 22 of the Mortgage requires that a Default Notice be sent to the borrowers

prior to the initiation of foreclosure proceedings.  See Plaintiff's Trial Exhibit #5 at pg. 10, ¶ 22.

　　　On the second day of trial, the Court admitted into evidence a Default Notice from ASC

dated October 18, 2009 addressed to Defendant, Barbara Ann Kelly, at 4505 Wetherhill Road,

Bethesda, Maryland 20816-1836.  See Plaintiff's Trial Exhibit #31; see also Trial Transcript at pg. 214, lines 13-16.

The Defendants argue that the Default Notice is deficient because it was not sent by the Plaintiff, but rather, ASC.  The Defendants further argue that the Default Notice is deficient because on October 25, 2013, Plaintiff filed a Supplemental Affidavit Regarding Notice of Intent attaching a copy of the Default Notice that did not contain a loan number.  The Court will address each of these arguments in turn.

Regarding Defendants' first argument, Ms. Shanabrook testified that Wells Fargo d/b/a ASC is servicing the Defendants' loan on behalf of the Plaintiff.  See id. at pg. 102, lines 13-21. Based on that testimony, the Court finds that Plaintiff sent the Default Notice to the Defendants, albeit through its agent, Wells Fargo d/b/a ASC, again that ASC was at all times material to this litigation the authorized agent of Wells Fargo.

Regarding Defendants' second argument, the Court finds that the Default Notice filed with the Court on October 25, 2013 had a loan number on it but that the loan number was redacted.  This is apparent from reviewing the original version of the Supplemental Affidavit Regarding Notice of Intent which was presented to the Court at the third day of trial and substituted into evidence as Defendants' Exhibit #36.  See Third Day of Trial Transcript at pg. 13, line 8 through pg. 17, line 21.

This is also apparent from the testimony given by at least two witnesses at trial: Cindy Shanabrook and Rod Walz.

As set forth above, Ms. Shanabrook is the Plaintiff's corporate representative.  She testified that that when she looked at images of the Default Notice on Wells Fargo's system of records, the Default Notice had a loan number on it.  See Trial Transcript at pg. 369, lines 10-13.

6

Ms. Shanabrook also testified that during her eight year tenure at Wells Fargo, she had never seen a default notice that was sent to the borrower without a loan number. Id. at pg. 369, lines 16-25.

Rod Walz is the Chief Executive Officer of Walz Postal Solutions, the entity that generated the Default Notice and converted it into a PDF for mailing by a third party vendor by the name of RR Donnelley. See Third Day of Trial Transcript at pg. 26, lines 2-8 & pg. 27, lines 20-22. Mr. Walz testified that he had no records of a Default Notice without a loan number:

Q.    . . . And based on your review of records . . . which you've given us today, the PDFs went from Walz to RR Donnelly had loan numbers on them?

A.    That is correct.

Q.    Okay. And if there were alternative PDFs that did not have loan numbers, that would have been archived in your system?

A.    It would have been archived in our system.

Q.    Okay. And you would have retrieved that in your review of the system in preparation for today's deposition?

A.    That is correct.

Q.    Okay. So you can tell me that there were no alternative PDFs without loan numbers that went from Walz to RR Donnelley?

A.    There was no alternative. According to our records and our computers, there was no alternative one that had no loan number on it.

Third Day of Trial Transcript at pg. 43, line 22 through pg. 44, line 15. The Court finds that the default notice sent to the Defendants contained the loan number.

The Court will address Defendants' remaining arguments about paragraph 22 of the Mortgage in section II (E) below.

7

E.   The Amounts Due and Owing

The Court finds that the Plaintiff presented substantial, competent evidence of the amounts due and owing under the Promissory Note and Mortgage, those amounts being set forth in section II (D) below and totaling $2,690,161.93.

Specifically, Plaintiff presented the testimony of Cindy Shanabrook.  See Trial Transcript at pg. 218, line 17 through pg. 230, line 12.  The Plaintiff also presented records (which were admitted into evidence by the Court) which corroborated Cindy Shanabrook's testimony.  See Plaintiff's Trial Exhibit #37.

There was no cross examination about the accuracy of Plaintiff's calculation of the amounts due and owing, nor was there any evidence presented suggesting that the amounts due and owing were erroneous or otherwise incorrect.  The Court finds that the evidence of amounts due and owing was essentially unrebutted and the Court accepts the testimony of Cindy Shanabrook.

F.   The Superiority of Plaintiff's Lien

The Plaintiff sued Defendants, SunTrust Bank, Navy Federal Credit Union, and Fidelity & Deposit Company of Maryland, and all three have been defaulted and thus concede their interests are subject, subordinate and inferior to Plaintiff's title, interest and lien.  The Court took judicial notice of those defaults by way of an Order entered on March 13, 2015.  See Order on February 19, 2015 and February 20, 2015 Matters.  Based on the judicial notice, the Court finds that Plaintiff's interest in the property is superior to that of SunTrust Bank, Navy Federal Credit Union, and Fidelity & Deposit Company of Maryland.

## II.   THE DEFENDANTS' FOURTH AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO MORTGAGE FORECLOSURE COMPLAINT

A.   Background

On December 17, 2009, the Plaintiff filed its Mortgage Foreclosure Complaint against the Defendants.

On January 28, 2015, Defendants filed their Fourth Amended Answer and Affirmative Defenses to Mortgage Foreclosure Complaint asserting four affirmative defenses: (1) that Plaintiff is not a proper party and lacks standing; (2) that Plaintiff violated the Truth-In-Lending Act; (3) that Plaintiff added illegal charges to the balance due and owing on this loan; and (4) that Plaintiff failed to satisfy conditions precedent.

Notably, Defendants do not allege that they have been making payments on the loan to the Plaintiff. Nor do the Defendants allege that they have been making payments on the loan to a non-party to these foreclosure proceedings.

On February 4, 2015, Plaintiff filed a Motion to Strike paragraphs 39, 40, and 41 of Defendants' Fourth Amended Answer and Affirmative Defenses alleging that Plaintiff failed to satisfy the requirements of Florida Statute section 559.71 prior to initiating this lawsuit. On February 19, 2015, the Court granted Plaintiff's Motion to Strike. The Court then proceeded to consider the Defendants' remaining affirmative defenses at the trial of this matter. The Court will address those Affirmative Defenses in turn.

B.    **Plaintiff is a Proper Party and Has Standing to Prosecute this Foreclosure Action**

As their First Affirmative Defense, Defendants argue that Plaintiff is not a proper party to this action and/or lacks standing to prosecute this action because:

- (1) The note ("Note") and mortgage ("Mortgage") attached to the Plaintiff's Complaint identify the lender as AmSouth Bank ("AmSouth Bank") and Plaintiff is not a party to the Note and Mortgage. See Fourth Amended Answer and Affirmative Defenses at pgs. 8-9, ¶ 6.

- (2) The Plaintiff failed to show that it had any legal interest in the Note and Mortgage, on the date the Complaint was filed that entitles the Plaintiff to prosecute this action. As such, the Plaintiff lacks standing to prosecute this action. See id. at pg. 9, ¶ 7.

- (3) The Plaintiff failed to show that it had physical possession of the Note and Mortgage, on the date the Complaint was filed, that entitles the Plaintiff to prosecute this action. As such, the Plaintiff lacks standing to prosecute this action. See id. at pg. 9, ¶ 8.

- (4) There is evidence contained in the Plaintiff's pleadings filed in this action that an entity or entities other than the Plaintiff owns and/or holds the Note and Mortgage. The Affidavit filed on February 21, 2011 contains business records indicating that the Note and Mortgage are owned and held by an entity known as CSMC PMSR CSMC 2005-11. The Affidavit filed on October 25, 2013 contains business records indicating the Note and Mortgage are owned by an entity known as "Credit Suisse First Boston Mortgage Acceptance Corp." See id. at pg. 9, ¶¶ 9-11.

- (5) The Plaintiff was only putatively assigned the Note and Mortgage several months after the commencement of this action. See id. at pg. 9, ¶ 12.

1. The Face of the Note and Mortgage Indicate that They are Transferable. As such, the Loan Documents can be Enforced by Parties Other than the Original Lender

The Defendants first argue that Plaintiff lacks standing to prosecute this foreclosure action because the Note and Mortgage "identify the lender as AmSouth Bank" and "Plaintiff is not a party to the Note and Mortgage." See Fourth Amended Answer and Affirmative Defenses at pgs. 8-9, ¶ 6.

The Court rejects this argument. The face of the Promissory Note and Mortgage reflect that they are transferable. In fact, the Promissory Note, admitted as Plaintiff's Trial Exhibit #3, provides: "I understand that Lender may transfer this Note. The Lender or anyone who takes this

Note by transfer and who is entitled to receive payments under this Note is called the 'Note Holder.'" Id. at pg. 1, ¶ 1.

The Mortgage, admitted as Plaintiff's Trial Exhibit #5, likewise provides that: "The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower." Id. at pg. 9, ¶ 20.

The Court finds that the Promissory Note is also endorsed in blank meaning it is bearer paper.

2.  The Plaintiff Demonstrated that it had a Legal Interest in the Promissory Note and Mortgage on the date the Complaint was filed Entitling Plaintiff to Prosecute this Action

The Defendants next argue that Plaintiff lacks standing to prosecute this foreclosure action because Plaintiff failed to show that it had any legal interest in the Note and Mortgage on the date the Complaint was filed. See Fourth Amended Answer and Affirmative Defenses at pg. 9, ¶ 7.

The Defendants' argument is predicated on several documents including, without limitation: the Loan History Transfer Screenshot (hereinafter, "the LNTH Screenshot"); two Servicing Compliance Statements prepared by Wells Fargo and submitted to the Security and Exchange Commission (hereinafter, "the SEC"); and an "Investors with No Active Loans Report" prepared by Wells Fargo.

The LNTH Screenshot is a document maintained by Wells Fargo, as the servicing agent for the Plaintiff, to track the transfers of loans. See Plaintiff's Trial Exhibit #7. The face of that document reflects a "SALE" of Defendants' loan from investor number 554 to investor number 374 or "CSFB PMSR CSFB 2005-11" on February 28, 2006. See id.

11

The Servicing Compliance Statements are dated March 1, 2007 and review "the activities of Wells Fargo during the calendar year 2006 . . . ." for its servicing clients.

The first Servicer Compliance Statement includes a row for investor number 554 and contains the following data:

| Client | Investor Number | Investor | Master Servicer/ Trustee | Deal Name |
|---|---|---|---|---|
| 106 | 554 | CSFB SUB CSFB 2005-11 | WFB CTS | CSFB 2005-11 |

See Defendants' Trial Exhibit #16.

The second Servicer Compliance Statement includes a row for investor number 374 and contains the following data:

| Client | Investor Number | Investor | Master Servicer/ Trustee | Deal Name |
|---|---|---|---|---|
| 106 | 374 | CSMC | Wells Fargo CTS | PMSR CSMC 2005-11 |

See Defendants' Trial Exhibit #17.

The "Investors with No Active Loans" Report is a report maintained by Wells Fargo for inactive loans and reflects that investor number 554 had no active loans on the following dates when the report was run: June 15, 2006; February 27, 2007; November 12, 2009; and November 2, 2012. See Plaintiff's Trial Exhibit #15.

According to the Defendants, the compilation of these documents indicate that investor number 554 and investor number 374 are separate and distinct entities; that investor number 554 sold the Defendants' loan to investor number 374 in February of 2006; and that, therefore, investor number 554 – the named Plaintiff in this action – lacks standing to prosecute this residential mortgage foreclosure action.

The Court rejects Defendants' arguments for several reasons.

First, Plaintiff's corporate representative, Cindy Shanabrook, testified that the "SALE" referenced in the LNTH Screenshot was not an actual sale of the Defendants' loan but rather a reassignment from one investment number (554) to another investment number (374):

> Q.    Did you research the transfer on February 28, 2006?
>
> A.    Yes, sir.
>
> Q.    And what did you learn from your research?
>
> ***
>
> A.    My research indicated that the line entry listed as sale to CSFB PMSR CSFB 2005-11 was a change in the investor number, not a change in the investor.
>
> Q.    So the investor was the same?
>
> A.    Yes, sir.
>
> Q.    And it was the same pooling and servicing agreement?
>
> A.    Yes, sir.
>
> Q.    It was just a change in the investor number?
>
> A.    Yes, sir.
>
> Q.    Has the defendant's loan been with the same investor, the plaintiff, since Wells Fargo started servicing this loan on January 1, 2006?
>
> A.    Yes, sir.

Trial Transcript at pg. 183, line 21 through pg. 184, line 19.

This change was effectuated because Wells Fargo erroneously designated itself as a sub servicer under investor number 554 even though Wells Fargo was not a sub servicer under the applicable Pooling and Servicing Agreement. See Trial Transcript at pg. 179, line 2 through pg. 180, line 5.

13

The documents admitted into evidence provide competent substantial evidence which corroborates Ms. Shanabrook's testimony. The Investor Servicers Screenshots maintained by Wells Fargo link both investor number 554 and investor number 374 to the same Pooling and Servicing Agreement. See Plaintiff's Exhibit #9; see also Trial Transcript at pg. 146, line 19, through pg. 147, line 15.

The investor matrix maintained by Wells Fargo identifies investor number 374 as "US Bank National Association, as Trustee for Credit Suisse First Boston CSFB 2005-11", the named Plaintiff in this action. See Plaintiff's Trial Exhibit #19. Notably, the information contained in the investor matrix was entered on February 2, 2007, more than two years before this foreclosure proceeding was initiated. See id.

The Pooling and Servicing Agreement also corroborates Ms. Shanabrook's testimony. The Pooling and Servicing Agreement was admitted into evidence as Plaintiff's Trial Exhibit #11 and includes a voluminous Mortgage Loan Schedule. See Plaintiff's Trial Exhibit #12. The Mortgage Loan Schedule is a list of loans that are part of the trust and subject to the Pooling and Servicing Agreement. Ms. Shanabrook testified that the Defendants' loan appears on the Mortgage Loan Schedule at line 2127. See Trial Transcript at pg. 129, lines 3-18; and pg. 371, line 24 through pg. 372, line 2.

The Court finds that the Mortgage Loan Schedule also corroborates Ms. Shanabrook's testimony. See Plaintiff's Trial Exhibit #12. Specifically, line 2127 of the Mortgage Loan Schedule contains the following data supporting Plaintiff's standing argument:

| Line | Cut-Off Date | Borrower Last Name | Address | City | State | Issue Date | First Pay Date | Maturity Date | Remaining Term |
|------|--------------|--------------------|---------|------|-------|------------|----------------|---------------|----------------|
| 2127 | 11/1/2005 | Kelly | 700 Gulf Shore | Naples | FL | 6/30/2005 | August 1, 2005 | July 1, 2020 | 176 |

| | | | BLVD North | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

Although Wells Fargo submitted two Servicer Compliance Statements to the SEC on March 1, 2007 separately identifying investor number 554 and investor number 374, the Servicer Compliance statements covered activities during the calendar year 2006 when both of those investor numbers were active.  See Trial Transcript at pg. 176, line 7 through pg. 178, line 9.  Specifically, investor number 554 was active until at least February 28, 2006, when the Defendants' loan was assigned investor number 374.  Likewise, investor number 374 was active from February 28, 2006 going forward.  Thus, the SEC Compliance Statements are not inconsistent with investor number 554 being the same entity as investor number 374.

The "Investor With No Active Loans" report supports Plaintiff's argument that investor number 554 is the same investor as investor number 374.  Investor number 554 became inactive with no loans after the Defendants' loan was assigned investor number 374 in 2006.  See Plaintiff's Trial Exhibit #12.

The Court finds that investor number 554 and investor number 374 are the same investor.  The Court finds that the Plaintiff had a legal interest in the Promissory Note on the date the Complaint was filed.  The Court finds that although Wells Fargo's internal investor numbers may have changed, the underlying investor did not.

The Court finds that even if the investor changed on February 28, 2006, that the "new investor" is the Plaintiff and that the Plaintiff has held the Promissory Note since that time including, without limitation, on the date the Complaint was filed on December 17, 2009.  Thus, under either scenario presented the Plaintiff has proven its standing to prosecute this residential foreclosure action.

3.      The Plaintiff Demonstrated that it had Physical Possession of the
        Promissory Note and Mortgage, on the date the Complaint was
        <u>filed</u>

The Defendants next argue that the Plaintiff lacks standing to prosecute this foreclosure

action because Plaintiff failed to show that it had physical possession of the original Promissory

Note, endorsed in blank, and the original Mortgage on the date the Complaint was filed on

December 17, 2009.  <u>See</u> Fourth Amended Answer and Affirmative Defenses at pg. 9, ¶ 8.

As a preliminary matter, the Court notes that it is not necessary for Plaintiff to prove that

it had physical possession of the original Mortgage on the date the Complaint was filed.  Instead,

it is only necessary to prove physical possession of the original Promissory Note.  <u>See</u> <u>Perry v.</u>

<u>Fairbanks Capital Corp.</u>, 888 So. 2d 725, 727 (Fla. 5th DCA 2004) (holding that a promissory

note is a negotiable instrument, which is why the original must be filed; however, the original

mortgage is not necessary, as the mortgage can be proved by using a properly authenticated

duplicate").

The Court finds there was competent substantial evidence demonstrating Plaintiff's

possession of the original Promissory Note, endorsed in blank, as of December 17, 2009.

The Court accepts the testimony of Cindy Shanabrook on this issue.  Ms. Shanabrook

testified in detail concerning Wells Fargo's Collections/Customer Service Loan Activity Archive

(hereinafter, "the Archive"), which tracks the location of Defendants' original loan documents.

Based on her review of the Archive, Ms. Shanabrook testified that Wells Fargo received

the Defendants' original loan documents, including the Promissory Note, on December 5, 2009.

<u>See</u> Trial Transcript at pg. 203, lines 11-16.   Mr. Shanabrook further testified that upon receipt

of the original loan documents, including the Promissory Note, Wells Fargo sent the original

loan documents to imaging to get scanned into Wells Fargo's system of record – Imaging &

Content Management Platform (hereinafter, "ICMP") – which is a routine business practice of Wells Fargo.  See id. at pg. 203, line 17 through pg. 204, line 2.  Consistent with that routine business practice, Ms. Shanabrook testified that Defendants' Promissory Note appeared in ICMP on December 14, 2009 – three (3) days before the Mortgage Foreclosure Complaint was filed in this case – and that the image of the Promissory Note scanned in that day contained an endorsement in blank.  See id. at pg. 204, line 3 through pg. 206, line 2.

Ms. Shanabrook's testimony is corroborated by the Archive which was admitted into evidence as Plaintiff's Trial Exhibit #35.  See id. at pg. 203, lines 6-9. Ms. Shanabrook's testimony is also corroborated by the ICMP records which were admitted into evidence as Plaintiff's Exhibit #4.  See id. at pg. 206, lines 18-20.  Finally, Ms. Shanabrook's testimony is corroborated by the original Promissory Note that was filed with the Court on March 30, 2010 which contains an endorsement in blank.

The Defendants argue that an entry in the Archive on January 15, 2010 calls into question Ms. Shanabrook's testimony about Plaintiff's possession of the Promissory Note on the date the Complaint was filed.  In pertinent part, that entry provides: "11708 ORDERED ORIGINAL DOCUMENTS LASALLE."

Unlike the December 5, 2009 entry referenced above, the January 15, 2010 entry does not contain a specific reference to the Promissory Note.  Moreover, unlike the December 5, 2009 entry, the January 15, 2010 entry is not followed by scanning activity in the ICMP records.  See Plaintiff's Exhibit 4.

The ICMP index indicates that the last scan of the Promissory Note was December 14, 2009.  If Wells Fargo had received the Defendants' Promissory Note on or after January 15, 2010, then it would have scanned the Promissory Note into the ICMP system of records

consistent with the routine business practice at the time. The Court finds that the absence of business records reflecting imaging and scanning activity after December 14, 2009 also corroborates Ms. Shanabrook's testimony.

Because the original Promissory Note contains and endorsement in blank, and contained an endorsement in blank as of the date the Mortgage Foreclosure Complaint was filed, the Court finds that Plaintiff is the holder of the Promissory Note and Mortgage with standing to prosecute this foreclosure action. See Harvey v. Deutsche Bank Nat'l Trust Co., 69 So. 3d 300, 304 (Fla. 4th DCA 2011) (holding that possession of original note endorsed in blank which was filed with the Court was sufficient to establish standing); Riggs v. Aurora Loan Services, LLC, 36 So. 3d 932, 933 (Fla. 4th DCA 2010) (possession of the original promissory note, indorsed in blank, sufficient to establish lawful holder of the note, and entitlement to enforce its terms).

4.    The Promissory Note is a Negotiable Instrument

Cindy Shanabrook testified that the original Promissory Note did not bear an endorsement in blank on March 23, 2006, when the Promissory Note was initially scanned into Wells Fargo's system of records. See Trial Transcript at pg. 356, lines 12-15.

Based on that testimony, Defendants argue that the Promissory Note is not a negotiable instrument and that Plaintiff is not a holder. Defendants rely on Florida Statute section 673.1041(1)(a). In pertinent part, that statute provides: "[T]he term 'negotiable instrument' means an unconditional promise or order to pay a fixed amount of money . . . if it . . . is payable to bearer . . . at the time it . . . first comes into possession of a holder." Since the Promissory Note was not payable to bearer, i.e., endorsed in blank, when it first came into possession of

18

Plaintiff in 2006, Defendants argue that the Promissory Note does not meet the definition of a "negotiable instrument" and, by extension, Plaintiff does not meet the definition of a "holder."

The Court rejects the Defendants' argument.

The testimony of Cindy Shanabrook demonstrates that the original Promissory Note was endorsed in blank as of December 17, 2009.  Thus, the original Promissory Note was a negotiable instrument when the Plaintiff filed the Mortgage Foreclosure Complaint and the Plaintiff was a holder at that time.  In that connection, Florida Statute section 673.2031 provides:

> Unless otherwise agreed, if an instrument is transferred for value and the transferee does not become a holder because of lack of indorsement by the transferor, the transferee has a specifically enforceable right to the unqualified indorsement of the transferor, but negotiation of the instrument does not occur until the indorsement is made.

Florida Statute section 673.203 (emphasis added).  Under this provision, provided the endorsement is authentic, the "timing is immaterial" for purposes of determining whether the Plaintiff is a valid holder of the promissory note with standing to prosecute a foreclosure action. See Bank of America v. Martinson, No. 10-cv-10-wmc, 2013 WL 5965540, at *1 (W.D. Wis. Nov. 8, 2013) (interpreting identical statutory provision).

Here, Defendants did not challenge the authenticity of the endorsement in their pleadings or at the trial of this matter.  In fact, on the final day of trial, Defendants conceded that they were not alleging that the endorsement is a product of fraud.  See Third Day of Trial Transcript at pg. 166, lines 2-5 ("Um, he talked about the fact that we have a problem because we didn't plea that Mr. Loukotka's signature was a fraud.  We're not saying that it is a fraud.").

As a result, Defendants' admitted the authenticity of the endorsement in blank.  See Florida Statute section 673.3081(1) ("In an action with respect to an instrument, the authenticity

of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings.").

As a result, the timing of the endorsement in blank is immaterial, and Plaintiff is a holder of the Promissory Note and was a holder at the time the Mortgage Foreclosure Complaint was filed on December 17, 2009.  See Comment 3 to Florida Statute section 673.2031 ("Subsection (c) provides that there is no negotiation of the instrument until the indorsement by the transferor is made.  Until that time the transferee does not become a holder . . . . " (emphasis added)).

5.    The Plaintiff owns/holds the Promissory Note and Mortgage

The Defendants next argue that Plaintiff lacks standing to prosecute this foreclosure action because "[t]here is evidence contained in the Plaintiff's pleadings . . . that an entity or entities other than the Plaintiff owns and/or holds the Note and Mortgage." Fourth Amended Answer and Affirmative Defenses at pg. 9, ¶ 9.

Specifically, Defendants assert that an affidavit filed on February 21, 2011 contains business records indicating that the Note and Mortgage are owned and held by an entity known as CSMC PMSR CSMC 2005-11. See id. at ¶ 10. Similarly, Defendants allege that an affidavit filed on October 25, 2013 contains business records indicating the Note and Mortgage are owned by an entity known as "Credit Suisse First Boston Mortgage Acceptance Corp." See id. at ¶ 11.

On the first day of trial, Cindy Shanabrook testified that Defendants' loan is held by investor number 374.  See Trial Transcript at pg. 118, line 12 through pg. 119, line 14.  Cindy Shanabrook further testified that Investor number 374 is U.S. Bank National Association, as Trustee for Credit Suisse First Boston CSFB 2005-11, the named Plaintiff in this action, and that the Plaintiff has held Defendants' loan continuously since January 1, 2006.  See id. at pg. 119, lines 15-21; and pg. 184, lines 16-19.

Ms. Shanabrook testified that in the course of servicing this loan for the Plaintiff from 2006 forward, Wells Fargo used several acronyms to describe the Plaintiff including, without limitation, the following:

(1)    CSFB PMSR CSFB 2005-11;

(2)    CSFB 2005-11 PMSR;

(3)    CSMC PMSR CSMC 2005-11;

(4)    CSMC PMSR CSFB 2005-11; and

(5)    PMSR CSMC 2005-11.

See Trial Transcript at pg. 180, line 12 through pg. 181, line 7.

Notably, Ms. Shanabrook testified that although the acronyms used to describe the Plaintiff changed, the Plaintiff did not. See Trial Transcript at pg. 303, lines 13-17.

Ms. Shanabrook's testimony is corroborated by numerous trial exhibits that were admitted into evidence by the Court including Plaintiff's Trial Exhibit #7 (the Loan History Transfer Screenshot); Plaintiff's Trial Exhibit #9 (the Investor Services Screenshots); Plaintiff's Trial Exhibits #18 and #21 (the MAS1 Screenshots); Plaintiff's Trial Exhibit #19 (the Investor Matrix); and Plaintiff's Trial Exhibit #17 (The Investor Header Update Report).

The Court accepts Ms. Shanabrook's testimony which was corroborated by the documentary evidence and rejects Defendants' argument that an entity or entities other than the Plaintiff holds the Promissory Note at issue in this case.

6.    The Plaintiff was not putatively assigned the Note and Mortgage
      several months after the commencement of this action

The Defendants next argue that Plaintiff lacks standing to prosecute this foreclosure action because "Plaintiff was only putatively assigned the Note and Mortgage several months

after the commencement of this action." See Fourth Amended Answer and Affirmative Defenses

at pg. 9, ¶ 12.

In that connection, Defendants rely on an Assignment of Mortgage, admitted into

evidence as Defendants' Trial Exhibit #26, that was recorded in the official records of Collier

County, Florida on April 21, 2010. In pertinent part, that Assignment provides:

> **FOR VALUE RECEIVED, on or before December 01, 2009 2009**, the undersigned, **REGIONS BANK SUCCESSOR BY MERGER WITH AMSOUTH BANK** . . . assigned, transferred and conveyed to: **US BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR CREDIT SUISSE FIRST BOSTON CSFB 2005-11** . . . the right, title, and interest of Assignor in and to that certain Mortgage . . . dated June 30, 2005 and recorded July 6, 2005 . . . encumbering the following-described real property:
>
> **LOT 10, SUBDIVISION OF BLOCK 7, NAPLES GOLF AND BEACH CLUB TRACT, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 2, PAGE 78, OF THE PUBLIC RECORDS OF COLLIER COUNTY, FLORIDA.**
>
> as the same may have been amended from time to time; together with the Note and indebtedness secured thereby.

Defendants' Trial Exhibit #26 (emphasis in the original).

The Court rejects Defendants' argument.

The Plaintiff did not rely on the Assignment of Mortgage to establish its standing to

prosecute this mortgage foreclosure action. The Plaintiff is relied upon its possession of the

original Promissory Note, endorsed in blank.

Second, it is well-established that the mere possession of the original promissory note,

endorsed in blank, is sufficient to establish standing under Florida law. See Riggs v. Aurora

Loan Servs., LLC, 36 So. 3d 932, 933 (Fla. 4th DCA 2010) (possession of the original

promissory note, indorsed in blank, is sufficient to establish the lawful holder of the note and

entitlement to enforce its terms); Jacobs v. Becks, 355 So. 2d 1241, 1243 (Fla. 1st DCA 1978) ("The promissory note is itself evidence of the existence of the debt and its introduction into evidence is sufficient to establish a prima facie case.").

In these circumstances, the assignment has no legal effect other than to take the mortgage out of the name of the original lender – AmSouth Bank n/k/a Regions Bank – in the public records. Thus, the assignment is not material to the Court's standing analysis. See Gonzalez v. Deutsche Bank Nat'l Trust Co., 95 So. 3d 251, 253 (Fla. 2d DCA 2012) ("If the note or other debt secured by a mortgage [is] transferred without any formal assignment of the mortgage, or even delivery of it, the mortgage in equity passes as an incident to the debt, unless there [is] some plain and clear agreement to the contrary . . . ." (quoting Johns v. Gillian, 184 So. 140, 143 (Fla. 1938)); Harvey v. Deutche Bank Nat'l Trust Co., 69 So. 3d 300, 304 (Fla. 4th DCA 2011) ("[B]ecause the note at issue is . . . indorsed in blank, and because Deutsche possessed the original note and filed it with the circuit court, its standing may be established from its status as the note holder, regardless of any recorded assignments."); Chem. Residential Mortg. v. Rector, 742 So. 2d 300, 300-01 (Fla. 1st DCA 1998) ("Because the lien follows the debt, there was no requirement of attachment of a written and recorded assignment of the mortgage in order for the appellant to maintain the foreclosure action.").

C.    The Truth-In-Lending Act is Inapplicable

As their Second Affirmative Defense (labeled Fifth Affirmative Defense), Defendants assert that Plaintiff violated section 131(g) of the Truth In Lending Act (hereinafter, "TILA") by failing to notify Defendants in writing within thirty (30) days after the mortgage loan was sold or otherwise transferred to the Plaintiff. See Fourth Amended Answer and Affirmative Defenses at pg. 10, ¶¶ 14-16.

Section 131(g) of TILA, also known as section 1641(g), became effective on May 20, 2009, and does not apply retroactively. See 74 F.R. 60143-01 (November 20, 2009) ("Section 131(g) became effective immediately upon enactment on May 20, 2009 .... Mortgage loans sold or transferred on or after that date became subject to the requirements of Section 131(g) . . . .").

Defendants' loan has been with the Plaintiff since at least January 1, 2006. See Trial Transcript at pg. 184, lines 16-19. Because January 1, 2006 predates May 20, 2009. The Court finds TILA is inapplicable to this dispute.

D.     There is No Evidence of Illegal Charges Added to the Balance of Defendants' Loan

As their Third Affirmative Defense (labeled Eighth Affirmative Defense), Defendants assert that Plaintiff "added improper charges to the alleged debt." See Fourth Amended Answer and Affirmative Defenses at pg. 10, ¶ 17.

At the trial of this matter, Plaintiff's corporate representative testified at great length about the amounts due and owing. See Trial Transcript at pg. 218, line 17 through pg. 230, line 12. More specifically, Ms. Shanabrook testified that Defendants owed: (1) $1,840,000 in principal; (2) $631,423.31 in interest; (3) $101,621.68 for tax advances; (4) $116,158.60 for insurance advances; and (5) $958.34 in late fees, for a grand total of $2,690,161.93. See id. at pg. 218, lines 21-22; pg. 219, lines 11-12; pg. 225, lines 18-21; pg. 225, lines 22-24; pg. 226, lines 3-4; and pg. 230, lines 8-12. Plaintiff's corporate representative also testified about a per diem interest charge in the amount of $315.07 per day that would be added from February 20, 2015 going forward.

The Defendants did not cross examine Plaintiff's corporate representative about the amounts due and owing. Moreover, Defendants presented no evidence that the amounts due and

24

owing were improper.   In light of the foregoing, the Court finds that Defendants' Third

Affirmative Defense (labeled Eighth Affirmative Defense) fails.

E.     The Defendants' Failure to Satisfy Condition Precedent Defense Fails

As their Fourth Affirmative Defense (labeled Ninth Affirmative Defense) Defendants

assert that Plaintiff "failed to provide Defendants with a notice of default and intent to accelerate

("Default Notice") that meets the requirements of paragraph 22 of the Mortgage."   See Fourth

Amended Answer and Affirmative Defenses at pgs. 11-12, ¶ 25.   In pertinent part, that paragraph

provides as follows:

> 22.     **Acceleration; Remedies.   Lender shall give notice to
> Borrower prior to acceleration following Borrower's
> breach of any covenant or agreement in this Security
> Instrument (but not prior to acceleration under Section
> 18 unless Applicable law provides otherwise).     The
> notice shall specify: (a) the default; (b) the action
> required to cure the default; (c) a date, not less than 30
> days from the date the notice is given to Borrower, by
> which default must be cured; and (d) that failure to
> cure the default on or before the date specified in the
> notice may result in acceleration of the sums secured by
> this Security Instrument, foreclosure by judicial
> proceeding and sale of the Property.   The notice shall
> further inform Borrower of the right to reinstate after
> acceleration and the right to assert in the foreclosure
> proceeding the non-existence of a default or any other
> defense of Borrower to acceleration and foreclosure.**

Plaintiff's Trial Exhibit #5 at pg. 10, ¶ 22 (emphasis in the original).

Relying on that paragraph, Defendants allege eight (8) deficiencies with the Default

Notice:

- (1) That the Default Notice was never sent to the
  Defendants.   See Fourth Amended Answer and
  Affirmative Defenses at pgs. 12-13, ¶¶ 28.

- (2) That the Default Notice was sent to an address
  different than the address set forth in the 'Address

Certification' executed by the Defendants.  Id. at pg. 12, ¶ 30.

- (3) That the Default Notice does not specify the name of the lender; the subject property address; and references a loan number which is different than the loan number identified on the Note and Mortgage.  Id. at pg. 12, ¶ 31.

- (4) That the Default Notice does not specify the default.  Id. at pg. 12, ¶ 32.

- (5) That the Default Notice does not specify the action required to cure the default.  Id. at pg. 12, ¶ 33.

- (6) That the Default Notice does not specify a date which is not less than 30 days from the date the alleged Default Notice was allegedly sent to Defendants by which the alleged default must be cured.  Id. at pgs. 12-13, ¶ 34.

- (7) That the Default Notice does not specify that failure to cure the default on or before the date specified may result in acceleration of the sums secured by the Mortgage, foreclosure by judicial proceeding, and sale of the subject property. Id. at pg. 13, ¶ 35.

- (8) That the Default Notice does not specify or inform Defendants of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Defendants to acceleration and foreclosure.  Id. at pg. 13, ¶ 36.

The Court will address each of the alleged deficiencies in turn.

1.    The Default Notice Was Sent to the Defendants

The Defendants first argue that the Default Notice is defective because it was never sent to Defendants pursuant to paragraph fifteen (15) of the Mortgage.  In pertinent part, that paragraph provides: "All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security

Instrument shall be deemed to have been given to Borrower when mailed by first class mail . . ." Plaintiff's Trial Exhibit #5 at pg. 8, ¶ 15.

The Default Notice at issue in this case was admitted into evidence as Plaintiff's Trial Exhibit 31. See Trial Transcript at pg. 214, lines 13-16.

The Plaintiff's corporate representative testified that the Default Notice is tracked by the Archive, see Trial Transcript at pg. 212, lines 7-12, which was admitted into evidence as Plaintiff's Trial Exhibit 35. See id. at pg. 203, lines 6-9.

The Plaintiff's corporate representative further testified that the Archive reflects that the Default Notice was sent to the Defendants. See id. at pg. 212, lines 13-22. If the Default Notice had not been sent to the Defendants, then the Archive would state "Demand Not Sent"; however, that notation did not appear in the Archive.

Q.   If a demand letter is not sent, does Wells Fargo have a code that they input into the collections archive?

A.   Yes, sir.

Q.   What is that code?

A.   Demand not sent.

Q.   Demand not sent?

A.   Yes, sir.

Q.   Is that a routine business practice of Wells Fargo?

A.   Yes sir, it is.

Q.   Do you see the notation, "Demand letter not sent" or "Demand not sent" in these collection notes?

A.   No, sir.

Id. at pg. 212, line 23 through pg. 213, line 10. The Plaintiff's corporate representative finally testified that the Default Notice was sent via first class mail. See Third Day of Trial Transcript at pg. 83, lines 7-9.

Ms. Shanabrook's testimony is corroborated by the Archive. See Plaintiff's Trial Exhibit #35. In light of the foregoing, the Court finds that the Default notice was sent to the Defendants.

2.    The Default Notice was Sent to the Address Identified in Defendants' Address Certification

The Defendants next argue that the Default Notice is defective because it was sent to an address different than the address set forth in the 'Address Certification' executed by the Defendants.

On or about June 30, 2005, Defendant, Gregory Myers, executed an Address Certification listing the following address as Ms. Kelly's mailing address: 4505 Wetherill Road, Bethesda, Maryland 20816. See Plaintiff's Trial Exhibit #30.

The Court finds that the mailing address in the Address Certification is consistent with the mailing address in the Notice of Default. Even the Defendant, Gregory Myers, acknowledged this point at trial:

Q.    Okay. Do you recognize this document?

A.    This is a document titled "Address Certification."

Q.    And did you execute this document as attorney-in-fact for your wife Barbara Ann Kelly?

A.    Yes.

Q.    What is the mailing address listed on this address certification?

A.    The mailing address in the box is 4505 Wetherill . . . Road, Bethesda, Maryland 20816.

\*\*\*

Q.  Can you turn your attention, please, to Exhibit 31 [the
Notice of Default] in the binder.  Let me know when you
have had a chance to look at that document.

A.  Okay.

Q.  Do you see the address in the upper left-hand corner?

A.  Yes.

Q.  Does that address match the address in the mailing address
certification that was admitted into evidence as Exhibit 30?

A.  This - - except for the ZIP code is different.

Q.  What's different about the ZIP code?

A.  Exhibit 30, the ZIP Code is 20816.  And on this letter, the
Zip Code is 20816-1876.

Q.  So it's got four extra digits.

A.  It has four extra digits.

Trial Transcript at pg. 91, line 15 through pg. 93, line 6.

In light of the foregoing, the Court finds that the Notice of Default at issue in this case

was sent to an address consistent with the address identified in Defendants' Address

Certification.

3.  There is No Requirement that the Default Notice Specify the Name of the
Plaintiff; the Subject Property Address; or the Original Loan Number listed on the
Note and Mortgage

The Defendants next argue that the Default Notice is defective because it fails to specify:

(a) the name of the Plaintiff; (b) the Subject Property Address; and (c) references a loan number

different than the loan number identified on the Note and Mortgage.

This Court has reviewed the Note and Mortgage in detail. See Plaintiff's Trial Exhibits #3 & #5. Nothing in the Note and Mortgage requires the Default Notice to specify the name of the Plaintiff; the Subject Property Address; or the original loan number identified on the Promissory Note and Mortgage. On that basis alone, the Court rejects Defendants' argument.

The Court also rejects Defendants' argument because the Default Notice references a loan number – 1205228932 – that has been assigned to Defendants' loan since Wells Fargo d/b/a ASC began servicing the Defendants' loan and introduced itself to the Defendants by way of a "Welcome Letter" dated January 3, 2006. See Plaintiff's Trial Exhibit #27 which was admitted into evidence as reflected at pg. 194, line 22 through pg. 195, line 5 of the Trial Transcript.

4.    The Default Notice Specifies the Default

The Defendants next argue that the Default Notice is defective because it does not specify the Defendants' default.

The Court finds that the Defendants were required to make monthly payments on their loan in the amount of $9,583.33 starting August 1, 2005. See Plaintiff's Trial Exhibit #3.

The Court further finds that Defendants made a payment on August 7, 2009 in the amount of $9,583.33 but that they have failed to make a payment since that time. See Trial Transcript at pg. 208, lines 2-10. In fact, as of the date of trial, they had missed sixty-six (66) consecutive monthly payments. See id. at lines 11-13.

The Default Notice, dated October 18, 2009, states that the Defendants defaulted by failing to make payments on the loan. See Plaintiff's Trial Exhibit #31. It explains the "loan is in default" and that "[u]nless the payments on your loan can be brought current" the lender may seek acceleration. Id. The Default Notice further explains that Defendants must pay the "total delinquency . . . as of [October 18, 2009]", and identifies "Past Due Payments" in the amount of

30

"$19,166.66", as well as "Late Charge Balance" in the amount of $958.34 together with a "**Total Delinquency as of 10/18/2009**" in the amount of $20,125.00. Id. (emphasis in the original).

The "Past Due Payments" in the amount of $19,166.66 accounts for the missed September, 2009 payment and the missed October, 2009 payment. See Trial Transcript at pg. 215, line 2-6. The "Late Charge Balance" similarly account for two late charges; one for each month that was missed as of the date of the Default Notice. See id. at pg. 215, line 7-16.

The Default Notice further states that "[t]o avoid the possibility of acceleration, you must pay this amount plus any additional monthly payments," further clarifying that the Default Notice is directly and exclusively concerned with the default of nonpayment. See Plaintiff's Trial Exhibit #31.

In light of the foregoing, it is clear what particular default occurred here, and Defendants' argument to the contrary is unavailing.

5.   The Default Notice Sufficiently Specifies the Action Required to Cure the Default

The Defendants next argue that the Default Notice is defective because it does not specify the action required to cure the default; however, the Default Notice tracks paragraph twenty-two (22) of the Mortgage by unequivocally advising Defendant that she must bring her payment current or the lender may seek acceleration.

The Default Notice details the Defendants' delinquency as of the date the letter was generated and explains that payments must be brought current in order to avoid acceleration. See Plaintiff's Trial Exhibit #31.

The Court finds that this is sufficient to comply with paragraph 22 of the Mortgage. See HSBC Bank USA, NA v. Serban, No. 46-2008-CA-000846, 2014 WL 4762280 (Fla. 1st Cir. Ct. Sept. 15, 2014).

31

In any event, even if the Default Notice does not to strictly comply with paragraph 22 of the Mortgage, the Court finds that there was no prejudice suffered by the Defendants as they never attempted to cure the default. Thus, Defendants have no defense to Plaintiff's foreclosure action based on paragraph 22. See infra at § II D (7) below.

      6.     The Default Notice was Sent to the Defendants Within the Required 30 Day Cure Period

The Defendants next argue that the Default Notice is deficient because while the Default Notice is dated Sunday, October 18, 2009 it was not accepted by the United States Postal Service until Tuesday, October 20, 2009 – two days later – giving Defendants less than thirty (30) days to cure their default.

The Default Notice is dated Sunday, October 18, 2009 and provides for a cure date of Tuesday, November 17, 2009. See Plaintiff's Trial Exhibit #37.

The Plaintiff's corporate representative, Cindy Shanabrook, testified that the Default Notice was sent by Wells Fargo's third-party vendor, RR Donnelley, on October 18, 2009. See Third Day of Trial Transcript at pg. 6, lines 1-6; and pg. 12, lines 19-22. At that time, RR Donnelly's process was to print out default notices and deposit them into a postal unit contained within its facility. See id. at pg. 85, line 22 through pg. 86, line 8. Ms. Shanabrook's testimony is corroborated by the Archive. See Plaintiff's Trial Exhibit #35.

The Defendants testified that they never received the Default Notice. See Trial Transcript at pg. 94, lines 10-22. The Defendants additionally presented evidence that the Default Notice was not accepted by the United States Postal Service until Tuesday, October 20, 2009. Specifically, Defendants presented a screenshot from the Track Right system of records created by Rod Walz which tracks Default Notices. The Track Right including the following data:

| DATE | EVENT DESCRIPTION | DETAIL |
|------|-------------------|--------|
| 10/20/2009 12:48:35 PM | USPS Event – Confirm | 37230 – Acceptance – Mailpiece has been accepted in the USPS System |
| 10/18/2009 3:00:00 PM | Walz Event – Mailed | Walz Mailbook Batch #1000041102 |
| 10/18/2009 2:37:00 PM | Walz Event – Imported | Client import File: "1040_AL_20091018150000794721953_4mw.zip" Walz Import Batch #: 1000044420 |
| 10/18/2009 2:37:00 | Walz Event – Printed | 1 pages, Walz Print Batch #: 1000044420 |

Defendants' Trial Exhibit #23.

The Defendants also presented the testimony of Rod Walz regarding the October 20, 2009 entry appearing on the table:

Q.      Okay. And then we see on October 20th at 12:48:35

A.      . . . you notice the word "confirm"? The word confirm means something. And what it means, that the item was scanned by the US Postal Service at the time as approved. It's kind of like a proof that they've got it in their system, so it's accepted into their system at that date and time - -

Q.      Okay.

A.      - - on the 20th.

Q.      Are you familiar with how RR Donnelley takes the letters it prints and gets them to the United States Postal Service?

A.      No, I'm not.

Q.      Okay. Based on your experience, does the United States Postal Service traditionally accept things into its system, i.e., create this event with confirm on the same day they are received?

A.      Typically, yes. Typically, yes.

> Q. Okay. So, based on this, it is reasonable to understand that the physical printed letter and the physical printed envelope first made contact with the United States Postal Services on October 20[th], 2009?
>
> A. Yes. That is what that teaches me.
>
> Q. Excellent. . .

Third Day of Trial Transcript at pg. 36, line 5 through pg. 37, line 23.

The Court finds that paragraph twenty-two (22) of the Mortgage requires that the Default Notice state a date "not less than 30 days from the date the notice is given" by which the default must be cured. See Plaintiff's Trial Exhibit #5 at pg. 10, ¶ 22.

The Court further finds that under paragraph fifteen (15) of the Mortgage, a Default Notice is deemed to be given when it is mailed by first class mail. See id. ("Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail . . . .").

Thus, the Mortgage only requires that Plaintiff "mail" the Default Notice thirty (30) days before expiration of the cure period. The Mortgage does not require that Defendants receive the Default Notice within any timeframe. Moreover, the Mortgage does not require that Plaintiff ensure that materials put into the mail are actually removed from the out-going mailbox by a letter carrier thirty (30) days prior to the expiration of the cure period. Indeed, delivery time is included in the thirty (30) day time period.

In light of the foregoing, the Court finds that Defendants' Trial Exhibit #23 and the corresponding testimony of Rod Walz is not dispositive of issue of when the Default Notice was mailed.

Other courts have reached the same conclusion. In <u>Matanic v. Wells Fargo Bank, N.A.</u>, for example, the plaintiff contended he received only twenty-nine (29) days instead of the required thirty (30) days because the default notice was placed in the mail on a Sunday. No. 3:12CV472, 2012 WL 4321634, at *5 (E.D. Va. Sept. 19, 2012). In response, the court held "[t]he definition of 'mail' does not depend on when the Postal Service is open, only when the letter is deposited with the Postal Service." <u>Id.</u>; <u>see also</u> <u>Morrison v. Thoelke</u>, 155 So. 2d 889, 902 (Fla. 2d DCA 1963) (applying the mailbox rule to acceptance of a contract and holding that acceptance is complete at the moment it is placed in the mail, regardless of new post office regulations).

Because the definition of mail does not depend on when the United States Postal Service is open, or when the United States Postal Service accepts mail into its system of records, the Court rejects Defendants' argument.

In any event, even if the Court were to find that Tuesday, October 20, 2009 is the operative date instead of Sunday, October 18, 2009, the doctrine of substantial compliance applies since there has been no showing of prejudice to the Defendants. <u>See</u> <u>infra</u> at § III E (9). "Absent some prejudice, the breach of a condition precedent does not constitute a defense to the enforcement of an otherwise valid contract." <u>Gorel v. Bank of New York Mellon</u>, No. 5D13-3272, 2015 WL 2129505, at *3 (Fla. 5th DCA 2015) (fact that mortgagee's default letter to mortgagor set cure date 29 days later, not 30 or more days as required by mortgage agreement, did not prejudice mortgagor and thus was not a defense to mortgagee's foreclosure action, where mortgagor made no attempt to cure the default).

     7.    The Default Notice Specifies that the failure to cure the default may result in acceleration of the sums secured by the Mortgage, <u>foreclosure by judicial proceeding, and sale of the subject property</u>

The Defendants next argue that the Default Notice is defective because it does not specify that the failure to cure the default may result in acceleration of the sums secured by the Mortgage, foreclosure by judicial proceeding, and sale of the subject property.

The Default Notice provides:

> If funds are not received by the above referenced date, we will proceed with acceleration.  Once acceleration has occurred, we may take steps to terminate your ownership in the property by a foreclosure proceeding or other action to seize the home or pursue any other remedy permitted under the terms of your Mortgage.

> ***

> If acceleration is initiated, you will have the right to bring a court action to refute the existence of a default or offer any other defense to acceleration you may deem appropriate.  You have the right to bring a court action to assert the non-existence of a default or any other defense you may have to acceleration and sale.

Plaintiff's Trial Exhibit #31.

The Court finds that the above-referenced language adequately advises Defendants of acceleration, the possibility of foreclosure proceedings, and the sale of the subject property consistent with paragraph 22 of the Mortgage. See U.S. Bank Nat'l Ass'n v. Busquets, 135 So. 3d 488, 490 (Fla. 2d DCA 2014) (stating that a lender will pursue a foreclosure proceeding complied with the requirements of paragraph 22 of the Mortgage requiring that borrowers be advised of "judicial proceedings" because "in Florida, the only method for foreclosure is a judicial proceeding"). As such, the Court rejects Defendants' arguments.

8.  The Default Notice Specifies and Informs Defendants of the Right to Reinstate after Acceleration and the Right to Assert in the Foreclosure Proceeding the Non-Existence of a Default or any other Defense of Defendants to Acceleration and Foreclosure

The Defendants next argue that the Default Notice is deficient because it does not properly explain Defendants' right to reinstate; to contest default; and to raise defenses.

36

However, the plain language of the Default Notice advises Defendants of the right to reinstate; the right to refute the default; and the right to assert defenses consistent with paragraph 22 of the Mortgage:

> You have the right to reinstate your Mortgage Note and Mortgage or Deed of Trust after acceleration. . . . If acceleration is initiated, you will have the right to bring a court action to refute the existence of a default or offer any other defense to acceleration you may deem appropriate. You have a right to bring a court action to assert the non-existence of a default or any other defense you may have to acceleration and sale.

Plaintiff's Trial Exhibit #31.

Consistent with the Default Notice, Defendants have refuted the existence of a default in this action. See Complaint at ¶ 6; see also Fourth Amended Answer and Affirmative Defenses at ¶ 6. Moreover, Defendants have raised numerous affirmative defenses. See generally Fourth Amended Answer and Affirmative Defenses. Thus, even if the Default Notice does not strictly comply with paragraph 22, the Defendants have suffered no disadvantage as they have denied the existence of default and asserted affirmative defenses in their pleading.

9. The Plaintiff's Default Notice substantially complied with the Mortgage

Assuming, arguendo, that the Default Notice contains technical deficiencies, the Court nevertheless finds that those technical deficiencies do not afford Defendants a defense to this foreclosure proceeding because Florida courts have consistently rejected applying the standard of strict compliance to paragraph 22 absence a showing of prejudice suffered by the borrowers.

Thus, in Gorel v. Bank of New York Mellon, 2015 WL 2129505, at *3 (Fla. 5th DCA 2015), the Fifth District Court of Appeal held that although the bank's default notice set a cure date 29 days later and not 30 or more days as required by the mortgage agreement, that was not a defense to the bank's foreclosure action absent some prejudice.

Likewise, in BAC Home Loans, N.A. v. Phelps, Case No. 2010-05271 (Fla. 20th Cir. Ct. Aug. 29, 2013), affirmed, Case No. 2D13-4773 (Fla. 2d DCA Mar. 11, 2015), Judge Frederick Hardt held that a 27 day cure period was not fatal to the bank's foreclosure action because "the doctrine of substantial compliance and the performance of contracts has not been abrogated in the State of Florida, it still applies. Substantial performance means that we should overlook technical mistakes or omissions or errors where there is no prejudice to the other party." See August 29, 2013 trial transcript in the matter of BAC Home Loans, N.A. v. Phelps at pg. 73, lines 6-14; see also US Bank Nat'l Ass'n v. Busquets, 135 So. 3d 488, 490 (Fla. 2d DCA 2014) (default notice adequately described the nature of the proceedings in compliance with the notice provision in question (emphasis added)); Wells Fargo Bank, N.A. v. Butcher, No. 51-2011-CA-000795-WS, 2013 WL 1742684 (Fla. 6th Cir. Ct. Feb. 25, 2013) (holding that the standard of compliance for acceleration notices in mortgage foreclosures is substantial compliance and that the defendants suffered no prejudice due to the acceleration notice's failure to strictly parrot the language of paragraph 22); BAC Home Loan Servicing, LP f/k/a Countrywide Home Loans Servicing, LP v. Hillard, No. 09-5793CA, 20 Fla. L. Weekly Supp. 983a (Fla. 20th Cir. Ct. Jan. 10, 2013) (rejecting defendant's argument that plaintiff did not "strictly comply" with a condition precedent when it used notice that did not "exactly track the language in Paragraph 22") (emphasis added)); One West Bank, FSB v. Andreana, No. CACE 09-35224, 2012 WL 4835502, at *3 (Fla. 17th Cir. Ct. Aug. 8, 2012) ("[A]lthough not identical to the language in the mortgage, the language in the notice of acceleration clearly advised the Defendant that he would have the right to assert defenses." (emphasis added)).

Here, there is no evidence that any technical breach of paragraph 22 prejudiced the Defendants. On the contrary, the evidence presented establishes the absence of prejudice as

Defendants never attempted to cure the default after the date of the Default Notice.  In that connection, Plaintiff's corporate representative testified:

> Q.    And is it a routine business practice of Wells Fargo to allow, uh, borrowers to cure defaults up until the date the complaint is filed?
>
> ***
>
> A.    Yes, sir.
>
> Q.    And did the borrowers in this case make any attempt to cure the default from October 18th, 2009 through December 17th, 2009, the date the complaint was filed?
>
> A.    No, sir.

Third Day of Trial Transcript at pg. 83, line 15 through pg. 84, line 3; see also First and Second Day of Trial Transcript at pg. 216, lines 7-16.

In light of this uncontroverted testimony, the Court finds that even if there were technical breaches of paragraph 22, those breaches did not prejudice the Defendants, and do not afford Defendants with a defense to this mortgage foreclosure action.

The decisions rendered in Konsulian v. Busey Bank, N.A., 61 So. 3d 1283 (Fla. 2d DCA 2011) and Samaroo v. Wells Fargo Bank, 137 So. 3d 1127 (Fla. 5th DCA 2014) do not change this Court's analysis.

In Konsulian, the bank sent a pre-acceleration letter to the Defendant on October 6, 2008. 61 So. 3d at 1284.  On October 9, 2008, only three days later, the bank filed a mortgage foreclosure action.  Id.  As a result, the standard for compliance with the contractual condition precedent (i.e., strict versus substantial), was not even an issue before the court.

In Samaroo, the borrowers asserted that the plaintiff failed to give them notice of default that complied with the notice requirements of paragraph 22 of the mortgage pertaining to the

right of reinstatement. 137 So. 3d at 1128. In response, the plaintiff argued the notice of default complied with the mortgage, but the Fifth District Court of Appeal disagreed:

> [The default letter] does not inform the Samaroos of their right to reinstate after acceleration. Rather, it informs the Samaroos that 'acceptance of one or more payments for less than the amount required to cure the default shall not be deemed to reinstate [their] loan or waive any acceleration of the loan.' This in no way suggests the right to reinstate after acceleration.

Id. at 1129 (citations omitted).

This case does not involve a default letter that altogether omits a required element of paragraph 22. In Samaroo, a mandatory element of the provision was not addressed at all in the default letter nor did language in the letter "suggest" the existence of that right. As a result, the standard for compliance with the contractual condition precedent (i.e., strict versus substantial), was not an issue before the court and even if it was, Samaroo states that if the letter "suggested" the existence of the right to reinstate, even if not precisely tracking the language in the mortgage, that would have been sufficient. But because the bank's "own mortgage specified the important information that it was bound to give its borrower in default," which information was completely missing from the default letter, the court rejected application of the substantial compliance test to those facts. Id.

The Default Notice here is not missing any information required by paragraph 22 of the Mortgage. As such, nothing in Samaroo, nor any other Florida decision, requires this Court to depart from the foregoing prevailing authorities.

## FINAL JUDGMENT OF FORECLOSURE

In light of the foregoing discussion and authorities, it is hereby **ORDERED** and **ADJUDGED** that:

1.    The Plaintiff, US Bank National Association, as Trustee for Credit Suisse First

Boston CSFB, is due:

| ITEM | AMOUNT |
|---|---|
| Principal due on the note secured by the mortgage foreclosed | $1,840,000 |
| Interest on the note and mortgage | $631,423.31 |
| Taxes | $101,621.68 |
| Insurance | $116,158.60 |
| Late Charges | $958.34 |
| SUBTOTAL: | $2,690,161.93 |
| Per Diem Interest of $315.07 from February 21, 2015 through September 9, 2015 (201 Days) | $63,329.07 |
| GRAND TOTAL: | $2,753,490.90 |

That shall bear interest at the prevailing legal rate of interest.

2.    The Plaintiff holds a lien for the total sum superior to all claims or estates of

Defendants on the following described property in Collier County, Florida:

**LOT 10, BLOCK 7, NAPLES GOLF AND BEACH CLUB TRACT, ACCORDING TO THE PLAT IN PLAT BOOK 2, PAGE 78, OF THE PUBLIC RECORDS OF COLLIER COUNTY, FLORIDA**

**A/K/A 700 GULF SHORE BOULEVARD NORTH, NAPLES, FLORIDA 34102**

3.    If the total sum with interest at the rate described in paragraph 1 and all costs

accrued subsequent to this judgment are not paid, the clerk of this Court shall sell the property at

public sale on _October 5_, 2015, to the highest bidder for cash, except as prescribed in

paragraph 4, at the courthouse located at 3315 Tamiami Trail East, 3rd Floor, Naples, Florida, in

accordance with section 45.031, Florida Statutes, using the following method:

> Foreclosure sales are held at 11:00 a.m. on the third floor of the
> Courthouse Annex in the Collier County Courthouse.

41

4.      The Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the clerk if the Plaintiff is not the purchaser of the property for sale; provided, however, that the purchaser of the property for sale shall be responsible for the documentary stamps payable on the certificate of title.  If Plaintiff is the purchaser, the clerk shall credit Plaintiff's bid with the total sum with interest and costs accruing subsequent to this judgment, or such part of it as is necessary to pay the bid in full.

5.      On filing the certificate of title, the clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of Plaintiff's costs; second, documentary stamps affixed to the certificate; third, the total sum due to Plaintiff less the items paid, plus interest at the rate prescribed in paragraph 1 from this date to the date of the sale; and by retaining any remaining amount pending the further order of this Court.

6.      On filing the certificate of sale, Defendants and all persons claiming under or against Defendants since the filing of the notice of *lis pendens*, shall be foreclosed of all estate or claim in the property, except as to claims or rights under chapter 718 or chapter 720, Florida Statutes, if any.  Upon the filing of the certificate of title, the person named on the certificate of title shall be let into possession of the property.

7.      Jurisdiction of this action is retained to enter further orders that are proper including, without limitation, orders pertaining to any motion to tax attorneys' fees and costs and motion for deficiency judgment.

8.      If any Defendant remains in possession of the property, the clerk shall without further order of the Court issue forthwith a writ of possession upon request of the person named on the certificate of title.

**IF THE PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED**

TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THE FINAL JUDGMENT.

IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN SIXTY (60) DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.

IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED. PLEASE CHECK WITH THE CLERK OF THE COURT AT (239) 252-2646 (CIVIL DEPARTMENT, FORECLOSURES) WITHIN (10) DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT.

IF YOU DECIDE TO SELL YOUR HOME OR HIRE SOMEONE TO HELP YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE PERSON OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER INFORMATION. IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY CONTACT THE LEGAL AID SERVICE OF COLLIER COUNTY, AT (239) 775-4555 TO SEE IF YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT ASSIST YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFERRAL AGENCY OR SUGGEST OTHER OPTIONS. IF YOU CHOOSE TO CONTACT THE COLLIER COUNTY BAR ASSOCIATION OR LEGAL AID SERVICE OF COLLIER COUNTY, YOU SHOULD DO SO AS SOON AS POSSIBLE AFTER RECEIPT OF THIS NOTICE.

DONE AND ORDERED in chambers in Naples, Collier County, Florida, this 9th day of September, 2015.

_____

The Honorable James R. Shenko
Circuit Court Judge

Copies furnished to:
9/16/15 KM
Jason A. Perkins, Esquire
✓ Carlton Fields Jorden Burt, P.A.
450 S. Orange Avenue, Suite 500

Orlando, Florida 32801
jperkins@cfjblaw.com
**Counsel for Plaintiff**

Julie Anthousis, Esquire
janthousis@wolfelawfl.com
acastillo@wolfelawfl.com
✓   eservice@wolfelawfl.com
Ronald R. Wolfe & Associates, P.L.
P.O. Box 25018
Tampa, Florida 33622-5018
**Co-Counsel for Plaintiff**

✓   Timothy Lynch, Esquire
Maurice "Mac" VerStandig, Esquire
Offit Kurman
✓   4800 Montgomery Lane, 9th Floor
Bethesda, MD 20814
tlynch@offitkurman.com
mverstandig@offitkurman.com
**Counsel for Defendants, Barbara Ann Kelly and Gregory B. Myers**

Christopher C. Fogleman, Esquire
Gleason, Flynn, Emig & Fogleman, Chartered
✓   11 North Washington Street, Suite 400
Rockville, Maryland 20850-4278
cfogleman@gleason-law.com
**Co-Counsel for Defendants, Barbara Ann Kelly and Gregory B. Myers**

Michael A. Gort, Esquire
Mike@GortLaw.com
✓   Gort Law Firm
501 Heritage Drive
Jupiter, Florida 33458
**Co-Counsel for Defendants, Barbara Ann Kelly and Gregory B. Myers**

Phillips Storey, Esquire
Alvarez, Sambol & Winthrop, P.A.
✓   200 S. Orange Avenue
Orlando, Florida 32801
STB@aswpa.com
**Counsel for Defendant, Sun Trust Bank**

✓ Fidelity and Deposit Company of Maryland (by U.S. Mail)
c/o Chief Financial Officer, Registered Agent
✓   P.O. Box 6200 (32314-6200)

200 E. Gaines Street
Tallahassee, Florida 32399
**Defendant**

✓ Navy Federal Credit Union (by U.S. Mail)
Legal Department
820 Follin Lane
✓ Vienna, Virginia 22180
**Defendant**

*Dee*
*9-10-15*



# Exhibit F

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

BARBARA ANN KELLY

    VS                                CASE NO.  3:10CV392-RV/EMT

ROBERT DAVIS, ET. AL.

### JUDGMENT

Pursuant to and at the direction of the Court, it is

ORDERED that judgment is entered in favor of Seaside Community Development

Corp., in the amount of $611,543.30 for the reasonable attorney fees that Seaside

Community Development Corp. incurred in defending this litigation.

JESSICA J. LYUBLANOVITS
CLERK OF COURT

<u> August 31, 2017       </u>        <u>/s/ A'Donna Bridges                      </u>
DATE                                    Deputy Clerk: A'Donna Bridges

# Exhibit G

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 25, 2017

Danny Richard Stengle
Dan R Stengle Attorney LLC - Tallahassee Fl
502 N ADAMS ST
TALLAHASSEE, FL 32301

Appeal Number: 17-14348-G
Case Style: Barbara Kelly v. Robert Davis, et al
District Court Docket No: 3:10-cv-00392-RV-EMT

NOTICE OF APPEAL FILED: <u>September 26, 2017</u>

After review of the district court docket entries, order and/or judgment appealed from, and the notice of appeal, it appears that this court may lack jurisdiction over this appeal. If it is determined that this court is without jurisdiction, this appeal will be dismissed.

The parties are requested to simultaneously advise the court in writing within fourteen (14) days from the date of this letter of their position regarding the jurisdictional question(s) set forth on the attached page. Counsel must submit their response electronically, and do not need to provide paper copies. The responses must include a Certificate of Interested Persons and Corporate Disclosure Statement as described in Fed.R.App.P. 26.1 and the corresponding circuit rules. Requests for extensions of time to file a response are disfavored.

After fourteen (14) days, this court will consider any response(s) filed and any portion of the record that may be required to resolve the jurisdictional issue(s). Please note that the issuance of a jurisdictional question does not stay the time for filing appellant's briefs otherwise provided by 11th Cir. R. 31-1.

Counsel who wish to participate in this appeal must complete and return an appearance form within fourteen (14) days. <u>Appearance of Counsel Form</u> are available on the Internet at www.ca11.uscourts.gov. The clerk may not process filings from an attorney until that attorney files an appearance form. <u>See</u> 11th Cir. R. 46-6.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Bryon Robinson, G/bjk
Phone #: (404) 335-6185

Enclosure(s)

JUR-1 Resp reqd JQ

No. 17-14348-G

## JURISDICTIONAL QUESTION

It appears that the relevant pleadings did not sufficiently allege the citizenship of Plaintiff Barbara Davis or Defendants Robert Davis, Doris Goldstein, Dean Burgis, or Bruce Noonan so as to establish the district court's subject matter jurisdiction in the first instance. *See* 28 U.S.C. § 1332(a); *Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1268-69 (11th Cir. 2013) (explaining that, for a natural person, the complaint must allege the person's citizenship or domicile, an allegation of residence is insufficient); *McCormick v. Aderholt*, 293 F.3d 1254, 1257-58 (11th Cir. 2002) ("A person's domicile is the place of his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom.").

Insofar as the allegations may be inadequate, please address: (1) whether the allegations should be amended on appeal, pursuant to 28 U.S.C. § 1653, to cure any jurisdictional deficiencies in the current pleadings; (2) alternatively, whether current record evidence adequately establishes the parties' citizenships; or (3) whether the record should be supplemented with additional evidence to demonstrate the parties' citizenships. *See* 28 U.S.C. § 1653; *Travaglio*, 735 F.3d at 1269-70 (discussing when record evidence may be used to cure jurisdictional pleading defects, and noting that self-serving arguments and unsworn statements in trial briefs are insufficient to establish a party's citizenship); *Mallory & Evans Contractors & Eng'rs, LLC v. Tuskegee Univ.*, 663 F.3d 1304, 1305 (11th Cir. 2011) (inviting appellant to file a motion for leave to amend the complaint to correct deficient allegations of citizenship). If applicable, the parties should submit any motions they consider necessary or appropriate to cure the deficiencies.

# Exhibit H

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

BARBARA ANN KELLY

     VS                                CASE NO.  3:10cv392-RV/EMT

ROBERT DAVIS, et al.

## AMENDED JUDGMENT

Pursuant to and at the direction of the Court, it is ORDERED that judgment is entered against Plaintiff, BARBARA ANN KELLY and in favor of Defendant, SEASIDE COMMUNITY DEVELOPMENT CORP, for the reasonable attorney fees in the amount of $611,543.30 incurred in defending this litigation.


JESSICA J. LYUBLANOVITS
CLERK OF COURT


 December 7, 2017                /s/ *Donna Bajzik*
DATE                            Deputy Clerk: Donna Bajzik

# Exhibit I

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**(Pensacola Division)**

| | |
|---|---|
| BARBARA ANN KELLY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No: 3:10-cv-00392-RV/EMT |
| | ) |
| ROBERT DAVIS, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## NOTICE OF APPEAL

Pursuant to Rule 3 of the Federal Rules of Appellate Procedure, plaintiff Barbara Ann

Kelly hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the

AMENDED JUDGMENT (Dkt. No. 379) entered by the Clerk of Court on December 7, 2017.

Dated: January 5, 2018.

Respectfully Submitted,

/s/ Dan R. Stengle
Dan R. Stengle, Esquire
DAN R. STENGLE, ATTORNEY, LLC
Florida Bar Number 352411
502 North Adams Street
Tallahassee, Florida 32301
Telephone: 850-566-7619
Facsimile: 850-222-1249
dstengle@comcast.net
*Attorney for Barbara Ann Kelly*

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by electronic transmission and/or the CM/ECF system this 5th day of January, 2018 upon all counsel of record.

/s/ Dan R. Stengle
Dan R. Stengle, Esquire
DAN R. STENGLE, ATTORNEY, LLC
Florida Bar Number 352411
502 North Adams Street
Tallahassee, Florida 32301
Telephone: 850-566-7619
Facsimile: 850-222-1249
dstengle@comcast.net
*Attorney for Barbara Ann Kelly*

# Exhibit J

Filing # 70326325 E-Filed 04/05/2018 08:27:40 PM

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT
IN AND FOR WALTON COUNTY, FLORIDA
CIVIL DIVISION**

**BARBARA ANN KELLY**
700 Gulf Shore Blvd. North
Naples, Florida 34102

      **Plaintiff,**

**v.**                                      Case No.: _____

**SEASIDE COMMUNITY DEVELOPMENT
CORP.**
121 Central Square, Suite J
Santa Rosa Beach, FL 32459

     Serve:
     Robert S. Davis, Registered Agent
     121 Central Square, Suite J
     Santa Rosa Beach, FL 32459

      **Defendant.**
_____/

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiff, BARBARA ANN KELLY ("Kelly" or "Plaintiff"), *pro se*, files this *Complaint and Jury Trial Demand* (the "Complaint") against Defendant, SEASIDE COMMUNITY DEVELOPMENT CORP. ("SCDC" or "Defendant"), and for cause does allege as follows:

### PARTIES

1.    Plaintiff, BARBARA ANN KELLY is a natural person who owns property in Walton County, Florida.

2.    Defendant, SEASIDE COMMUNITY DEVELOPMENT CORP. is a Florida Profit Corporation organized and existing under the laws of the State of Florida, with its principal address in Walton County, Florida.

## JURISDICTION AND VENUE

3.　　Personal jurisdiction over the Defendant is appropriate because at all relevant times the Defendant has transacted business in Walton County, Florida and currently transacts business in Walton County, Florida.

4.　　Venue is proper in this district because Defendant is an entity subject to this Court's personal jurisdiction, a substantial part of the conduct, events and omissions giving rise to the claims occurred within this district, and the Defendant regularly transacts business in this district.

## FACTS

5.　　On February 12, 1985, Robert S. Davis, President of SCDC, executed the "DEDICATION" on the face of the "Seaside 3" record plat (the "Seaside 3 Plat"). On February 21, 1985, SCDC recorded the Seaside 3 Plat in the Walton County official records in Plat Book 7, Page 3.

6.　　On March 21, 1985, SCDC executed the "Declaration of Covenants, Conditions and Restrictions [for] Seaside III, a Planned Unit Development" (the "Seaside III Declaration"). On March 25, 1985, SCDC recorded the Seaside III Declaration in the Walton County official records in Book 337, Page 62. The Seaside III Declaration states that "Association" shall mean and refer to the "Seaside III Neighborhood Association, Inc." (the "Seaside III Association"). A Copy of the Seaside III Declaration is attached hereto as **Exhibit A**.

7.　　The Seaside III Declaration, *inter alia*, provides:

> **Section 4**. "Common Area" shall mean all real property and Improvements thereon owned by the Association for the common use and enjoyment of the Owners. The Common Area owned by the Association at the time of the conveyance of the first lot is as described in the Plat. The Common Area shall include all the facilities thereon, including the streets, parking areas, pedestrian paths, beach access and beach area, but excluding individual lots and

buildings on these lots, subject to the utility easements granted on, in and under the Common Area for the benefit and use of the Common Area and each Individual lot.

8.     The Seaside III Declaration constitutes a deed under Florida law as it contains the signatures of two witnesses, a corporate seal, and a notary attestation which states:

> Before me, the undersigned authority, personally appeared Robert S. Davis, to me well known and known to me to be the Individual described In and executed the foregoing Instrument as President of the above-named Seaside Community Development Corp., and acknowledged to and before me that he executed such Instrument as such President of said corporation, and that the seal affixed to the foregoing instrument Is the corporate seal of said corporation and that it was affixed to said instrument by due and regular corporate authority, and that said instrument Is the free act and deed of said corporation.

9.     SCDC transferred ownership of the "Common Area" - including without limitation the Seaside Avenue right of way - to the Seaside 3 Association by the act of SCDC executing and recording the Seaside III Declaration making reference to the Seaside 3 Plat. [1]

10.     On October 26, 1991, the Seaside III Declaration was amended (the "Seaside III Amendment"). SCDC executed the Seaside III Amendment. On January 23, 1992, the Seaside III Amendment was recorded in the Walton County official records at Book 816, Page 67. A Copy of the Seaside III Amendment is attached hereto as **Exhibit B**.

11.     The Seaside III Amendment, Article XI, *inter alia*, provides:

---

[1] It is SCDC's conveyance with reference to the Seaside 3 Plat that creates rights in purchasers to have the Seaside 3 Plat maintained according to its references. *City of Miami v. Fla. E. Coast Ry.*, 84 So. 726 (Fla.1920). *See also, e.g., McCorquodale v. Keyton*, 63 So.2d 906 (Fla.1953), holding "[w]henever the owner of a tract of land subdivides the same into lots and blocks, lays off streets and other public ways and designates portions of said lands to be parks playgrounds or similar facilities or uses similar words calculated to encourage prospective purchasers to buy said lots, and actually sells lots with reference to the plat, he becomes bound to his grantees by the plat and the representations thereon. As the maker of the plat and the one who selects the words used thereon it will be construed against him. Common honesty requires that he perform that which at the time of conveyance he represented he would perform."

**Section 1. Organization of Town Council.** The Association and other neighborhood associations which have been organized to administer the respective declarations of covenants, conditions and restrictions or similar documents applicable to various neighborhoods within the planned community known as Seaside have organized a Florida not-for-profit corporation known as the Seaside Town Council, Inc. Such Florida not-for-profit corporation is hereinafter referred to as the "Town Council." The Association and other neighborhood associations which have organized the Town Council are hereinafter collectively referred to as the "Participating Associations." The properties described in the declarations of covenants, conditions and restrictions or similar documents applicable to each Participating Association are hereinafter collectively referred to as the "Participating Neighborhoods."

\*\*\*

**Section 3. License and Right of Access and Use**. All members of each Participating Association, members of their families and guests, shall have a nonexclusive license and right to access and use the Common Area and all facilities and improvements located thereon.

### Kelly Purchases Lot 13, Seaside 15

12.     On March 24, 2004, pursuant to a "Seaside Purchase and Sale Agreement" (the "Purchase and Sale Agreement"), Kelly purchased from SCDC that certain real property located in Walton County, Florida, described as Lot 13, Seaside 15 Subdivision according to the plat thereof recorded in Plat Book 15, Page 38 of the Public Records of Walton County, Florida (the "Property"). A copy of the Purchase and Sale Agreement is attached hereto as **Exhibit C**. A copy of the Warranty Deed is attached hereto as **Exhibit D**.

13.     The Purchase and Sale Agreement, *inter alia*, states:

**2. Title, Condition of Lot.** … Title to the Lot shall be good and insurable subject only to the following: (iv) Conditions, restrictions, reservations, limitations, easements and utility agreements of record. [Seller represents that none of the foregoing title conditions substantially impair the intended use of the Lot.]

\*\*\*

**5. Default.** … **(b) By Seller.** If Seller defaults in Seller's obligations, Buyer shall be entitled to obtain a refund of the Deposit and all other sums paid by Buyer to Seller pursuant to this Agreement (together with interest earned, if any), whereupon this Agreement shall terminate. In addition, Buyer may seek actual damages, up to fifteen thousand dollars ($15,000) or fifteen percent (15%) of the Purchase Price, whichever is greater.

\*\*\*

**6. Miscellaneous Provisions.** … **(e) Survival.** The provisions hereof which are intended to have effect subsequent to closing of title shall survive such closing and delivery of the deed.

14.     The Warranty Deed provides that the Property is, *inter alia*, subject to the "Declaration of Covenants, Conditions and Restrictions [for] Seaside I, a Subdivision" (the "Seaside I Declaration"), recorded June 11, 1982 in Volume 238, page 121 of the public records of Walton County, Florida. The Seaside I Declaration states that "Association" shall mean and refer to the "Seaside I Homeowners' Association, Inc." (the "Seaside I Association"). A copy of the Seaside I Declaration is attached hereto as **Exhibit E**.

15.     The Seaside I Association is one of the "Participating Associations" referenced in the Seaside III Amendment, Article XI. As a "Member" of the Seaside I Association - and by virtue of the "License and Right of Access and Use" set forth in the Seaside III Amendment - Kelly has a nonexclusive license and right to access and use the Seaside Avenue right-of-way, streets, and all facilities and improvements located thereon as described in and shown on the Seaside 3 Plat.

16.     The Seaside I Declaration, Article X, § 1., provides:

The association, or any owner, shall have the right to enforce, by any proceeding at law or in equity, all restrictions, conditions,

covenants, reservations, liens, and charges now or hereafter imposed by the provisions of this declaration. Failure by the association or by any owner to enforce any covenant or restriction herein contained shall, in no way, be deemed a waiver of the right to do so thereafter.

## Seaside Post Office Plaza Development

17.    On or about April 5, 2017, SCDC submitted a "MAJOR/MINOR DEVELOPMENT ORDER APPLICATION" to Walton County Planning and Development Services for the "Seaside Post Office Plaza" development (the "Post Office ADA"). The Post Office ADA states that SCDC is the "Owner" of the Seaside Avenue right-of-way. SCDC executed the Post Office ADA on April 5, 2017 and on April 21, 2017. A copy of the Post Office ADA is attached hereto as **Exhibit F**.

18.    The Post Office ADA contains the following requirement:

### NOTIFICATION OF AFFECTED PROPERTY OWNERS

The Board of County Commissioners requires any applicant for a Major/Minor Development Order to notify all property owners within 300 feet of the perimeter of the subject property. The applicant is responsible for notifying property owners within 300 feet by certified, return receipt mail, not less than 10 days but no more than 20 days prior to each hearing for the proposed development.

19.    The Post Office ADA contains the following warning:

### FLORIDA STATUTES 837.06 – FALSE OFFICIAL STATEMENT

Whoever knowingly makes a false statement in writing with the intent to mislead a public servant in the performance of his official duty shall be guilty of a misdemeanor of the second degree.

20.    On or about July 27, 2017, Walton County Planning and Development Services issued a "Final Development Order: Seaside Post Office Plaza," "Development Order No. 17-00100062" (the "Post Office DO"). The Post Office DO states that SCDC is the "Owner" of the

Seaside Avenue right-of-way. SCDC executed the Post Office DO on August 1, 2017. A copy of

the Post Office DO is attached hereto as **Exhibit G**.

21.    The Post Office DO, <u>Conditions of Approval</u>, state:

> This project will required [sic] a re-plat to remove the right of way
> from Seaside 3, Plat Book 7, Page 3 and must be done prior to the
> CO of the post office relocation, approved by legal.

## COUNT I
### Breach of Contract
### (Purchase and Sale Agreement)

22.    Plaintiff incorporates each and every preceding paragraph of this Complaint as

though fully set forth herein.

23.    The Purchase and Sale Agreement is a valid, binding, and enforceable contract

between Plaintiff and Defendant.

24.    The Defendant materially breached the Purchase and Sale Agreement by refusing

and failing to honor the terms and conditions of the Purchase and Sale Agreement, including

without limitation, by filing false documents in the public records counterfactually claiming

ownership of the "Common Area" as defined in the Seaside III Declaration - i.e., the Seaside

Avenue right of way as described and shown on the Seaside 3 Plat - and by physically removing

and closing "the streets" as described and shown on the Seaside 3 Plat.

25.    The Seaside III Declaration and the Seaside 3 Plat, *inter alia*, constitute

"[c]onditions, restrictions, reservations, limitations, easements and utility agreements of record."

26.    The Defendant's material breach of the Purchase and Sale Agreement has actually

and proximately caused Plaintiff to be materially harmed, and to incur various damages, costs and

expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of

Defendant and its agents, including without limitation, the Defendant filing false documents in the

public records counterfactually claiming ownership of the "Common Area" as defined in the Seaside III Declaration - i.e., the Seaside Avenue right of way as described and shown on the Seaside 3 Plat - and by physically removing and closing "the streets" as described and shown on the Seaside 3 Plat.

27.     Plaintiff has suffered material damage inasmuch as Plaintiff has been denied the benefit of her bargain in the Purchase and Sale Agreement.

28.     Plaintiff has suffered material damage inasmuch as certain opportunities related to development and alienation of the Plaintiff's Property have been accordingly frustrated.

29.     The breaches of SCDC have proximately caused Plaintiff to suffer foreseeable harm.

.       WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Five Million Dollars ($5,000,000.00), award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

## COUNT II
### Breach of Contract
### (Seaside III Declaration)

30.     Plaintiff incorporates each and every preceding paragraph of this Complaint as though fully set forth herein.

31.     The Seaside III Declaration, as amended and recorded, is a valid, binding, and enforceable contract between Plaintiff and Defendant. Alternatively, Plaintiff is a third-party beneficiary of the Seaside III Declaration, as amended and recorded.

32.     The Plaintiff purchased the Property from the Defendant in reliance on, *inter alia*, the Seaside III Declaration, as amended and recorded.

33.     The Defendant materially breached the Seaside III Declaration, as amended and recorded, by refusing and failing to honor the terms and conditions of the Seaside III Declaration, as amended and recorded, including without limitation, by filing false documents in the public records counterfactually claiming ownership of the "Common Area" as defined in the Seaside III Declaration - i.e., the Seaside Avenue right of way as described and shown on the Seaside 3 Plat - and by physically removing and closing "the streets" as described and shown on the Seaside 3 Plat.

34.     The Defendant's material breach of the Seaside III Declaration, as amended and recorded, has actually and proximately caused Plaintiff to be materially harmed, and to incur various damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, the Defendant filing false documents in the public records counterfactually claiming ownership of the "Common Area" as defined in the Seaside III Declaration - i.e., the Seaside Avenue right of way as described and shown on the Seaside 3 Plat - and by physically removing and closing "the streets" as described and shown on the Seaside 3 Plat.

35.     Plaintiff has suffered material damage inasmuch as Plaintiff has been denied the benefit of her bargain in the Purchase and Sale Agreement and/or the Seaside III Declaration, as amended and recorded.

36.     Plaintiff has suffered material damage inasmuch as certain opportunities related to development and alienation of the Plaintiff's Property have been accordingly frustrated.

37.     The breaches of SCDC have proximately caused Plaintiff to suffer foreseeable harm.

.       WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Five Million Dollars ($5,000,000.00), award Plaintiff

her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

## COUNT III
### Declaratory Relief

38.     Plaintiff incorporates each and every preceding paragraph of this Complaint as though fully set forth herein.

39.     There presently exists an actual, bona fide, justiciable controversy between the parties regarding the actions of the Defendant and the legal status and validity of the various documents discussed herein.

40.     The Defendant maintains an actual, present and antagonistic interest to Plaintiff regarding these matters and the legal status and validity of the various documents discussed herein.

41.     There is an actual, practical and present need for a declaration because the parties have not been able to resolve their dispute.

42.     Absent the issuance of declaratory relief, Plaintiff has no adequate remedy at law.

43.     Plaintiff will continue to be irreparably injured absent the issuance of a declaratory judgment.

WHEREFORE, Plaintiff requests that the Court enter a declaratory judgment as follows:

(i)     That the Seaside Avenue right of way as described and shown on the Seaside 3 Plat is "Common Area" as is more particularly defined in the Seaside III Declaration.

(ii)     That SCDC transferred ownership of the Seaside Avenue right of way as described and shown on the Seaside 3 Plat to the Seaside 3 Association by the act of SCDC executing and recording the Seaside III Declaration making reference to the Seaside 3 Plat.

(iii)    That Plaintiff has a nonexclusive license and right to access and use the Seaside Avenue right-of-way, streets, and all facilities and improvements located thereon as described and shown on the Seaside 3 Plat.

(iv)    That SCDC has no ownership interest in the Seaside Avenue right of way as described and shown on the Seaside 3 Plat.

(v)    That SCDC is prohibited from developing and/or subdividing the Seaside Avenue right of way as described and shown on the Seaside 3 Plat.

(vi)    That SCDC is prohibited from using any part of the Seaside Avenue right of way as described and shown on the Seaside 3 Plat for parking or storing of any type of vehicle(s).

(vii)    That SCDC is prohibited from physically removing, altering, blocking and/or closing any part/all of any street within the Seaside Avenue right of way as described and shown on the Seaside 3 Plat.

(viii)    That SCDC is required to immediately restore, at SCDC's sole cost and expense, any part/all of any street within the Seaside Avenue right of way as described and shown on the Seaside 3 Plat which SCDC removed, altered, blocked and/or closed in conjunction with the Seaside Post Office Plaza development.

(ix)    That SCDC is prohibited from locating any structure of any type within the Seaside Avenue right of way as described and shown on the Seaside 3 Plat, including without limitation, a United States Post Office building, restrooms, storage, or automated teller machine.

(x)    That SCDC is prohibited from renting, leasing, charging, or collecting rent and/or fees of any type or in any amount in connection with any structure and/or use within the Seaside Avenue right of way as described and shown on the Seaside 3 Plat, including without limitation, the United States Post Office building, restrooms, storage, parking, or automated teller machine(s).

## COUNT IV
### Injunctive Relief

44.    Plaintiff incorporates each and every preceding paragraph of this Complaint as though fully set forth herein.

45.    This is a claim to permanently enjoin SCDC from unlawfully violating the various documents discussed herein.

46.    This is a claim to permanently enjoin SCDC from proceeding with any development of the Seaside Post Office Plaza project pursuant to "Development Order No. 17-00100062" issued by Walton County Planning and Development Services on or about July 27, 2017.

47.    Plaintiff has been, and continues to be, irreparably harmed by SCDC's unlawful violation of the various documents discussed herein.

48.    Plaintiff has been, and continues to be, irreparably harmed by SCDC proceeding with any development of the Seaside Post Office Plaza project pursuant to "Development Order No. 17-00100062" issued by Walton County Planning and Development Services on or about July 27, 2017.

49.    Absent the issuance of injunctive relief, Plaintiff has no adequate remedy at law.

50.    Plaintiff has been, and will continue to be, irreparably harmed absent the issuance of an order from the Court granting injunctive relief.

WHEREFORE, Plaintiff requests that the Court enter an order permanently enjoining SCDC from:

(i)    developing and/or subdividing the Seaside Avenue right of way as described and shown on the Seaside 3 Plat.

(ii)    filing with Walton County any "re-plat" to remove any part of the Seaside Avenue right of way as described and shown on the Seaside 3 Plat.

(iii)    physically removing, altering, blocking and/or closing any part of any street within the Seaside Avenue right of way as described and shown on the Seaside 3 Plat.

(iv)    using any part of the Seaside Avenue right of way as described and shown on the Seaside 3 Plat for parking or storing of any type of vehicle(s).

(v)    locating or building any structure of any type within the Seaside Avenue right of way as described and shown on the Seaside 3 Plat, including without limitation, a United States Post Office building, restrooms, storage, and/or automated teller machine.

(vi)    renting, leasing, charging, or collecting rent and/or fees of any type or in any amount in connection with any structure and/or use within the Seaside Avenue right of way as described and shown on the Seaside 3 Plat, including without limitation, the United States Post Office building, restrooms, storage, parking, or automated teller machine(s).

**RESPECTFULLY SUBMITTED** on this 5th day of April, 2018.

/s/ Barbara Ann Kelly
Barbara Ann Kelly, *pro se*
700 Gulf Shore Blvd. N.
Naples, FL 34102
(301) 325-3528
bakellymyers@verizon.net


**JURY TRIAL DEMAND**

Plaintiff Barbara Ann Kelly does hereby demand a trial by jury on all counts of her Complaint so triable.

/s/ Barbara Ann Kelly
Barbara Ann Kelly, *pro se*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of April, 2018, the foregoing was electronically filed with the Clerk of Court using the Florida E-Filing Portal and a copy of same was electronically served via email to the following:

Robert A. Emmanuel
EMMANUEL SHEPPARD & CONDON
30 South Spring Street
Pensacola, Florida 32502
Email:  rae@esclaw.com

/s/ Barbara Ann Kelly
Barbara Ann Kelly, *pro se*

# Exhibit K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| BARBARA ANN KELLY | * |
| 700 Gulf Shore Blvd. North | * |
| Naples, FL 34102 | * |
| | * |
| **Plaintiff,** | * |
| | * |
| v. | * |
| | * |
| OFFIT KURMAN, P.A. | * |
| Attn: Maurice Offit, Resident Agent | * |
| 8171 Maple Lawn Blvd. | * |
| Suite 200 | * |
| Fulton, MD 20759 | * |
| | * |
| Serve on: | * |
| Offit Kurman, P.A. | * |
| c/o: Maurice Offit, Resident Agent | * |
| 8171 Maple Lawn Blvd. | * |
| Suite 200 | * |
| Fulton, MD 20759 | * |
| | * |
| **Defendant.** | * |
| | * |
| | * |

Case No. _CCB 17 CV3668_

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT AND DEMAND FOR JURY TRIAL [1]

Plaintiff, Barbara Ann Kelly ("Kelly" or "Plaintiff"), *pro se*, files this Complaint and

Demand for Jury Trial (the "Complaint") against the Defendant Offit Kurman, P.A. ("Offit

Kurman" or "Defendant"), and for cause does allege as follows:

### PARTIES

---

[1] A *pro se* plaintiff is held to a "'less stringent'" standard than a lawyer, and the Court must
liberally construe a *pro se* plaintiff's complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)
(quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

1

1.      Plaintiff, Barbara Ann Kelly is a natural person who is a resident of Collier County, Florida.

2.      Defendant, Offit Kurman, P.A. is a is a close corporation formed under the laws of the state of Maryland.

### JURISDICTION AND VENUE

3.      This Court has jurisdiction because this is a case that arises under a federal law. This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1332 because this action involves citizens of different states, and is for a sum greater than seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

4.      This Court has personal jurisdiction over the parties.  Personal jurisdiction over the Defendant is appropriate because at all relevant times the Defendant has transacted business in Maryland and currently transacts business in Maryland.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is an entity subject to this Court's personal jurisdiction, a substantial part of the conduct, events and omissions giving rise to the claims occurred within this District, and the Defendant regularly transacts business in this District.

### FACTS

6.      On or about December 13, 2013, Kelly and Offit Kurman entered into a "Credit Agreement" (the "Credit Agreement"). The Credit Agreement required Offit Kurman to perform "Future Legal Services" in connection with four separate legal actions identified in the Credit Agreement. The Credit Agreement required Offit Kurman to prosecute the legal actions identified in the Credit Agreement to their ultimate conclusion, including without limitation, filing all possible appeals, and as more specifically set forth in the Credit Agreement. A copy of the Credit Agreement is attached hereto as **Exhibit A.**

2

7.    The Credit Agreement further provided for a mortgage (the "Mortgage"), *inter alia*, as follows:

> The Total Amount Due shall be secured by that certain mortgage of even date herewith in the amount of Five Hundred Fifty Thousand Dollars ($550,000.00), a copy of which is attached hereto as Exhibit "A" ("Florida Mortgage"), encumbering in favor of Offit Kurman (a) the unimproved real property owned by Kelly and located in Walton County, Florida and commonly known as Lot 3 Watercolor ("Mortgage Parcel 1"), and (b) the unimproved real property owned by Kelly and her husband, Myers and located in Walton County, Florida and commonly known as Lot 6 Seaside ("Mortgage Parcel 2").

8.    The Mortgage, *inter alia*, states:

> This Mortgage, including the assignment of Rents and the security interest in the Rents, is given to secure, <u>up to a maximum amount of Five Hundred Fifty Thousand and No/100 Dollars ($550,000.00)</u>, (a) payment by Borrower of the Indebtedness and (b) performance of any and all other obligations under the Credit Agreement and this Mortgage.

(Emphasis original). Offit Kurman caused the Mortgage to be recorded in the Walton County Official Records on January 13, 2014, at BK 2940, Page 1825. A copy of the Mortgage is attached hereto as **Exhibit B**.

9.    On July 29, 2014, "Lot 3 of TOWN CENTER 30-A EAST" ("Lot 3"), also identified in the Mortgage as "Mortgage Parcel 1," was sold, and Offit Kurman was paid $335,000.00 from the sale proceeds at closing. After Offit Kurman was paid $335,000.00 from the Lot 3 sale proceeds, the remaining security under the Mortgage was $215,000. A copy of the HUD-1 Settlement Statement for the sale of Lot 3 is attached hereto as **Exhibit C**.

10.    On July 29, 2014, in connection with the sale of Lot 3, Offit Kurman executed a "Partial Release of Mortgage" (the "Partial Release") which, *inter alia*, provides:

> OFFfT KURMAN, P.A. hereby agrees to a release its Mortgage lien on the Property upon receipt by OFFIT KURMAN, P,A. of funds in the amount of THREE HUNDRFD TIURTY -FIVE THOUSAND

3

> AND NO/100 DOLLARS ($335,000.00) on or before July 29, 2014
> via wire transfer to: [Offit Kurman SunTrust Bank account].

A copy of the Partial Release is attached hereto as **Exhibit D**.

11.     On September 11, 2016, Aaron Bukowitz, Chief Operating Officer of Offit

Kurman, met with Gregory Myers (the "September 11 Meeting"), and provided Gregory Myers

("Myers") with a copy of his agenda/notes that he had prepared in advance of the September 11

Meeting with Myers (the "September 11 Meeting Notes"). The September 11 Meeting Notes,

*inter alia*, state "4 Review Current Status of Credit Agreement":

> $550,000 Credit Agreement Security
> $335,000 Payment in July 2014 from sale (Lot 3)
> **$215,000 Remaining security under the agreement**

(Emphasis added). A copy of the September 11 Meeting Notes is attached hereto as **Exhibit E**.

12.     On September 24, 2015, Aaron Bukowitz sent a letter to Kelly in "RE: *Breach of*

*Credit Agreement"* (the "Breach Letter"). The Breach Letter, *inter alia*, alleges that Kelly was in

breach of the Credit Agreement, that the "breach necessarily cannot be cured," and "that on the

thirty first (31st) day following the date of this letter, all sums due under the Credit Agreement

shall become immediately due and payable and Offit Kurman shall have all of the rights and

remedies provided under the Credit Agreement in addition to all of the rights and remedies

otherwise available at law or equity. Specifically, and without limitation, Offit Kurman will then

have the option to discontinue the provision of legal services in connection with the various

cases expressly set forth in the Credit Agreement." A Copy of the Breach Letter is attached

hereto as **Exhibit F**.

13.     The Breach Letter identifies the alleged breach as follows:

> Specifically, pursuant to the Covenant Regarding Land Sales
> contained in Article 2 of the Credit Agreement, you were to list for
> sale that certain property commonly known as Lot 6 of Seaside, not
> later than January 20, 2014, for a price of not more than $1.995
> million, unless otherwise agreed to in writing by Offit Kurman, P.A.

4

> There has been no agreement to the contrary in writing, and yet this
> property has not been listed for sale at the indicated price.

Contrary to the assertion in the Breach Letter, on August 12, 2014, Offit Kurman issued an email

(the "August 12, 2014 Email") which confirms, in writing, that the reason Lot 6 Seaside ("Lot 6"

or "Mortgage Parcel 2") was not listed for sale pursuant to the terms of the Credit Agreement

was because Offit Kurman instructed that Lot 6 <u>not be listed</u> pursuant to the terms of the Credit

Agreement given the procedural posture of one of the four legal matters identified in the Credit

Agreement, specifically the legal matter identified as the "Seaside Case." A Copy of the August

12, 2104 Email is attached hereto as **Exhibit G**.

  14. On October 5, 2015, Aaron Bukowitz sent a letter to Kelly and Myers in "RE:

Termination of Various Representations (the "Termination Letter"). A Copy of the Termination

Letter is attached hereto as **Exhibit H**.

  15. On October 13, 2016, Offit Kurman issued a "Statement of Account" under

"Client Number 00220238" identified as "Invoice Number 563243." Invoice Number 563243

listed five matters: "00220238.00001 Regions Bank Litigation;" "00220238.00002 Naples

Foreclosure Action;" "00220238.00003 Lot 6 Foreclosure;" "00220238.00004 Silver Laurel

Way Foreclosure;" "00220238.00005 Wetherill Road Foreclosure." A Copy of Invoice Number

563243 is attached hereto as **Exhibit I**.

  16. On October 13, 2016, Offit Kurman issued a "Statement of Account" under

"Client Number 00220144" identified as "Invoice Number 563244." Invoice Number 563244

listed a single matter: "00220144.00003 Seaside Litigation (con't)." A Copy of Invoice Number

563244 is attached hereto as **Exhibit J**.

  17. On December 2, 2016, Gregory Johnson, Esquire with Offit Kurman sent a letter

to Kelly in "Re: SUPPLEMENTAL NOTICE OF DEFAULT DEMAND FOR PAYMENT AND

IMMINENT SUIT FILING Credit Agreement dated December 13, 2013" (the "Supplemental

Notice of Default"). The Supplemental Notice of Default, *inter alia*, states "A copy of each matter ledger with *A/R* balances and the amortization schedule for repayment of the balance due have been attached for your review." Attached to the Supplemental Notice of Default is a document identified as "OFFIT KURMAN, P.A. LEDGER SUMMARY FOR BARBARA ANN KELLY" which purportedly "lists the various legal matters in which OK represented Barbara Ann Kelly" (i.e., "Seaside Case;" "Regions Case (Regions Bank Litigation);" "Lot 6 Case (Lot 6 Foreclosure);" "Naples Case (Naples Foreclosure Action);" "Silver Laurel Was [sic] Foreclosure;" "Weatherill [sic] Road Foreclosure"). A Copy of the Supplemental Notice of Default is attached hereto as **Exhibit K**.

18.     On July 6, 2017, Kelly sent an email to Aaron Bukowitz and Gregory Johnson with Offit Kurman, "Subject:  Mortgage - Legally Required Disclosure - Federal Truth-In-Lending Act" (the "TILA Email"). The TILA Email, *inter alia*, states:

> Pursuant to the terms of the attached Mortgage and the disclosure requirements of the Federal Truth-in-Lending Act, please immediately forward to me a copy of the legally required disclosure…which disclosure was required by law to be provided to me at the time the purported debt/lien was incurred.
>
> **DEFINITIONS.** The following words shall have following when used in this Mortgage:
>
> **Indebtedness.** The word "indebtedness" means all principal and interest payable by Borrower under the Credit Agreement and any amounts expended or advanced by Lender to discharge obligations of Grantor or expenses incurred by Lender to enforce obligations of Grantor under this Agreement, together with interest on such amounts as provided in this Agreement, and any and all other present or future, direct or contingent liabilities or indebtedness of Borrower identified herein and in the Credit Agreement (or any amendment thereto) to the Lender of any nature whatsoever, whether classified as secured or unsecured, **except that the word "Indebtedness" shall not include any debt subject to the disclosure requirements of the Federal Truth-In-Lending Act if, at the time such debt is incurred, any legally required disclosure of the lien afforded hereby with respect to such debt shall not have been made.**

6

(Emphasis original). Offit Kurman never responded to Kelly's TILA Email request. A copy of the TILA Email is attached hereto as **Exhibit L**.

<u>**COUNT I**</u>
**Breach of Contract**

19.     Plaintiff incorporates all previous paragraphs as though they were fully set forth within this Count of the Complaint.

20.     The Credit Agreement constitutes a valid contract.

21.     Defendant materially breached the Credit Agreement when it failed and refused to honor its obligations under the Credit Agreement to diligently prosecute the four separate legal actions set forth in the Credit Agreement to their ultimate conclusion, including without limitation, filing all possible appeals, and without just cause, discontinuing the provision of legal services and prematurely withdrawing its representation.

22.     Plaintiff's granting of the Mortgage to Defendant was premised on Defendant diligently prosecuting the four separate legal actions set forth in the Credit Agreement to their ultimate conclusion, including without limitation, filing all possible appeals, which Defendant refused to do by materially breaching the Credit Agreement and discontinuing the provision of legal services and prematurely withdrawing its representation.

23.     Defendant's material breach of the Credit Agreement, discontinuation of the provision of legal services and premature withdrawal of its representation denied Plaintiff the benefit of her bargain such that the Defendant is not entitled to retain the $335,000.00 which Defendant received from the sale of Lot 3.

24.     Defendant's material breach of the Credit Agreement, discontinuation of the provision of legal services and premature withdrawal of its representation denied Plaintiff the benefit of her bargain such that Defendant is not entitled to any payment under the Mortgage.

25.     Defendant's material breach of the Credit Agreement, discontinuation of the provision of legal services and premature withdrawal of its representation denied Plaintiff the benefit of her bargain such that the Mortgage is voidable.

26.     Defendant's material breach of the Credit Agreement has actually and proximately caused Plaintiff to be materially harmed, and to incur various damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant, to which Plaintiff is entitled, at a minimum, to a complete offset and/or recoupment against Defendant, including without limitation, the $335,000.00 which Defendant received from the sale of Lot 3.

WHEREFORE, Plaintiff prays for relief as follows:

(a)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for Breach of Contract, and that the Court award Kelly those losses and damages incurred by Kelly as a result of Offit Kurman's Breach of Contract in a sum *not less than* Ten Million Dollars ($10,000,000.00);

(b)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for all foreseeable losses and damages incurred by Kelly as a result of Offit Kurman's Breach of Contract;

(c)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for punitive damages, in an amount *not less than* Ten Million Dollars ($10,000,000.00), as a result of Offit Kurman's Breach of Contract;

(d)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for attorneys' fees and costs incurred by Kelly in connection with her prosecution of this action as a result of Offit Kurman's Breach of Contract; and

(e)     For such further and other relief as the Court may deem just and proper.

8

## COUNT II
### Violation of the Federal Truth-In-Lending Act

27.    Plaintiff incorporates all previous paragraphs as though they were fully set forth within this Count of the Complaint.

28.    The Offit Kurman law firm failed to provide the legally required Federal Truth-In-Lending Act disclosures required by the Federal Truth-In-Lending Act, and the Mortgage.

29.    On July 6, 2017, Kelly sent an email to Aaron Bukowitz and Gregory Johnson with Offit Kurman, "Subject:  Mortgage - Legally Required Disclosure - Federal Truth-In-Lending Act" (the "TILA Email"). The TILA Email, *inter alia*, states:

> Pursuant to the terms of the attached Mortgage and the disclosure requirements of the Federal Truth-in-Lending Act, please immediately forward to me a copy of the legally required disclosure…which disclosure was required by law to be provided to me at the time the purported debt/lien was incurred.
>
> **DEFINITIONS.** The following words shall have following when used in this Mortgage:
>
> **Indebtedness.** The word "indebtedness" means all principal and interest payable by Borrower under the Credit Agreement and any amounts expended or advanced by Lender to discharge obligations of Grantor or expenses incurred by Lender to enforce obligations of Grantor under this Agreement, together with interest on such amounts as provided in this Agreement, and any and all other present or future, direct or contingent liabilities or indebtedness of Borrower identified herein and in the Credit Agreement (or any amendment thereto) to the Lender of any nature whatsoever, whether classified as secured or unsecured, **except that the word "Indebtedness" shall not include any debt subject to the disclosure requirements of the Federal Truth-In-Lending Act if, at the time such debt is incurred, any legally required disclosure of the lien afforded hereby with respect to such debt shall not have been made.**

(Emphasis original).

30.    The Offit Kurman law firm failed to respond to Kelly's July 6, 2017 TILA Email request.

31.     Kelly has been materially damaged as a result of Offit Kurman's violation of the Federal Truth-In-Lending Act, and Kelly is entitled to all rights of setoff, recoupment, damages, attorneys fees and any other remedies as provided for under the Federal Truth-In-Lending Act, and the Mortgage.

WHEREFORE, Plaintiff prays for relief as follows:

(a)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for Violation of the Federal Truth-In-Lending Act, and that the Court award Kelly those losses and damages incurred by Kelly as a result of Offit Kurman's Violation of the Federal Truth-In-Lending Act;

(b)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for all foreseeable losses and damages incurred by Kelly as a result of Offit Kurman's Violation of the Federal Truth-In-Lending Act;

(c)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for punitive damages as a result of Offit Kurman's Violation of the Federal Truth-In-Lending Act;

(d)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for attorneys' fees and costs incurred by Kelly in connection with her prosecution of this action as a result of Offit Kurman's Violation of the Federal Truth-In-Lending Act; and

(e)     For such further and other relief as the Court may deem just and proper.

### COUNT III
### Violation of the Fair Debt Collection Practices Act

32.     Plaintiff incorporates all previous paragraphs as though they were fully set forth within this Count of the Complaint.

33.     The Offit Kurman law firm is considered a "Debt Collector" pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. 1692 et seq. (the "FDCPA"), and is subject to the

requirements and obligations of the FDCPA. The stated purpose of the FDCPA is "to eliminate

abusive debt collection practices by debt collectors ... and to promote consistent State action to

protect consumers against debt collection abuses." 15 U.S.C. 1692(e).

34.    On July 6, 2017, Kelly sent an email to Aaron Bukowitz and Gregory Johnson

with Offit Kurman, "Subject: Mortgage - Legally Required Disclosure - Federal Truth-In-

Lending Act" (the "TILA Email"). The TILA Email, inter alia, states:

> Pursuant to the terms of the attached Mortgage and the disclosure
> requirements of the Federal Truth-in-Lending Act, please
> immediately forward to me a copy of the legally required
> disclosure…which disclosure was required by law to be provided to
> me at the time the purported debt/lien was incurred.
>
> **DEFINITIONS.** The following words shall have following when
> used in this Mortgage:
>
> **Indebtedness.** The word "indebtedness" means all principal and
> interest payable by Borrower under the Credit Agreement and any
> amounts expended or advanced by Lender to discharge obligations
> of Grantor or expenses incurred by Lender to enforce obligations of
> Grantor under this Agreement, together with interest on such
> amounts as provided in this Agreement, and any and all other
> present or future, direct or contingent liabilities or indebtedness of
> Borrower identified herein and in the Credit Agreement (or any
> amendment thereto) to the Lender of any nature whatsoever,
> whether classified as secured or unsecured, **except that the word
> "Indebtedness" shall not include any debt subject to the
> disclosure requirements of the Federal Truth-In-Lending Act if,
> at the time such debt is incurred, any legally required disclosure
> of the lien afforded hereby with respect to such debt shall not
> have been made.**

(Emphasis original).

35.    The Offit Kurman law firm failed to comply with the requirements of the Fair

Debt Collections Practices Act, including without limitation, sending Kelly the Breach Letter and

the Supplemental Notice of Default, and failing to respond to Kelly's July 6, 2017 TILA Email

request.

36.    Kelly has been materially damaged as a result of Offit Kurman's violation of the FDCPA, and Kelly is entitled to all rights of setoff, recoupment, damages, attorneys fees and any other remedies as provided for under the FDCPA.

WHEREFORE, Plaintiff prays for relief as follows:

(a)    That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for Violation of the Fair Debt Collection Practices Act, and that the Court award Kelly those losses and damages incurred by Kelly as a result of Offit Kurman's Violation of the Fair Debt Collection Practices Act;

(b)    That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for all foreseeable losses and damages incurred by Kelly as a result of Offit Kurman's Violation of the Fair Debt Collection Practices Act;

(c)    That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for punitive damages as a result of Offit Kurman's Violation of the Fair Debt Collection Practices Act;

(d)    That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for attorneys' fees and costs incurred by Kelly in connection with her prosecution of this action as a result of Offit Kurman's Violation of the Fair Debt Collection Practices Act; and

(e)    For such further and other relief as the Court may deem just and proper.

**COUNT IV**
**Constructive Fraud, Fraudulent Inducement, and Fraudulent Misrepresentation**

37.    Plaintiff incorporates all previous paragraphs as though they were fully set forth within this Count of the Complaint.

38.    The Credit Agreement is a valid, binding, and enforceable contract between Plaintiff and Defendant, evidences the Defendant's promise to give legal advice to the Plaintiff, and evidences an attorney-client relationship between the Plaintiff and the Defendant.

39.    The Defendant made false statements of material fact to Plaintiff that the Credit Agreement and Mortgage were authorized, lawful and in the Plaintiff's best interest.

40.    The Defendant represented to Plaintiff, through acts of material omission, that the Credit Agreement and Mortgage were authorized, lawful and in the Plaintiff's best interest.

41.    The Defendant knew that its statements were false or made the statements without knowledge of the statements' truth or falsity.

42.    The Plaintiff was ignorant of the falsity off the Defendant's representations, and the falsity of these representations is material inasmuch as the Plaintiff reasonably relied on these representations in her decision to execute the Credit Agreement and Mortgage.

43.    The Defendant and its principals knew these representations to be false, being persons intimately familiar with the practice of law and the nature of the Credit Agreement and Mortgage and the Plaintiff's legal matters and situation.  Despite this familiarity, the Defendant and its principals propagated the false representations and material omissions to the benefit of their business interests and to the detriment of Plaintiff's economic interests.

44.    The Defendant intended for its false statements of material fact, false representations, and material omissions to induce Plaintiff to enter into the Credit Agreement and Mortgage.

45.    The Defendant had actual knowledge of the wrongfulness of the conduct in question and the high probability that Plaintiff would reasonably rely on the Defendant's false statements of material fact, false representations, and material omissions, resultantly incurring damages.

46.    The Defendant and its principals, despite such knowledge, intentionally pursued this conduct.

47.     The Defendant's false statements of material fact, false representations, and material omissions were each part of a scheme to induce Plaintiff to execute the Credit Agreement and Mortgage.

48.     The Plaintiff did justifiably and detrimentally rely on the Defendant's false statements of material fact, false representations, and material omissions.

49.     The Defendant's false statements of material fact, false representations, and material omissions resulted in the Plaintiff executing the Credit Agreement and Mortgage, which the Plaintiff would not have done had such Constructive Fraud, Fraudulent Inducement, and Fraudulent Misrepresentation not occurred.

50.     The Defendant's false statements of material fact, false representations, and material omissions resulted in Plaintiff incurring alleged liability which exceeds that which Plaintiff would have incurred had such Constructive Fraud, Fraudulent Inducement, and Fraudulent Misrepresentation not occurred.

51.     The Defendant's false statements of material fact, false representations, and material omissions have resulted in the Plaintiff being materially damaged.

WHEREFORE, Plaintiff prays for relief as follows:

(a)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for Constructive Fraud, Fraudulent Inducement, and Fraudulent Misrepresentation, and that the Court award Kelly those losses and damages incurred by Kelly as a result of Offit Kurman's Constructive Fraud, Fraudulent Inducement, and Fraudulent Misrepresentation in a sum *not less than* Ten Million Dollars ($10,000,000.00);

(b)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for all foreseeable losses and damages incurred by Kelly as a result of Offit Kurman's Constructive Fraud, Fraudulent Inducement, and Fraudulent Misrepresentation;

(c)      That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for punitive damages, in an amount *not less than* Ten Million Dollars ($10,000,000.00), as a result of Offit Kurman's Constructive Fraud, Fraudulent Inducement, and Fraudulent Misrepresentation;

(d)      That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for attorneys' fees and costs incurred by Kelly in connection with her prosecution of this action as a result of Offit Kurman's Constructive Fraud, Fraudulent Inducement, and Fraudulent Misrepresentation; and

(e)      For such further and other relief as the Court may deem just and proper.

## COUNT V
### Breach of Fiduciary Duty

52.      Plaintiff incorporates all previous paragraphs as though they were fully set forth within this Count of the Complaint.

53.      The Credit Agreement is a valid, binding, and enforceable contract between Plaintiff and Defendant, evidences the Defendant's promise to give legal advice to the Plaintiff, and evidences an attorney-client relationship between the Plaintiff and the Defendant.

54.      As Plaintiff's attorneys, the Defendant owed Plaintiff a fiduciary duty to provide skillful and competent representation and to act at all times in good faith and in the Plaintiff's best interests, to perform the services for which they were retained with reasonable care, skill, and diligence that are commonly exercised by other attorneys in similar conditions and circumstances, and to act in Plaintiff's highest and best interests at all times, and to not expose Plaintiff to any unnecessary risk or peril.

55.      The Defendant breached its fiduciary duty to Plaintiff by failing to provide skillful and competent representation and to act at all times in good faith and in the Plaintiff's best interests, to perform the services for which they were retained with reasonable care, skill, and

15

diligence that are commonly exercised by other attorneys in similar conditions and circumstances, and to act in Plaintiff's highest and best interests at all times, and to not expose Plaintiff to any unnecessary risk or peril, including without limitation, filing frivolous pleadings and failing to properly counsel and advise Plaintiff that the Credit Agreement was not in Plaintiff's best interest.

56.     The Defendant breached its fiduciary duty to Plaintiff by making false statements of material fact to Plaintiff, when the Defendant and its principals knew these statements and representations to be false, being persons intimately familiar with the practice of law and the nature of the Credit Agreement and the Plaintiff's legal affairs and situation. Despite this familiarity, the Defendant and its principals propagated the false representations and material omissions to the benefit of their business interests and to the detriment of Plaintiff's economic interests.

57.     The Defendant breached its fiduciary duty to Plaintiff by inducing Plaintiff to execute the Credit Agreement and Mortgage when the Defendant had actual knowledge of the wrongfulness of its conduct, and despite such knowledge, intentionally pursued the wrongful conduct to induce Plaintiff to execute the Credit Agreement and Mortgage, which the Plaintiff would not have done had such Breach of Fiduciary Duty not occurred.

58.     The Defendant breached its duty by failing to properly counsel and advise Plaintiff in order to limit the litigation in Plaintiff's legal cases, by placing the Defendant's interests in charging fees above Plaintiff's interests, and by generally mishandling, mismanaging, and overbilling in the Plaintiff's legal cases to such an extent that Plaintiff was forced to incur excessive and unnecessary legal fees and expenses, and further, causing Plaintiff's position to become compromised by the failures of the Defendant and its attorneys to manage the Plaintiff's legal cases and associated litigation in a prudent manner.

59.     The Defendant's false statements, false representations, and material omissions resulted in Plaintiff incurring alleged liability which exceeds that which Plaintiff would have incurred had such breach of fiduciary duty not occurred.

60.     The Defendant's breach of its fiduciary duty to Plaintiff by failing to provide skillful and competent representation and to act at all times in good faith and in the Plaintiff's best interests, to perform the services for which they were retained with reasonable care, skill, and diligence that are commonly exercised by other attorneys in similar conditions and circumstances, and to act in Plaintiff's highest and best interests at all times, and to not expose Plaintiff to any unnecessary risk or peril, including without limitation, failing to properly counsel and advise Plaintiff that the Credit Agreement and Mortgage were unauthorized, unlawful and not in Plaintiff's best interest, has resulted in the Plaintiff incurring alleged liability which exceeds that which Plaintiff would have incurred had such Breach of Fiduciary Duty not occurred.

61.     The Defendant's breach of its fiduciary duty to Plaintiff by failing to provide skillful and competent representation and to act at all times in good faith and in the Plaintiff's best interests, to perform the services for which they were retained with reasonable care, skill, and diligence that are commonly exercised by other attorneys in similar conditions and circumstances, and to act in Plaintiff's highest and best interests at all times, and to not expose Plaintiff to any unnecessary risk or peril, including without limitation, failing to properly counsel and advise Plaintiff that the Credit Agreement and Mortgage were unauthorized, unlawful and not in Plaintiff's best interest, has resulted in the Plaintiff being materially damaged.

WHEREFORE, Plaintiff prays for relief as follows:

(a)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for Breach of Fiduciary Duty, and that the Court award Kelly those losses and damages incurred by

17

Kelly as a result of Offit Kurman's Breach of Fiduciary Duty in a sum *not less than* Ten Million Dollars ($10,000,000.00);

      (b)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for all foreseeable losses and damages incurred by Kelly as a result of Offit Kurman's Breach of Fiduciary Duty;

      (c)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for punitive damages, in an amount *not less than* Ten Million Dollars ($10,000,000.00), as a result of Offit Kurman's Breach of Fiduciary Duty;

      (d)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for attorneys' fees and costs incurred by Kelly in connection with her prosecution of this action as a result of Offit Kurman's Breach of Fiduciary Duty; and

      (e)     For such further and other relief as the Court may deem just and proper.

### COUNT VI
### Legal Malpractice

62.     Plaintiff incorporates all previous paragraphs as though they were fully set forth within this Count of the Complaint.

63.     The Credit Agreement is a valid, binding, and enforceable contract between Plaintiff and Defendant, evidences the Defendant's promise to give legal advice to the Plaintiff, and evidences an attorney-client relationship between the Plaintiff and the Defendant.

64.     As Plaintiff's attorneys, the Defendant owed Plaintiff a duty to provide skillful and competent representation and to act at all times in good faith and in the Plaintiff's best interests, to perform the services for which they were retained with reasonable care, skill, and diligence that are commonly exercised by other attorneys in similar conditions and

circumstances, and to act in Plaintiff's highest and best interests at all times, and to not expose

Plaintiff to any unnecessary risk or peril.

65.    The Defendant committed legal malpractice by failing to provide skillful and

competent representation and to act at all times in good faith and in the Plaintiff's best interests,

to perform the services for which they were retained with reasonable care, skill, and diligence

that are commonly exercised by other attorneys in similar conditions and circumstances, and to

act in Plaintiff's highest and best interests at all times, and to not expose Plaintiff to any

unnecessary risk or peril.

66.    The Defendant committed legal malpractice by failing to understand and apply

the law correctly to Plaintiff's facts and circumstances, including without limitation, failing to

properly understand and apply Florida common law correctly to Plaintiff's facts and

circumstances.

67.    The Defendant committed legal malpractice by making false statements of

material fact to Plaintiff, when the Defendant and its principals knew these statements and

representations to be false, being persons intimately familiar with the practice of law and the

nature of the Credit Agreement and Mortgage.  Despite this familiarity, the Defendant and its

principals propagated the false representations and material omissions to the benefit of their

business interests and to the detriment of Plaintiff's economic interests.

68.    The Defendant committed legal malpractice by inducing Plaintiff to execute the

Credit Agreement and Mortgage when the Defendant had actual knowledge of the wrongfulness

of its conduct, and despite such knowledge, intentionally pursued the wrongful conduct to induce

Plaintiff to execute the Credit Agreement and Mortgage, which the Plaintiff would not have done

had such legal malpractice not occurred.

19

69.    The Defendant committed legal malpractice by failing to properly counsel and advise Plaintiff in order to limit the litigation in Plaintiff's various legal actions, and by generally mishandling and mismanaging the Plaintiff's legal actions to such an extent that Plaintiff was forced to incur excessive and unnecessary legal fees and expenses, and further, causing Plaintiff's position to become compromised by the failures of the Defendant and its attorneys to manage the Plaintiff's legal cases and associated litigation in a prudent manner, and not taking proper steps to remedy same.

70.    The Defendant committed legal malpractice by Defendant's acts and omissions in connection with the Credit Agreement and Mortgage.

71.    The Defendant committed legal malpractice by failing to take all necessary actions, including without limitation, filing all necessary and appropriate motions and other pleadings with respect to Plaintiff's various legal actions in order to adequately protect the Plaintiff's interests.

72.    The Defendant committed legal malpractice by filing frivolous pleadings in Plaintiff's various legal actions.

73.    There were numerous other instances of legal malpractice wherein the conduct of the Defendant, and Defendant's individual attorneys, fell below the applicable standard of care during the course of the Defendant's representation of the Plaintiff. The Defendant, and each of its attorneys, failed to exercise reasonable care and skill in their representation of Plaintiff by negligently and carelessly doing all of the acts and omissions as herein alleged, and by generally mishandling, mismanaging, and overbilling in Plaintiff's matters to such an extent that Plaintiff has incurred excessive legal fees and expenses, and Plaintiff's legal and financial position has become compromised by the negligence of the Defendant.

74.     Had the Defendant and its individual attorneys not been negligent or otherwise acted wrongfully, the outcome of the Plaintiff's legal cases would have been materially different and Plaintiff would not have suffered the damages, financial losses, and harm which the Plaintiff has suffered.

75.     The conduct of the Defendant, including the conduct of each of its attorneys, in doing the acts and omissions herein alleged, constitutes legal malpractice, and was the proximate and foreseeable cause of the damages, financial losses, and harm which the Plaintiff has suffered and will continue to suffer in the foreseeable future.

WHEREFORE, Plaintiff prays for relief as follows:

(a)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for Legal Malpractice, and that the Court award Kelly those losses and damages incurred by Kelly as a result of Offit Kurman's Legal Malpractice in a sum *not less than* Ten Million Dollars ($10,000,000.00);

(b)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for all foreseeable losses and damages incurred by Kelly as a result of Offit Kurman's Legal Malpractice;

(c)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for punitive damages, in an amount *not less than* Ten Million Dollars ($10,000,000.00), as a result of Offit Kurman's Legal Malpractice;

(d)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for attorneys' fees and costs incurred by Kelly in connection with her prosecution of this action as a result of Offit Kurman's Legal Malpractice; and

(e)     For such further and other relief as the Court may deem just and proper.

## COUNT VII
### Intentional Infliction of Emotional Distress

76.     Plaintiff incorporates all previous paragraphs as though they were fully set forth within this Count of the Complaint.

77.     Defendant knew on September 24, 2015, when Defendant sent a letter to Plaintiff alleging that Plaintiff breached the Credit Agreement, and advising Plaintiff that Defendant was going to "discontinue the provision of legal services in connection with the various cases expressly set forth in the Credit Agreement," that Defendant's actions were not justified under the terms of the Credit Agreement.

78.     Defendant knew that its intentional, unlawful, and malicious actions with respect to Plaintiff and Plaintiff's Property were causing Plaintiff to experience severe emotional distress and mental pain and suffering.

79.     Defendant intentionally, deliberately, and **recklessly** inflicted severe emotional distress and mental pain and suffering upon the Plaintiff by refusing to honor its obligations under the Credit Agreement.

80.     The Defendant's conduct was motivated by the potential for unreasonable financial gain, constituting unclean hands.

81.     Plaintiff has suffered severe emotional distress and mental pain and suffering, with accompanying physical symptoms as a result of Defendant's intentional, unlawful, and malicious conduct.

82.     Plaintiff's emotional distress was so severe that it has physically manifested itself in the following ways: grinding of teeth and cracked tooth due to grinding; constant chest pains; constant headaches; insomnia; nausea; lower back pain; shortness of breath; numbness in neck and arm; panic attacks; anxiety attacks; development of cysts on skin; and development of cancerous lesions on skin.

22

83.     Plaintiff continues to suffer severe emotional distress and mental pain and suffering with physical manifestations.

84.     Defendant's material breach of the Credit Agreement has actually and proximately caused Plaintiff to be materially harmed, and to incur various damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant.

WHEREFORE, Plaintiff prays for relief as follows:

(a)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for Intentional Infliction of Emotional Distress and mental pain and suffering, and that the Court award Kelly those losses and damages incurred by Kelly as a result of Offit Kurman's Intentional Infliction of Emotional Distress and mental pain and suffering in a sum *not less than* Ten Million Dollars ($10,000,000.00);

(b)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for all foreseeable losses and damages incurred by Kelly as a result of Offit Kurman's Intentional Infliction of Emotional Distress and mental pain and suffering;

(c)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for punitive damages, in an amount *not less than* Ten Million Dollars ($10,000,000.00), as a result of Offit Kurman's Intentional Infliction of Emotional Distress and mental pain and suffering;

(d)     That the Court enter a judgment in favor of Kelly, and against Offit Kurman, for attorneys' fees and costs incurred by Kelly in connection with her prosecution of this action as a result of Offit Kurman's Intentional Infliction of Emotional Distress and mental pain and suffering; and

(e)     For such further and other relief as the Court may deem just and proper.

## RESERVATION OF RIGHTS

Plaintiff hereby reserve the right to add additional facts and claims not currently known and that may be revealed through discovery in this matter.

RESPECTFULLY SUBMITTED on this 12th day of December, 2017.

Barbara Ann Kelly, *pro se*
700 Gulf Shore Blvd. North
Naples, Florida 34102
(301) 325-3528
bakellymyers@verizon.net

## JURY TRIAL DEMAND

Plaintiff Barbara Ann Kelly does hereby demand a trial by jury on all counts of her Complaint so triable.

Barbara Ann Kelly, *pro se*

24

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of December, 2017, a copy of the foregoing was served via U.S. Mail, first class, postage prepaid, to the following:

Maurice Offit, Esq.
Offit Kurman, P.A.
8171 Maple Lawn Blvd.
Suite 200
Fulton, MD 20759

_____
Barbara Ann Kelly, *pro se*

# Exhibit L

Filing # 68422328 E-Filed 02/25/2018 11:09:47 PM

## IN THE CIRCUIT COURT IN AND FOR WALTON COUNTY, FLORIDA

BARBARA ANN KELLY
700 Gulf Shore Blvd. North
Naples, Florida 34102

       Plaintiff,                    CASE NO. _____

v.

SUNTRUST BANK
303 Peachtree Street NE, GA-ATL-0643
Atlanta, Georgia 30308

       SERVE:
       Corporation Service Company
       40 Technology Pkwy, South, #300
       Norcross, Georgia 30092

       Defendant.

_____/

### COMPLAINT AND JURY TRIAL DEMAND

Plaintiff, BARBARA ANN KELLY ("Kelly" or "Plaintiff"), *pro se*, files this *Complaint and Jury Trial Demand* (the "Complaint") against Defendant, SUNTRUST BANK ("SunTrust" or "Defendant"), and for cause does allege as follows:

### PARTIES

1.     Plaintiff, BARBARA ANN KELLY is a natural person who owns property in Walton County, Florida.

2.     Defendant, SUNTRUST BANK is a corporation organized and existing under the laws of the State of Georgia.

### JURISDICTION AND VENUE

3.     Personal jurisdiction over the Defendant is appropriate because at all relevant times the Defendant has transacted business in Walton County, Florida and currently transacts business in Walton County, Florida.

4.      Venue is proper in this district because Defendant is an entity subject to this Court's personal jurisdiction, a substantial part of the conduct, events and omissions giving rise to the claims occurred within this district, and the Defendant regularly transacts business in this district.

**FACTS**

5.      On April 9, 2013, SunTrust filed a *Verified Mortgage Foreclosure Complaint* in the Circuit Court in and for Walton County, Florida styled *SunTrust Bank v. Barbara Ann Kelly, et al.*, Case No.: 2013-CA-000290 (the "Foreclosure Litigation"). In the Foreclosure Litigation, SunTrust seeks to foreclose a "Mortgage" (the "Mortgage") in connection with "LN# 0028908598" on property identified as "LOT 13, SEASIDE 15 SUBDIVISION, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 15, PAGE 38, OF THE PUBLIC RECORDS OF WALTON COUNTY, FLORIDA" ("Lot 13").

6.      On November 22, 2013, Ashley A. Sawyer, Esq. ("Ms. Sawyer"), counsel for SunTrust, issued a written settlement offer to Kelly in "Re: Loan Number 0028908598" (the "Settlement Offer"). A copy of the Settlement Offer is attached hereto as **Exhibit A**. The Settlement Offer states:

> This law firm has been retained by SunTrust for the limited purpose or engaging in negotiations to settle the above-referenced matter. Foreclosure counsel at Johnson & Freedman LLC is aware of our retention and has been advised by SunTrust that the undersigned has the sole authority to enter into settlement discussions on SunTrust's behalf in this action. Please direct all future settlement communications accordingly.
>
> The borrower, Barbara Ann Kelly, defaulted under the above-referenced mortgage loan. As of the date hereof, the principal amount due on the loan is approximately $464,043.03. This amount is exclusive of interest, late fees, attorney's fees, costs, etc.

2

In an effort to resolve this matter promptly and without further expense, SunTrust has authorized us to offer the following basic settlement terms: (a) SunTrust will accept $232,021.00 [the **Settlement Amount**] in complete settlement of the underlying indebtedness; and (b) SunTrust will release its lien on the mortgaged property. This offer is **not** contingent on the Borrower providing financials to SunTrust. SunTrust is also prepared to consider a deed in lieu of foreclosure or consent judgment, as applicable, with a cash contribution from the borrower, to accompany the deal.

Any final, binding settlement of this matter is of course subject to and conditioned upon the execution of a formal written settlement agreement satisfactory to the parties that sets forth in greater detail the terms of the parties' settlement including. without limitation, a complete general release of SunTrust and a provision for dismissal of the litigation by all parties, with prejudice and with each party to bear their own fees and costs, among other, mutually-beneficial settlement terms.

Please advise us if the Borrower is prepared to accept the foregoing settlement terms so that we can begin preparation of formal settlement documentation. While we have refrained from imposing a deadline on this settlement offer, we cannot assure you that the favorable settlement terms SunTrust is offering will remain available indefinitely.

If the Borrower would like SunTrust to consider an alternative to the foregoing settlement proposal, please advise the undersigned immediately and we will convey any proposed counteroffer to SunTrust. Please be advised, however, that SunTrust may not entertain a counterproposal tor payment of an amount less than the Settlement Amount without first receiving detailed financial information from the Borrower.

Thank you in advance for your time and consideration, I look forward to resolving this matter with you. Please contact me directly if you have any questions or wish to discuss.

(Emphasis in original).

7.     On July 19, 2016, Kelly sent an email to Ms. Sawyer, attaching a signed letter accepting SunTrust's Settlement Offer ("[t]his letter shall constitute my full acceptance of the Settlement Offer, and my full acceptance of the settlement terms you have offered on behalf of

3

SunTrust") (the "Acceptance Letter") (the Settlement Offer and the Acceptance Letter are collectively referred to as the "Settlement Agreement"). A copy of the Acceptance Letter is attached hereto as **Exhibit B.** The Acceptance Letter states:

> I am writing in response to your letter dated November 22, 2013 to my former attorney Michael A. Gort, a copy of which is attached hereto as EXHIBIT A (the "Settlement Offer").
>
> The Settlement Offer states that "(a) SunTrust will accept $232,021.00 [the Settlement Amount] in complete settlement of the underlying indebtedness" relative to a mortgage loan secured by property located in Walton County, Florida and legally described as LOT 13, SEASIDE 15, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 15, PAGE 38, OF THE PUBLIC RECORDS OF WALTON COUNTY, FLORIDA; and "(b) SunTrust will release its lien on the mortgaged property."
>
> The Settlement Offer clearly states that there is no deadline for acceptance of the Settlement Offer. SunTrust has never provided notice that the Settlement Offer is/was withdrawn.
>
> This letter shall constitute my full acceptance of the Settlement Offer, and my full acceptance of the settlement terms you have offered on behalf of SunTrust. Please begin preparation of formal settlement documentation.

8.    On July 21, 2016, Ms. Sawyer sent Kelly an email which states, "As a follow-up, I spoke with SunTrust. They are not interested in settling with you at this time and will proceed with the foreclosure."

**COUNT I**
**Breach of Contract**

9.    Plaintiff incorporates each and every preceding paragraph of this Complaint as though fully set forth herein.

10.    The Settlement Agreement is a valid, binding, and enforceable contract between Plaintiff and Defendant.

4

11.     After the Plaintiff and the Defendant entered into the Settlement Agreement, the Defendant materially breached the Settlement Agreement by refusing and failing to honor the terms of the Settlement Agreement, including without limitation, continuing the Foreclosure Litigation against Lot 13 and the Plaintiff.

12.     As a result of Defendant's material breach of the Settlement Agreement, Plaintiff has been materially harmed, and has incurred various material damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, the Defendant continuing the Foreclosure Litigation against Lot 13 and the Plaintiff.

.     WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Five Million Dollars ($5,000,000.00), award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

**COUNT II**
**Detrimental Reliance**

13.     Plaintiff incorporates each and every preceding paragraph of this Complaint as though fully set forth herein.

14.     The Settlement Agreement constitutes a clear and definite promise of the Defendant to the Plaintiff.

15.     The Defendant should have expected that the Settlement Offer would induce action on the part of the Plaintiff.

16.     The Settlement Offer did induce action on the part of the Plaintiff.

17.     The detriment caused by the Defendant can only now be avoided by the

enforcement of the promises contained in the Settlement Agreement.

18.    As a result of Defendant's actions, Plaintiff has been materially harmed, and has incurred various material damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, the Defendant continuing the Foreclosure Litigation against Lot 13 and the Plaintiff.

.    WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Five Million Dollars ($5,000,000.00), award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

## COUNT III
### Negligent Misrepresentation

19.    Plaintiff incorporates each and every preceding paragraph of this Complaint as though fully set forth herein.

20.    Defendant had a duty of care to the Plaintiff to fulfill Defendant's obligations and promises under the Settlement Agreement.

21.    The Defendant materially breached its duty of care to the Plaintiff by failing to fulfill its obligations and promises under the Settlement Agreement.

22.    As a result of the Defendant's material breach of its duty of care to the Plaintiff by failing to fulfill its obligations and promises under the Settlement Agreement, Plaintiff has been materially harmed, and has incurred various material damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, the Defendant continuing the Foreclosure Litigation against Lot 13 and the Plaintiff.

.       WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Five Million Dollars ($5,000,000.00), award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

**COUNT IV**
**Negligence**

23.     Plaintiff incorporates each and every preceding paragraph of this Complaint as though fully set forth herein.

24.     Defendant had a duty of care to the Plaintiff to fulfill its obligations and promises under the Settlement Agreement.

25.     The Defendant materially breached its duty of care to the Plaintiff by failing to fulfill its obligations and promises under the Settlement Agreement.

26.     As a result of the Defendant's material breach of its duty of care to the Plaintiff by failing to fulfill its obligations and promises under the Settlement Agreement, Plaintiff has been materially harmed, and has incurred various material damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, the Defendant continuing the Foreclosure Litigation against Lot 13 and the Plaintiff.

.       WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Five Million Dollars ($5,000,000.00), award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

7

## COUNT V
### Negligent Infliction of Emotional Distress

27.    Plaintiff incorporate each and every preceding paragraph of this Complaint as though fully set forth herein.

28.    The Defendant has intentionally, deliberately, and recklessly inflicted severe emotional distress and mental pain and suffering upon the Plaintiff by refusing to honor its obligations and promises under the Settlement Agreement.

29.    Defendant knew that continuing the Foreclosure Litigation against Lot 13 and the Plaintiff in light of the Settlement Agreement was not justified, and that Defendant's intentional, unlawful, malicious and unjustified actions with respect to Lot 13 and Plaintiff were and are causing Plaintiff to experience severe emotional distress and mental pain and suffering, constituting outrageous conduct by the Defendant.

30.    The Defendant's conduct and that of its agents, was motivated, at least in part, by the potential for unreasonable financial gain, constituting unclean hands.

31.    Plaintiff has suffered severe emotional distress and mental pain and suffering, with accompanying physical symptoms, as a result of Defendant's intentional, unlawful, malicious and unjustified conduct.

32.    Plaintiff's emotional distress is so severe that it has physically manifested itself in the following ways: grinding of teeth and cracked tooth due to grinding; constant chest pains; constant headaches; insomnia; nausea; lower back pain; shortness of breath; numbness in neck and arm; panic attacks; anxiety attacks; and the development of cancerous lesions on the skin. Plaintiff continues to suffer severe emotional distress and mental pain and suffering with physical manifestations.

33.    Plaintiff has been materially harmed as a result of the Defendant's intentional, unlawful, malicious and unjustified conduct.

.    WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Five Million Dollars ($5,000,000.00), award Plaintiff punitive damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

### RESERVATION OF RIGHTS

34.    Plaintiff hereby reserves the right to add additional facts and claims not currently known and that may be revealed through discovery in this matter.

**RESPECTFULLY SUBMITTED** on this 25th day of February, 2018.

> /s/ Barbara Ann Kelly
> Barbara Ann Kelly, *pro se*
> 700 Gulf Shore Blvd. N.
> Naples, FL 34102
> (301) 325-3528
> bakellymyers@verizon.net

### JURY TRIAL DEMAND

Plaintiff Barbara Ann Kelly does hereby demand a trial by jury on all counts of her Complaint so triable.

> /s/ Barbara Ann Kelly
> Barbara Ann Kelly, *pro se*

9

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of February, 2018, the foregoing was electronically filed with the Clerk of Court using the Florida E-Filing Portal and a copy of same was electronically served via email to the following:

Amelia Hallenberg Beard, Esq.
McCalla Raymer Leibert Pierce, LLC
225 E. Robinson Street, Suite 155
Orlando, Florida 32801
Email: mrservice@mccalla.com

                              /s/ Barbara Ann Kelly
                              Barbara Ann Kelly, *pro se*

10

# Exhibit A



Ashley A. Sawyer

**Akerman LLP**
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2999
Tel: 954.463.2700
Fax: 954.463.2224

Dir: 954.759.8924

E-mail: ashley.sawyer@akerman.com

## CONFIDENTIAL SETTLEMENT COMMUNICATION
### FOR SETTLEMENT PURPOSES ONLY

November 22, 2013

### *Via U.S. Mail*

Michael A. Gort, Esq.
Gort Law Firm
601 Heritage Drive, Suite 457
Jupiter, FL 33458

> **Re:**   **Borrower Name:**   **Barbara Ann Kelly**
> **Loan Number:**   **0028908598**

Dear Counsel:

This law firm has been retained by SunTrust for the limited purpose of engaging in negotiations to settle the above-referenced matter. Foreclosure counsel at Johnson & Freedman LLC is aware of our retention and has been advised by SunTrust that the undersigned has the sole authority to enter into settlement discussions on SunTrust's behalf in this action. Please direct all future settlement communications accordingly.

The borrower, Barbara Ann Kelly, defaulted under the above-referenced mortgage loan. As of the date hereof, the principal amount due on the loan is approximately $464,043.03. This amount is exclusive of interest, late fees, attorney's fees, costs, etc.

akerman.com

{27488737;1}

In an effort to resolve this matter promptly and without further expense, SunTrust has authorized us to offer the following basic settlement terms: (a) SunTrust will accept $232,021.00 [the **Settlement Amount**] in complete settlement of the underlying indebtedness; and (b) SunTrust will release its lien on the mortgaged property. This offer is **not** contingent on the Borrower providing financials to SunTrust. SunTrust is also prepared to consider a deed in lieu of foreclosure or consent judgment, as applicable, with a cash contribution from the borrower, to accompany the deal.

Any final, binding settlement of this matter is of course subject to and conditioned upon the execution of a formal written settlement agreement satisfactory to the parties that sets forth in greater detail the terms of the parties' settlement including, without limitation, a complete general release of SunTrust and a provision for dismissal of the litigation by all parties, with prejudice and with each party to bear their own fees and costs, among other, mutually-beneficial settlement terms.

Please advise us if the Borrower is prepared to accept the foregoing settlement terms so that we can begin preparation of formal settlement documentation. While we have refrained from imposing a deadline on this settlement offer, we cannot assure you that the favorable settlement terms SunTrust is offering will remain available indefinitely.

If the Borrower would like SunTrust to consider an alternative to the foregoing settlement proposal, please advise the undersigned immediately and we will convey any proposed counteroffer to SunTrust. Please be advised, however, that SunTrust may not entertain a counterproposal for payment of an amount less than the Settlement Amount without first receiving detailed financial information from the Borrower.

Thank you in advance for your time and consideration, I look forward to resolving this matter with you. Please contact me directly if you have any questions or wish to discuss.

Very truly yours,

Ashley A. Sawyer, Esq.
For the Firm

# Exhibit B

**Barbara Ann Kelly**
**4505 Wetherill Road**
**Bethesda, Maryland 20816**
**(301) 325-3528**

July 19, 2016

**Via Federal Express and E-mail (ashley.sawyer@akerman.com)**
Ashley A. Sawyer, Esq.
Akerman LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2999

      Re:    **Barbara Ann Kelly**
              **SunTrust Loan Number 0028908598**

Dear Ms. Sawyer:

      I am writing in response to your letter dated November 22, 2013 to my former attorney Michael A. Gort, a copy of which is attached hereto as EXHIBIT A (the "Settlement Offer").

      The Settlement Offer states that "(a) SunTrust will accept $232,021.00 [the Settlement Amount] in complete settlement of the underlying indebtedness" relative to a mortgage loan secured by property located in Walton County, Florida and legally described as LOT 13, SEASIDE 15, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 15, PAGE 38, OF THE PUBLIC RECORDS OF WALTON COUNTY, FLORIDA; and "(b) SunTrust will release its lien on the mortgaged property."

      The Settlement Offer clearly states that there is no deadline for acceptance of the Settlement Offer.  SunTrust has never provided notice that the Settlement Offer is/was withdrawn.

      This letter shall constitute my full acceptance of the Settlement Offer, and my full acceptance of the settlement terms you have offered on behalf of SunTrust.  Please begin preparation of formal settlement documentation.

                    Sincerely,

                    Barbara Ann Kelly

Enclosure

"EXHIBIT A"


Akerman

Ashley A. Sawyer

Akerman LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2999
Tel: 954.463.2700
Fax: 954.463.2224

Dir: 954.759.8924

E-mail: ashley.sawyer@akerman.com

## CONFIDENTIAL SETTLEMENT COMMUNICATION
## FOR SETTLEMENT PURPOSES ONLY

November 22, 2013

*Via U.S. Mail*

Michael A. Gort, Esq.
Gort Law Firm
601 Heritage Drive, Suite 457
Jupiter, FL 33458

|  | | |
|---|---|---|
| *Re:* | *Borrower Name:* | *Barbara Ann Kelly* |
|  | *Loan Number:* | *0028908598* |

Dear Counsel:

This law firm has been retained by SunTrust for the limited purpose of engaging in negotiations to settle the above-referenced matter. Foreclosure counsel at Johnson & Freedman LLC is aware of our retention and has been advised by SunTrust that the undersigned has the sole authority to enter into settlement discussions on SunTrust's behalf in this action. Please direct all future settlement communications accordingly.

The borrower, Barbara Ann Kelly, defaulted under the above-referenced mortgage loan. As of the date hereof, the principal amount due on the loan is approximately $464,043.03. This amount is exclusive of interest, late fees, attorney's fees, costs, etc.

akerman.com

{27488737.1}

In an effort to resolve this matter promptly and without further expense, SunTrust has authorized us to offer the following basic settlement terms:  (a) SunTrust will accept $232,021.00 [the **Settlement Amount**] in complete settlement of the underlying indebtedness; and (b) SunTrust will release its lien on the mortgaged property.  This offer is **not** contingent on the Borrower providing financials to SunTrust.  SunTrust is also prepared to consider a deed in lieu of foreclosure or consent judgment, as applicable, with a cash contribution from the borrower, to accompany the deal.

Any final, binding settlement of this matter is of course subject to and conditioned upon the execution of a formal written settlement agreement satisfactory to the parties that sets forth in greater detail the terms of the parties' settlement including, without limitation, a complete general release of SunTrust and a provision for dismissal of the litigation by all parties, with prejudice and with each party to bear their own fees and costs, among other, mutually-beneficial settlement terms.

Please advise us if the Borrower is prepared to accept the foregoing settlement terms so that we can begin preparation of formal settlement documentation.  While we have refrained from imposing a deadline on this settlement offer, we cannot assure you that the favorable settlement terms SunTrust is offering will remain available indefinitely.

If the Borrower would like SunTrust to consider an alternative to the foregoing settlement proposal, please advise the undersigned immediately and we will convey any proposed counteroffer to SunTrust. Please be advised, however, that SunTrust may not entertain a counterproposal for payment of an amount less than the Settlement Amount without first receiving detailed financial information from the Borrower.

Thank you in advance for your time and consideration. I look forward to resolving this matter with you.  Please contact me directly if you have any questions or wish to discuss.

Very truly yours,

Ashley A. Sawyer, Esq.
For the Firm

# Exhibit M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)



2017 OCT 13  PM 3: 43

BY____ 5/H____ DEPUTY

| | |
|---|---|
| BARBARA ANN KELLY | * |
| Plaintiff, | * |
| v. | *    Case No. **8:17-cv-01812-PWG** |
| U.S. BANK, NA, Successor Trustee To | * |
| BANK OF AMERICA, NA, Successor In | |
| Interest to LASALLE BANK, NA, As | * |
| Trustee, On Behalf of The Holders of the | |
| WAMU MORTGAGE Pass-Through | * |
| Certificates, Series 2007-OA4 | |
| | * |
| Defendant. | |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### AMENDED COMPLAINT AND JURY TRIAL DEMAND [1]

Pursuant to Fed.R.Civ.P. 15(a)(1)(B), plaintiff Barbara Ann Kelly, *pro se*, files this Amended Complaint and Jury Trial Demand (the "Complaint") against defendant U.S. BANK, NA, Successor Trustee to BANK OF AMERICA, NA, Successor In Interest to LASALLE BANK, NA, As Trustee, on Behalf of the Holders of the WAMU MORTGAGE Pass-Through Certificates, Series 2007-OA4, and does allege as follows:

### PARTIES

1.      Plaintiff Barbara Ann Kelly ("Kelly" or "Plaintiff") is a natural person who is a resident of the State of Maryland.

---

[1] A *pro se* plaintiff is held to a "'less stringent'" standard than a lawyer, and the Court must liberally construe a *pro se* plaintiff's complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

1

2.     Defendant U.S. Bank ("U.S. Bank" or "Defendant") is a national banking association with a principal place of business in Minneapolis, Minnesota.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1332 because this action involves citizens of different states, and is for a sum greater than seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

4.     This Court has jurisdiction under 28 U.S.C. § 2201, *et seq.*, because Plaintiff is seeking a declaration from this Court regarding her rights to xxxx. Defendant contests Plaintiff's position concerning the parties' rights and obligations with regard to the xxx, specifically Plaintiff's right to xxx, and thus a true and actual controversy exists between the parties. The Court is vested, under 28 U.S.C. § 2201, with the power to declare the rights and obligations of the parties in this action and to provide any other relief that may be necessary.

5.     This Court has personal jurisdiction over the parties. Personal jurisdiction over the Defendant is appropriate because at all relevant times the Defendant has transacted business in Maryland and currently transacts business in Maryland.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant is an entity subject to this Court's personal jurisdiction, a substantial part of the conduct, events and omissions giving rise to the claims occurred within this District, and the parties regularly transact business in this District.

## FACTS

7.     On February 17, 1999, Kelly and her husband, Gregory B. Myers ("Myers"), purchased residential property located at 4505 Wetherill Road, Bethesda, Maryland 20816 (the "Bethesda Property") as tenants by the entireties. Kelly and Myers have continuously owned the Bethesda Property as tenants by the entireties since February 17, 1999.

2

8.      On March 30, 2007, Plaintiff executed an Adjustable Rate Note in the amount of $1,775,000.00 (the "Note"). The Note states "Lender is Washington Mutual Bank, FA" ("WAMU"). The Note was not executed under seal.

9.      On March 30, 2007, Kelly and Myers executed a Deed of Trust, which was amended by an Adjustable Rate Rider (the "Deed of Trust"). The Deed of Trust was not executed under seal.

10.     In or around February 2010, Kelly requested that Defendant modify the Note and Deed of Trust (the Note and the Deed of Trust being collectively referred to as the "Loan"). On March 23, 2010, the Defendant's agent, Chase Home Finance LLC ("Chase"), advised Plaintiff that it had performed a "Quality Analysis" of Plaintiff's Loan and related documentation, and that on March 12, 2010 Chase had a "perfected file" – meaning Chase does not require any further documentation from Plaintiff. See copy of MEMO attached hereto as **Exhibit A**.

11.     On April 5, 2010, Chase provided Plaintiff with an executed "Trial Plan Agreement" (the "Modification Agreement"). The Modification Agreement was issued under the "Chase Modification Program" or "CMP" (the Modification Agreement was <u>not</u> issued under the "Home Affordable Modification Program" or "HAMP"). A copy of the Modification Agreement is attached hereto as **Exhibit B**. The Modification Agreement, *inter alia*, states:

> Trial Plan Agreement
> Account:            **3012394254**
> Property Address:   **4505 WETHERILL RD**
>                     **BETHESDA, MARYLAND 20816**
>
> **Chase Home Finance LLC ("CHASE")** wants to help you stay in your home. We offer various programs for customers who are experiencing hardships that prevent them from making their home loan payments. We are writing regarding your recent request for a loan modification on the above-referenced account. This letter is to notify you that we have received and reviewed your verification of income documentation.

> The required first payment of **$6,529.35** must be made using the
> payment coupons enclosed, sent in the form of check, certified
> funds, or cashier's check payable to **CHASE PAYMENT
> PROCESSING**, and mailed to the following address by **MAY 01,
> 2010**. \*\*\*
>
> **Please note that the Trial Plan will not be valid until the first
> payment is received by CHASE as indicated above.** \*\*\*
>
> \*\*\* After successful completion of the Trial Period Plan, **CHASE**
> will send you a Modification Agreement for your signature which
> will modify the Loan as necessary to reflect this new payment
> amount.

(Emphasis in original).

12.    On April 29, 2010, pursuant to the terms of the Modification Agreement, Plaintiff

sent by Federal Express a check in the amount of $6,529.35 payable to Chase Payment Processing

for the first payment due May 1, 2010, using the payment coupon provided by Chase. A copy of

the May 1, 2010 payment is attached hereto as **Exhibit C**.

13.    On July 14, 2010, Chase sent Plaintiff a letter, *inter alia*, stating "[t]hank you for

making your payments during your trial mortgage modification period." A copy of the July 14,

2010 letter is attached hereto as **Exhibit D**. On July 21, 2010, Chase sent Plaintiff a second

letter, *inter alia*, stating "[t]hank you for making your payments during your trial mortgage

modification period." A copy of the July 21, 2010 letter is attached hereto as **Exhibit E**.

14.    On April 13, 2011, U.S. Bank National Association entered into a Consent Order

with the Comptroller of the Currency of the United States of America (the "Consent Order"). A

copy of the Consent Order is attached hereto as **Exhibit F**.

15.    On or about March 2013, Plaintiff received a notice ("Reference Number:

1601522380") (the "Notice") specifically referencing Plaintiff's Loan number and the Bethesda

Property address, which states "[t]he Board of Governors of the Federal Reserve System and the

Office of the Comptroller of the Currency (federal bank regulators) have required an

4

Independent Foreclosure Review to identify customers who may have been financially injured as a result of errors, misrepresentations, or other deficiencies made during the foreclosure process." The Notice further states, "Washington Mutual will provide relevant documents along with any findings and recommendations related to your request for review to the independent consultant for review. Washington Mutual may be asked to clarify or confirm facts and disclose reasons for events that occurred related to the foreclosure process. You could be asked to provide additional information or documentation. Because the review process will be a thorough and complete examination of many details and documents, the review could take several months." A copy of the Notice is attached hereto as **Exhibit G**.

     16.     On April 12, 2013, Plaintiff received a subsequent notice ("Reference Number: 1601522380") (the "Second Notice"), which states "[y]ou were recently sent a notice that you are eligible to receive a payment as a result of an agreement between federal banking regulators and JPMorgan Chase in connection with an enforcement action related to deficient mortgage servicing and foreclosure processes. *** Earlier this year, JPMorgan Chase entered into an agreement with federal banking regulators-the Office of Comptroller of the Currency and the Board of Governors of the Federal Reserve System. This agreement resolved the Independent Foreclosure Review required by the regulators. Additional information about this agreement can be found at www.occ.gov and www.federalreserve.gov." [2] A copy of the Second Notice is attached hereto as **Exhibit H**.

     17.     On July 15, 2013, Chase sent Plaintiff a letter (the "2013 Letter"). A copy of the 2013 Letter is attached hereto as **Exhibit I**. The 2013 Letter, *inter alia*, states:

        Modification cancelled
        Account:         3012394254
        Property Address:   4505 Wetherill Road

---

[2] This Court may take judicial notice of matters of public record and documents attached to the Complaint. *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Bethesda, MD 20816-0000

As of the date of this letter, we have not received the documents required to evaluate your request for a modification of the above-referenced account. Therefore, your request has been cancelled.

18. On August 12, 2013, Defendant filed an Order to Docket action in the Circuit Court for Montgomery County, Maryland, Civil Case No: 380148-V (the "2013 Foreclosure Action"). The 2013 Foreclosure Action included an Affidavit of Debt dated January 25, 2013 (the "Affidavit of Debt"), signed by Monique D. Hamilton, Vice President of JP Morgan Chase Bank, National Association ("JP Morgan"). A copy of the Affidavit of Debt is attached hereto as **Exhibit J**. The Affidavit of Debt, *inter alia*, states:

> Chase is the servicer of the subject loan and is authorized to act on behalf of the secured party to the mortgage or deed of trust that is the subject of this foreclosure action on residential property. *** There has been a default under the terms of the promissory note and deed of trust/mortgage/secured instrument. The nature of the default is the failure to make required payments, as the payment that was due February 1, 2010 has not been made. Under the Definitions set forth by the Commissioner of Financial Regulation, Date of Default means the first calendar day after the borrower has failed to meet the borrower s obligations under the terms of the debt instrument where the debt instrument characterizes that failure as a default. Accordingly, under this definition, Borrower's Date of Default is February 2, 2010. *** The Borrower did not subsequently make payments to bring the loan current, and the entire loan balance has been accelerated and is now due and owing.

19. On August 28, 2013, Chase filed a motion to dismiss the 2013 Foreclosure Action without prejudice. On September 17, 2013, the Circuit Court entered an Order dismissing the 2013 Foreclosure Action without prejudice.

20. On October 28, 2013, in response to a subpoena in another action, Dawn Hurley, a "banking officer [and] operation analyst" who "represent[s] Bank of America as record custodian at court appearances and depositions," testified under oath that she oversaw an internal

6

Bank of America, NA[3] inquiry and disclaimed any knowledge of the existence of the Loan. Ms. Hurley further testified "[t]he information was searched by the name of the defendants in the subpoena" - which included Barbara Ann Kelly - and Bank of America, NA could not locate any records suggesting it to have ever handled any loans for Barbara Ann Kelly, and that Bank of America, NA has no knowledge of any lending activity involving Barbara Ann Kelly. A copy of Ms. Hurley's deposition transcript is attached hereto as **Exhibit K**.

21. On August 29, 2014, Defendant filed an Order to Docket action in the Circuit Court for Montgomery County, Maryland, Civil Case No: 394829-V (the "2014 Foreclosure Action"). The 2014 Order to Docket Action contains an *Affidavit Certifying Ownership of Debt Instrument and that Copy of Note is a True and Accurate Copy* dated July 14, 2014 (the "Affidavit Certifying Debt Instrument") which states, "the copy of the Note filed in this foreclosure case is a true and accurate copy of said Note." A copy of the Affidavit Certifying Debt Instrument is attached hereto as **Exhibit L**.

22. The 2014 Order to Docket Action also contains an *Affidavit of the Date and Nature of Default* dated July 14, 2014 (the "Affidavit of Default") which states "Borrower defaulted on February 2, 2010, for failure to make the payments as required under the loan documents." A copy of the Affidavit of Default is attached hereto as **Exhibit M**.

23. On February 13, 2015, in the 2014 Foreclosure Action, Plaintiff filed a *Verified Motion to Stay Sale of Property and Dismiss Foreclosure Action and Request for Hearing* (the "Motion to Stay").

24. On March 5, 2015, counsel for Defendant agreed in writing, "our client will not proceed with any sale, including advertising any sale, until the Motion to Stay is resolved" (the

---

[3] Bank of America, NA is the *putative* predecessor Trustee to U.S. Bank, NA as Trustee for the Defendant Trust in the instant case.

"March 5, 2015 Agreement"). A copy of the March 5, 2015 Agreement is attached hereto as **Exhibit N.**

25.    On August 18, 2015, Defendant produced a document titled "Contact History Report" (the "Contact History Report"). The Contact History Report contains an entry dated August 16, 2013 which states, "closed FC process **as loan is current**" A copy of the Contact History Report ("Page 50 of 50") is attached hereto as **Exhibit O.**

26.    On October 28, 2015, Plaintiff filed a *Notice of Interlocutory Appeal* to the Maryland Court of Special Appeals, appealing the order of the Circuit Court for Montgomery County, Maryland denying Plaintiff's Motion to Stay (the "Appeal"). The Appeal is currently pending and unresolved in the Maryland Court of Special Appeals (September Term, 2015, No. 1905).

27.    On November 18, 2015, Myers filed a voluntary petition for bankruptcy relief under the reorganization provisions of Chapter 11 of Tile 11 of the United States Code in the United States Bankruptcy Court for the District of Maryland, captioned *In re: Gregory B. Myers*, Case No. 15-26033 WIL (the "Bankruptcy Case").[4]

28.    On June 23, 2016, in Myers' Bankruptcy Case, the Defendant filed a *Motion for Relief from the Automatic Stay with Respect to 4505 Wetherill Road, Bethesda, MD 20816* (the "Motion to Lift Stay").[5] On June 29, 2017, the bankruptcy court entered a *Consent Order Modifying Relief from Stay* (the "Lift Stay Order").[6]

---

[4] *See In re Alvarez*, 733 F.3d 136 (2013) ("only the *debtor's interest* in the estate, rather than the complete entireties estate, was before the bankruptcy court"). Thus, only Myers' *interest* in the Bethesda Property is part of Myers' bankruptcy estate (i.e., Plaintiff's interest in the Bethesda Property is *not* part of Myers' bankruptcy estate).

[5] Defendant did not serve Plaintiff with a copy of the Defendant's Motion to Lift Stay.

[6] Plaintiff did not consent to the Lift Stay Order, and Plaintiff was not served with a copy of the Lift Stay Order.

## COUNT I
### Breach of Contract
### (the "Modification Agreement")

29.     Plaintiff incorporates each and every preceding paragraph of this Amended Complaint as though fully set forth herein.

30.     Plaintiff and Defendant entered into the Modification Agreement and Plaintiff made the Payments to Defendant pursuant to the terms of the Modification Agreement, which Payments constitute consideration to the Defendant.  The Modification Agreement is a valid, binding, and enforceable contract between Plaintiff and Defendant.[7]

31.     Upon Plaintiff making the Payments to Defendant pursuant to the terms of the Modification Agreement, Defendant was obligated to send Plaintiff a "Modification Agreement … which will modify the Loan."

32.     Upon Plaintiff making the Payments to Defendant pursuant to the terms of the Modification Agreement, Defendant was prohibited from commencing or continuing collection and/or foreclosure proceedings against the Bethesda Property or the Plaintiff.

33.     After Plaintiff made the required Payments to Defendant pursuant to the terms of the Modification Agreement, Defendant materially breached the Agreement by failing to send Plaintiff a "Modification Agreement … which will modify the Loan."

34.     After Plaintiff made the required Payments to Defendant pursuant to the terms of the Modification Agreement, Defendant materially breached the Agreement by commencing and continuing collection and foreclosure proceedings against the Bethesda Property and the Plaintiff.

---

[7] *Neil v. Wells Fargo Bank, N.A.*, 596 F. App'x 194 (4th Cir. 2014).

35.     Pursuant to the terms of the Modification Agreement, Plaintiff was not in default of the Note and/or the Deed of Trust, and the Defendant had no right to foreclose on the Bethesda Property.

36.     As a result of Defendant's material breach of the Modification Agreement, Plaintiff has been materially harmed, and has incurred various material damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, commencing and continuing collection and foreclosure proceedings against the Bethesda Property and the Plaintiff.

WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Ten Million Dollars ($10,000,000.00), award punitive damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

### COUNT II
### Breach of Contract
### (the "March 5, 2015 Agreement")

37.     Plaintiff incorporates each and every preceding paragraph of this Amended Complaint as though fully set forth herein.

38.     On February 13, 2015, Plaintiff filed the Motion to Stay.

39.     On March 5, 2015, counsel for Defendant agreed in writing, "our client will not proceed with any sale, including advertising any sale, until the Motion to Stay is resolved." The March 5, 2015 Agreement constitutes a valid and enforceable contract between Plaintiff and Defendant.

40.     On October 28, 2015, Plaintiff filed her Appeal, and the Appeal is currently pending and unresolved in the Maryland Court of Special Appeals (September Term, 2015, No. 1905).

41.     Defendant materially breached the March 5, 2015 Agreement, as is readily admitted by Defendant in Defendant's Motion to Dismiss Plaintiff's Complaint and/or In the Alternative Motion to Transfer (the "Motion to Dismiss") (Doc. 14), filed August 28, 2017 in the instant action ("It is true that Defendant is pursuing a foreclosure on the property" ... "A foreclosure sale is being scheduled").

42.     As a result of Defendant's material breach of the March 5, 2015 Agreement, Plaintiff has been materially harmed, and has incurred various damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, commencing and continuing collection and foreclosure proceedings against the Bethesda Property and the Plaintiff.

WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum in excess of Ten Million Dollars ($10,000,000.00), award punitive damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

## COUNT III
### Detrimental Reliance

43.     Plaintiff incorporates each and every preceding paragraph of this Amended Complaint as though fully set forth herein.

44.     The Modification Agreement constitutes a clear and definite promise of the Defendant to the Plaintiff.

45.     Defendant should have expected that the Modification Agreement would induce action on the part of the Plaintiff.

46.     The Modification Agreement did induce action on the part of the Plaintiff.

47.     The detriment caused by the Defendant can only now be avoided by the

11

enforcement of the promises contained in the Modification Agreement.

48.     As a result of Defendant's actions, Plaintiff has been materially harmed, and has incurred various damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, commencing and continuing collection and foreclosure proceedings against the Bethesda Property and the Plaintiff.

WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum in excess of Ten Million Dollars ($10,000,000.00), award punitive damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

## COUNT IV
### Negligent Misrepresentation

49.     Plaintiff incorporates each and every preceding paragraph of this Amended Complaint as though fully set forth herein.

50.     Defendant had a duty of care to the Plaintiff to fulfill its obligations and promises under the Modification Agreement.

51.     The Defendant materially breached its duty of care to the Plaintiff by failing to fulfill its obligations and promises under the Modification Agreement.

52.     As a result of the Defendant's material breach of its duty of care to the Plaintiff by failing to fulfill its obligations and promises under the Modification Agreement, Plaintiff has been materially harmed, and has incurred various damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, commencing and continuing collection and foreclosure proceedings against the Bethesda Property and the Plaintiff.

. WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum in excess of Ten Million Dollars ($10,000,000.00), award punitive damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

## COUNT V
### Negligence

53. Plaintiff incorporates each and every preceding paragraph of this Amended Complaint as though fully set forth herein.

54. Defendant had a duty of care to the Plaintiff to fulfill its obligations and promises under the Modification Agreement.

55. The Defendant materially breached its duty of care to the Plaintiff by failing to fulfill its obligations and promises under the Modification Agreement.

56. As a result of the Defendant's material breach of its duty of care to the Plaintiff by failing to fulfill its obligations and promises under the Modification Agreement, Plaintiff has been materially harmed, and has incurred various damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, commencing and continuing collection and foreclosure proceedings against the Bethesda Property and the Plaintiff.

. WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum in excess of Ten Million Dollars ($10,000,000.00), award punitive damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

## COUNT VI
### Fraudulent Inducement; Constructive Fraud; Fraudulent Misrepresentation

13

57.    Plaintiff incorporates each and every preceding paragraph of this Amended Complaint as though fully set forth herein.

58.    Plaintiff reasonably relied on the Defendant's representations and promises contained in the Modification Agreement.

59.    The Defendant made false statements of material fact related to the Modification Agreement.

60.    The Defendant knew that the statements were false or made the statements without knowledge of the statements' truth or falsity.

61.    The Defendant intended for the false statements to induce Plaintiff to enter into the Modification Agreement.

62.    As a consequence of Plaintiff's reliance on the Defendant's false statements of material fact, Plaintiff suffered material damages and has been materially harmed, and has incurred various damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, commencing and continuing collection and foreclosure proceedings against the Bethesda Property and the Plaintiff.

WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum in excess of Ten Million Dollars ($10,000,000.00), award punitive damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

## COUNT VII
### Slander of Title

63.    Plaintiff incorporates each and every preceding paragraph of this Amended Complaint as though fully set forth herein.

14

64.     Upon Plaintiff making the Payments to Defendant pursuant to the terms of the Modification Agreement, Defendant was prohibited from commencing or continuing collection and/or foreclosure proceedings against the Bethesda Property or the Plaintiff.

65.     After Plaintiff made the required Payments to Defendant pursuant to the terms of the Modification Agreement, Defendant materially breached the Agreement by commencing the 2013 Foreclosure Action and the 2014 Foreclosure Action, constituting the publication of matter to third persons which matter is derogatory to the Plaintiff and Plaintiff's title to her Bethesda Property, and which actions which were calculated to prevent others from dealing with Plaintiff and her Bethesda Property, or otherwise to interfere with her relations with others to her disadvantage.

66.     As a result of the Defendant's actions, Plaintiff has been materially harmed, and has incurred special damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, hiring multiple counsel to defend the foreclosure proceedings against the Bethesda Property and the Plaintiff.

WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Ten Million Dollars ($10,000,000.00), award punitive damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

### COUNT VIII
**Abuse of Process**

67.     Plaintiff incorporates each and every preceding paragraph of this Amended Complaint as though fully set forth herein.

15

68.     Upon Plaintiff making the Payments to Defendant pursuant to the terms of the Modification Agreement, Defendant was prohibited from commencing or continuing collection and/or foreclosure proceedings against the Bethesda Property or the Plaintiff.

69.     After Plaintiff made the required Payments to Defendant pursuant to the terms of the Modification Agreement, Defendant materially breached the Agreement by commencing the 2013 Foreclosure Action and the 2013 Foreclosure Action, constituting the publication of matter to third persons which matter is derogatory to the Plaintiff and Plaintiff's title to her Bethesda Property, and which actions which were calculated to prevent others from dealing with Plaintiff and her Bethesda Property, or otherwise to interfere with her relations with others to her disadvantage.

70.     Plaintiff's actions constitute an abuse of process.

71.     As a result of the Defendant's actions, Plaintiff has been materially harmed, and has incurred special damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, hiring multiple counsel to defend the foreclosure proceedings against the Bethesda Property and the Plaintiff.

WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Ten Million Dollars ($10,000,000.00), award punitive damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

## COUNT IX
### Intentional Infliction of Emotional Distress

72.     Plaintiff incorporate each and every preceding paragraph of this Complaint as though fully set forth herein.

16

73.    The Modification Agreement is a valid, binding, and enforceable contract between Plaintiff and Defendant.

74.    The March 5, 2015 Agreement is a valid, binding, and enforceable contract between Plaintiff and Defendant.

75.    Defendant materially breached the terms of the Modification Agreement by instructing its agent(s) to foreclose upon the Bethesda Property (i.e., by commencing the 2013 Foreclosure Action and the 2014 Foreclosure Action).

76.    Defendant materially breached the terms of the March 5, 2015 Agreement ("It is true that Defendant is pursuing a foreclosure on the property" … "A foreclosure sale is being scheduled").

77.    Defendant knew that instructing its agent(s) to foreclose upon the Bethesda Property when there was no default under the Modification Agreement was not justified.

78.    Defendant knew that instructing its agent(s) to pursue a foreclosure on the Bethesda Property ("A foreclosure sale is being scheduled") in contravention of the March 5, 2015 Agreement was not justified.

79.    Defendant knew that its intentional, unlawful, malicious and unjustified actions with respect to Plaintiff and Plaintiff's Bethesda Property were causing Plaintiff to experience severe emotional distress and mental pain and suffering (See Defendant's Motion to Dismiss wherein Defendant admits, "Plaintiff has clearly been going through a difficult financial situation for a number of years. It would not be surprising if that situation was causing her emotional distress with physical manifestations").

80.    The Defendant has intentionally, deliberately, and recklessly inflicted severe emotional distress and mental pain and suffering upon the Plaintiff by refusing to honor its obligations under the Modification Agreement and the March 5, 2015 Agreement.

81.     Defendant's intentional, unlawful, malicious and unjustified actions in an effort to foreclose on Plaintiff's Bethesda Property, without justification, when it knew such acts were causing Plaintiff severe emotional distress and mental pain and suffering, constitutes outrageous conduct.

82.     The Defendant's conduct and that of its agents, was motivated, at least in part, by the potential for unreasonable financial gain, constituting unclean hands.

83.     Plaintiff has suffered severe emotional distress and mental pain and suffering, with accompanying physical symptoms as a result of Defendant's intentional, unlawful, malicious and unjustified conduct.

84.     Plaintiff's emotional distress was so severe that it has physically manifested itself in the following ways: grinding of teeth and cracked tooth due to grinding; constant chest pains; constant headaches; insomnia; nausea; lower back pain; shortness of breath; numbness in neck and arm; panic attacks; anxiety attacks; development of cysts on skin; and development of cancerous lesions on skin.

85.     Plaintiff continues to suffer severe emotional distress and mental pain and suffering with physical manifestations.

86.     Defendant's intentional, unlawful, malicious and unjustified actions in an effort to foreclose on Plaintiff's Bethesda Property, without justification, when it knew such acts were causing Plaintiff severe emotional distress and mental pain and suffering, has caused Plaintiff to suffer severe emotional distress and mental pain and suffering with physical manifestations and thereby materially and irreparably harming Plaintiff.

WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Ten Million Dollars ($10,000,000.00), award punitive

damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

## COUNT X
### Negligent Infliction of Emotional Distress

87. Plaintiff incorporate each and every preceding paragraph of this Complaint as though fully set forth herein.

88. The Modification Agreement is a valid, binding, and enforceable contract between Plaintiff and Defendant.

89. The March 5, 2015 Agreement is a valid, binding, and enforceable contract between Plaintiff and Defendant.

90. Defendant materially breached the terms of the Modification Agreement by instructing its agent(s) to foreclose upon the Bethesda Property (i.e., by commencing the 2013 Foreclosure Action and the 2014 Foreclosure Action).

91. Defendant materially breached the terms of the March 5, 2015 Agreement ("It is true that Defendant is pursuing a foreclosure on the property" … "A foreclosure sale is being scheduled").

92. Defendant knew that instructing its agent(s) to foreclose upon the Bethesda Property when there was no default under the Modification Agreement was not justified.

93. Defendant knew that instructing its agent(s) to pursue a foreclosure on the Bethesda Property ("A foreclosure sale is being scheduled") in contravention of the March 5, 2015 Agreement was not justified.

94. Defendant knew that its intentional, unlawful, malicious and unjustified actions with respect to Plaintiff and Plaintiff's Bethesda Property were causing Plaintiff to experience severe emotional distress and mental pain and suffering (See Defendant's Motion to Dismiss wherein Defendant admits, "Plaintiff has clearly been going through a difficult financial situation

19

for a number of years. It would not be surprising if that situation was causing her emotional distress with physical manifestations").

.   95.   The Defendant has intentionally, deliberately, and recklessly inflicted severe emotional distress and mental pain and suffering upon the Plaintiff by refusing to honor its obligations under the Modification Agreement and the March 5, 2015 Agreement.

96.   Defendant's intentional, unlawful, malicious and unjustified actions in an effort to foreclose on Plaintiff's Bethesda Property, without justification, when it knew such acts were causing Plaintiff severe emotional distress and mental pain and suffering, constitutes outrageous conduct.

97.   The Defendant's conduct and that of its agents, was motivated, at least in part, by the potential for unreasonable financial gain, constituting unclean hands.

98.   Plaintiff has suffered severe emotional distress and mental pain and suffering, with accompanying physical symptoms as a result of Defendant's intentional, unlawful, malicious and unjustified conduct.

99.   Plaintiff's emotional distress was so severe that it has physically manifested itself in the following ways: grinding of teeth and cracked tooth due to grinding; constant chest pains; constant headaches; insomnia; nausea; lower back pain; shortness of breath; numbness in neck and arm; panic attacks; anxiety attacks; development of cysts on skin; and development of cancerous lesions on skin.

100.   Plaintiff continues to suffer severe emotional distress and mental pain and suffering with physical manifestations.

101.   Defendant's intentional, unlawful, malicious and unjustified actions in an effort to foreclose on Plaintiff's Bethesda Property, without justification, when it knew such acts were causing Plaintiff severe emotional distress and mental pain and suffering, has caused Plaintiff to

suffer severe emotional distress and mental pain and suffering with physical manifestations and thereby materially and irreparably harming Plaintiff.

WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Ten Million Dollars ($10,000,000.00), award punitive damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

## COUNT XI
### Maryland Consumer Protection Act

102.    Plaintiff incorporates each and every preceding paragraph of this Amended Complaint as though fully set forth herein.

103.    The Defendant engaged in an unfair and deceptive practice by making false statements of material fact and other material misrepresentations related to the Modification Agreement.

104.    The Defendant knew that the statements were false or made the statements without knowledge of the statements' truth or falsity.

105.    The Defendant intended for the false statements to induce Plaintiff to enter into the Modification Agreement.

106.    Plaintiff reasonably relied on the Defendant's statements, representations and promises to Plaintiff's detriment.

107.    As a consequence of Plaintiff's reliance on the Defendant's false statements of material fact, Plaintiff suffered material damages and has been materially harmed, and has incurred various damages, costs and expenses associated with Plaintiff being forced to deal with the improper and unlawful actions of Defendant and its agents, including without limitation, Plaintiff's credit being destroyed, Plaintiff's employment prospects being destroyed, and Plaintiff suffering emotional distress and mental anguish with consequential physical injury.

WHEREFORE, Plaintiff requests judgment in favor of Plaintiff, and against Defendant, for money damages in a sum not less than Ten Million Dollars ($10,000,000.00), award punitive damages, award Plaintiff her attorneys' fees and suit costs incurred in connection with her prosecution of this action, and afford such other and further relief as may be just and proper.

RESPECTFULLY SUBMITTED on this 13th day of October, 2017.

Barbara Ann Kelly, *pro se*
4505 Wetherill Road
Bethesda, Maryland 20816
(301) 325-3528
bakellymyers@verizon.net

## JURY TRIAL DEMAND

Plaintiff Barbara Ann Kelly does hereby demand a trial by jury on all counts of her Complaint so triable.

Barbara Ann Kelly, *pro se*

22

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of October, 2017, a copy of the foregoing was served via email to the following:

Daniel A. Glass, Esq.
Eckert, Seamans, Cherin & Mellott, LLC
1717 Pennsylvania Ave., NW, 12th Floor
Washington, DC 20006
E-mail: DGlass@eckertseamans.com
*Attorneys for Defendant, US Bank*

Barbara Ann Kelly, *pro se*

23

# Exhibit N

Barbara Ann Kelly

April 4, 2018

The Honorable Paul W. Grimm
United States District Court for the District of Maryland
6500 Cherrywood Lane
Greenbelt, MD 20770

Re:   *Barbara Ann Kelly v. WaMu Mortgage Pass-Through Certificates Series 2007-OA4 Trust*
      United States District Court Case No.: 8:17-cv-01812-PWG

Dear Judge Grimm:

        Plaintiff Barbara Ann Kelly's Amended Complaint and Jury Trial Demand, filed October 13, 2017 (Doc.
21), states in paragraph 4:

        4. This Court has jurisdiction under 28 U.S.C. § 2201, *et seq.,* because Plaintiff is seeking a
        declaration from this Court regarding her rights to xxxx. Defendant contests Plaintiff's position
        concerning the parties' rights and obligations with regard to the xxx, specifically Plaintiff's right to
        xxx, and thus a true and actual controversy exists between the parties. The Court is vested, under 28
        U.S.C. § 2201, with the power to declare the rights and obligations of the parties in this action and to
        provide any other relief that may be necessary.

        Plaintiff inadvertently failed to include a count for declaratory and injunctive relief in the Amended
Complaint, which Plaintiff clearly intended to include. Pursuant to this Court's July 5, 2017 Letter Order, Plaintiff
Barbara Ann Kelly respectfully requests that this Court issue an Order permitting her to file a second amended
complaint to: (i) add Gregory B. Myers as a party plaintiff (Mr. Myers is an owner of the property which is the
subject of this action); and (ii) include a count for declaratory and injunctive relief. Ms. Kelly also requests
permission to file a motion for summary judgment. In support of this request, Ms. Kelly states as follows:

**I.      Pursuant to the Maryland Court of Special Appeals reported opinion in *Blackstone v. Sharma* and
*Shanahan v. Marvastian*, 233 Md. App. 58, 161 A.3d 718 (Md. Ct. Spec. App., June 6, 2017),[1] the Trust is
legally barred, as a matter of law, from taking any action to "collect" on the Note or Deed of Trust.**

        On June 6, 2017, the Maryland Court of Special Appeals issued a reported opinion **[Exhibit A]** in the
consolidated cases of *Blackstone v. Sharma* and *Shanahan v. Marvastian*, 233 Md. App. 58, 161 A.3d 718 (Md. Ct.
Spec. App., June 6, 2017)[2] (hereinafter referred to as "*Blackstone*"), holding that a foreign statutory trust - such as
the Defendant herein - is required to be licensed under the Maryland Collection Agency Licensing Act (the
"MCALA") as a "collection agency" where it is "collecting a consumer claim the person owns, *if the claim was in
default when the person acquired it*[.]" Md. Code, B.R. § 7-101(c)(1)(ii). The Court of Special Appeals further held,
citing *Finch v. LVNV Funding, LLC*, 212 Md. App. 748, 758–64 (2013), that without a license, a foreign statutory
trust acting as a "collection agency" has no authority to file suit against the debtor, and accordingly, any "judgment
entered in favor of an unlicensed debt collector constitutes a void judgment[.]" *Id.* at 764.

        The Defendant, "WaMu Mortgage Pass-Through Certificates Series 2007-OA4 Trust" (the "Trust") - a
foreign [Delaware] statutory trust - is unlawfully attempting to "collect[] a consumer claim" from Kelly, which
"claim" was declared to be in default *years before* the Trust "acquired" the "claim." This reality is readily apparent
when reviewing the following timeline:

---

[1] The Maryland Court of Appeals accepted *Blackstone v. Sharma*, 170 A.3d 290 (2017), 456 Md. 53, Pet. Docket No. 193, Sept.
Term, 2017. Oral argument has concluded, but no decision has been issued as of the date of this letter.
[2] Both *Blackstone v. Sharma* and *Shanahan v. Marvastian* originated in Montgomery County Circuit Court.

1

**March 30, 2007:** Kelly obtains a loan from Washington Mutual Bank, FA (the "Loan"), together with an Adjustable Rate Note (the "Note") and Deed of Trust (the "Deed of Trust") ostensibly securing residential property located at 4505 Wetherill Road, Bethesda, Maryland, 20816 (the "Property"), which Property is owned by Ms. Kelly and Mr. Myers as tenants by the entireties.[3]

**September 25, 2008:** Pursuant to a Purchase and Assumption Agreement, JPMorgan Chase Bank, National Association purchased substantially all of the assets of Washington Mutual Bank from the FDIC as receiver of Washington Mutual Bank.

**February 5, 2010:** "Chase Home Finance LLC" sends Kelly a notice of default in "RE: Loan Number 3012394254" which, *inter alia,* states "You have missed more than one monthly payment" and "As of the date of this Notice, the amount required to cure your delinquent home loan is $13,022.61." The referenced letter includes a "DEBT VALIDATION NOTICE" which states, "The creditor to whom this amount is owed is Chase Home Finance LLC…The purpose of this communication is to collect the indebtedness due, or, in the alternative, to repossess the property which is the security of such debt." The referenced letter state, "THE INFORMATION ABOVE IS PROVIDED IN COMPLIANCE WITH THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT."

**January 25, 2011:** The Law Offices of Shapiro & Burson, LLP sends Kelly a letter in connection with the Loan, including a notice required by the Fair Debt Collections Practices Act, 15 U.S.C. Section 1692, et seq., which states "The creditor to whom the debt is owed is Chase Home Finance, LLC."

**April 5, 2011:** The Law Offices of Shapiro & Burson, LLP sends Kelly a letter which states "This response constitutes verification as required by the FDCPA…The current creditor is Chase Home Finance, LLC."

**February 19, 2013:** JPMorgan Chase Bank, National Association executes an "ASSIGNMENT" recorded March 14, 2013 in Book 46319, Page 276 in the official records of Montgomery County, MD, *inter alia,* stating "JPMorgan Chase Bank, National Association [], Assignor herein, its successor and assigns, has assigned and transferred to [] WaMu Mortgage Pass-Through Certificates Series 2007-OA4 Trust, Assignee herein, …its successors and assigns, all right, title, and interest in and unto [the] Deed of Trust."

**June 27, 2014:** Morris Hardwick Schneider, LLC, Attorneys at Law, sends Kelly a letter which states that the Trust "acquired" the Loan (i.e., "the claim") "by virtue of an Assignment of Deed of Trust filed in the Land Records of Montgomery County, Maryland on March 14, 2013."

**August 29, 2014:** The Trust - through its agents, the "Substitute Trustees" - files an "Order to Docket" action in the Circuit Court for Montgomery County, Maryland, Case No.: 394829-V, styled *Mark H Wittstadt et al. v. Barbara Ann Kelly et al.* (the "Order to Docket").[4] The Order to Docket includes an "Affidavit of the Date and Nature of Default" which, *inter alia,* states "Borrower defaulted on February 2, 2010, for failure to make the payments as required under the loan documents."

---

[3] Myers executed the Deed of Trust as an owner of the Property, but Myers did not execute the Note.

[4] On October 15, 2015, the Trust filed a *Notice of Substitution of Parties* "substitute[ing] in as Plaintiffs in this matter" Kristine D. Brown, et al., such that Mark H. Wittstadt, et al. "are no longer parties to this litigation." The Plaintiffs also requested that the Clerk of the Circuit Court "re-caption" the Order to Docket action as "Brown v. Kelly." Kristine D. Brown is a principal attorney with Shapiro & Brown, LLP which, upon information and belief, is the successor to Shapiro & Burson, LLP.

2

**September 29, 2015:** Montgomery County Circuit Court (Quirk, J.) enters an Order in Case No. 394829-V denying Kelly's and Myers' Motion to Stay Sale of Property and Dismiss Foreclosure Action (the "Order"). Critically, the Order contains no findings of fact or conclusions of law.[5]

Under these facts and circumstances, the MCALA requires that the Trust be licensed as a "collection agency" before it can take any action to "collect" on the Loan, either directly or indirectly. It is undisputed that the Trust is not now, and never has been, licensed in Maryland as a "collection agency" under the MCALA (or as a mortgage lender pursuant to the Maryland Mortgage Lender Law). Based upon the undisputed record evidence, and pursuant to the Court of Special Appeals reported opinion in *Blackstone*, the Trust is legally barred from maintaining the Order to Docket action in Case No. 394829-V, and the Order entered in Case No. 394829-V in favor of the Trust is **void** as a matter of law. Further, pursuant to Maryland Rule 14-211(e), Kelly is entitled to an appropriate order from this Court ordering that Case No.: 394829-V be dismissed without prejudice.

## II.     The statute of limitations has elapsed and the Trust cannot enforce the Note.

Pursuant to Md Code Ann Cts & Jud Proc. § 5-101, "[a] civil action at law shall be filed within **three years** from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." The Note at issue in this case is not an instrument under seal. The "Affidavit of the Date and Nature of Default" states "Borrower defaulted on February 2, 2010, for failure to make the payments as required under the loan documents." The Trust did not file the Order to Docket action until August 29, 2014 - more than four years later - and thus the Order to Docket action is untimely and must be dismissed with prejudice. Kelly is further entitled to an Order from this Court that any suit on the Note is barred by limitations as a matter of law.

## III.     The "endorsement" on the Note is admittedly a forgery.

The Note at issue in this case contains an undated, blank endorsement stamp ***purportedly*** made by "Cynthia Riley, Vice President [of] Washington Mutual Bank, FA." The undated, blank endorsement stamp is a ***forgery***. The January 15, 2013 deposition transcript of Cynthia Riley [**Exhibit C**] - which transcript has been admitted into evidence in numerous state and federal courts - states in relevant part:

> Q You've indicated that it was your team that did the endorsements of the stamps in Jacksonville. Did you yourself ever endorse any of the notes?
> A No.
> Q Never?
> A I never put an endorsement stamp on the notes.

WHEREFORE, Plaintiff avers that the above facts and law are dispositive of the legal issues, claims and defenses in this case, and Plaintiff respectfully suggests that granting the requested relief will prompt an end to the litigation between the parties and help conserve judicial resources.

RESPECTFULLY SUBMITTED on this 4th day of April, 2018.

_____
Barbara Ann Kelly, *pro se*

cc:     Daniel A. Glass, Esq., *Counsel for Defendant*

---

[5] Notably, on August 28, 2015, Judge Quirk entered the underlying OPINION [**Exhibit B**] in *Blackstone v. Sharma* (Case No. 397954-V), *inter alia*, concluding "In this case, there is no dispute that Ventures Trust lacks a license pursuant to Bus. Reg. § 7-301(a). Therefore, pursuant to the analysis above, Defendants "ha[ve] established that…plaintiff[s] ha[ve] no right to foreclose in the pending action pursuant to Md. Rule 14-211(e). Accordingly, this foreclosure proceeding is DISMISSED WITHOUT PREJUDICE."